# EXHIBIT 1

**General Civil and Domestic Relations Case Filing Information Form**

☒ Superior or ☐ State Court of  Forsyth  County

⬧ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1704-3**

Judge Philip C. Smith

SEP 22, 2025 01:40 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

| **For Clerk Use Only** | |
|---|---|
| Date Filed 09-22-2025 | Case Number 25CV-1704-3 |
| MM-DD-YYYY | |

**Plaintiff(s)**

Franklin Woods Partners, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Franklin Woods, LLC | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**

Fidelis Underwriting Limited

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Volante Specialty Risk, LLC | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** Bersinger, D. Austin     **Bar Number** 144792     **Self-Represented** ☐

**Check one case type and, if applicable, one sub-type in one box.**

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☑ Contract
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☑ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

25CV-1692-2          25CV-1693-2
**Case Number**          **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1704-3**
**Judge Philip C. Smith**
**SEP 22, 2025 01:40 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
### STATE OF GEORGIA

| | | |
|---|---|---|
| **FRANKLIN WOODS PARTNERS, LLC** | ) | |
| **and FRANKLIN WOODS, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.** |
| | ) | |
| **FIDELIS UNDERWRITING LIMITED** | ) | |
| **and VOLANTE SPECIALTY RISK, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Franklin Woods Partners, LLC ("Franklin Woods Partners") and Franklin Woods, LLC ("Franklin Woods") (collectively "Plaintiffs") file this Complaint against Defendants Fidelis Underwriting Limited ("Fidelis" or the "Insurer") and Volante Specialty Risk, LLC ("Volante Specialty"), and allege as follows:

### SUMMARY OF ACTION

This case involves the Insurer's breach of its contractual obligations under a 170(h) Liability Insurance Policy (No. VFP/FL/20451/2021/1) (the "Policy"). The Policy serves one purpose—insuring losses resulting from adjustments to the tax deduction that Franklin Woods claimed for the donation of a conservation easement over certain real property. The Insurer understood the transaction at issue, was provided relevant due diligence documents during the underwriting process, knew the asserted value of the conservation easement, and understood how the appraiser reached that value. The Insurer fully understood the risk that it insured, including the risk that the IRS might attempt to reduce or disallow the claimed deduction, and took handsome premiums in excess of $550,000 from the partnership, reflective of the risk it agreed to insure.

Now that this precise risk is coming to pass, the Insurer is refusing to either allow Franklin Woods to accept a reasonable, in-limits settlement offer from the IRS or to indemnify the partnership and its investors for the insured loss resulting from the settlement.

For more than a year, the Plaintiffs have sought in good faith to obtain the Insurer's consent to accept the IRS's reasonable settlement offer and to secure a clear coverage position under the Policy. Despite repeated requests, the Insurer has refused to consent (or, alternatively, to waive the consent requirement) and, even more fundamentally, has refused to provide any formal coverage determination at all. This refusal appears calculated: by declining to either consent or deny coverage, the Insurer is engaging in delay and strategic ambiguity designed to manufacture policy defenses that would otherwise be unavailable had it acted in good faith. The Insurer's prolonged inaction has left the Plaintiffs with no choice but to file this lawsuit—one of at least nineteen lawsuits necessitated by similar conduct—in order to protect their rights under the Policy and ensure that the coverage for which they paid substantial premiums is honored.

As explained below, the Insurer has breached its contractual obligations by unreasonably withholding its consent to accept the IRS's settlement offer, delaying payment under the Policy, failing to timely or adequately respond to Plaintiffs' claims, refusing to provide substantive coverage positions or adequately investigate the claims, and deliberately interfering with Plaintiffs' efforts to recover losses under the Policy. The Plaintiffs are entitled to damages from the Insurer as a result of these breaches.

## PARTIES, JURISDICTION, VENUE

1.       Plaintiff Franklin Woods Partners is a Delaware limited liability company with its principal place of business located at 2207 2nd Ave N., Birmingham, Alabama 35203. Franklin Woods Partners is the Named Insured under the Policy. Franklin Woods Partners' investors are

citizens of multiple states throughout the country, including Georgia. The investors in Franklin Woods Partners are also insured under the Policy.

2.      Plaintiff Franklin Woods is an Alabama limited liability company with its principal place of business located at 2207 2nd Ave N., Birmingham, Alabama 35203. Franklin Woods is also an insured under the Policy.

3.      Fidelis is a foreign surplus lines insurer registered in the United Kingdom with its principal place of business in London, England. Fidelis continuously and systematically transacted the business of insurance in Georgia through Volante Specialty. Fidelis insures risks in the United States through its managing general agent, Volante Specialty, which is domiciled in Georgia. Volante Specialty had authority (actual or apparent) to bind Fidelis to contracts in the United States and executed the Policy in this action on behalf of Fidelis. Fidelis is subject to personal jurisdiction in Georgia, where its managing general agent is domiciled and operates to bind coverage for risks in the United States.

4.      Finally, Fidelis, as a non-admitted insurer offering surplus lines coverage through Volante Specialty in Georgia, is subject to jurisdiction under O.C.G.A. § 33-5-34, or, in any event, plainly understood that it could be sued in Georgia based on the surplus lines coverage it sold in the United States through its Georgia agent. Therefore, pursuant to O.C.G.A. § 33-5-34, Fidelis may be served with process through the Georgia Commissioner of Insurance, John King, c/o Jeremy Betts, 2 Martin Luther King Jr. Dr. SE, Suite 704 West Tower, Atlanta, Georgia 30334, with a copy to Fidelis c/o Locke Lord LLP, 200 Vesey Street, Brookfield Place, New York, New York 10281.

5.      Volante Specialty is a limited liability company organized under the laws of the state of Delaware with a principal place of business located at 1595 Peachtree Parkway, Suite 204-

376, Cumming, Georgia, 30041. Volante Specialty possesses an active Georgia Principal Agency license (License Number 208812). Volante Specialty may be served through its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

6. While the Policy contains a provision related to the arbitration of disputes arising under the Policy, such provision is unenforceable under O.C.G.A. § 9-9-2(c)(3).

7. Venue is proper in this Court pursuant to GA. CONST. Art. 6, s. 2, para. IV, O.C.G.A. §§ 14-2-510(b)(1) & (4), O.C.G.A. § 33-47-6, and O.C.G.A. § 33-5-34. Volante Specialty maintains its principal office in Forsyth County, and, as alleged above, Fidelis has insured surplus lines coverages in the United States through its managing general agent, Volante Specialty, which is domiciled in Georgia, and maintains its registered office in this County. Venue in this action is proper in the County where Fidelis' managing general agent is present, and where the policy was written, sold, paid for, and notice of loss was provided.

## FACTUAL ALLEGATIONS

### I. *Conservation Easements*

8. A conservation easement is a nonpossessory interest in real property that restricts the use of the subject property to preserve the conservation values of the property.

9. In 1980, Congress codified taxpayers' ability to claim a federal tax deduction for the donation of a conservation easement at 26 U.S.C. § 170(h).

10. Under 26 U.S.C. § 170(h), if a taxpayer donates a conservation easement to a qualified organization exclusively for conservation purposes, the taxpayer may claim a deduction equal to the fair market value ("FMV") of the donated conservation easement.

11. The FMV of a conservation easement generally is determined using the "before-and-after" valuation method.

4

12. The "before-and-after" valuation method requires an appraiser to determine (i) the FMV of the subject property before the donation, and (ii) the FMV of the subject property after the donation. The difference between these two values is the FMV of the donated conservation easement. *See* Treas. Reg. § 1.170A-14(h)(3).

## II.     The Underlying Conservation Easement Donation

13. Franklin Woods acquired 164.09 acres of primarily unimproved real property in Elmore County, Alabama (the "Property") through a capital contribution in connection with its analysis of the Property's mineral resources for potential development or conservation.

14. Franklin Woods Partners was created in November 2021 to raise funds from investors to purchase an interest in Franklin Woods.

15. After assessment of the Property's mineral reserves, the investors in Franklin Woods Partners were given three options with respect to the Property: (i) develop a crushed stone quarry and processing operation on the Property, (ii) donate a conservation easement over the Property, or (iii) hold the Property for long-term appreciation.

16. As part of this purpose, the Plaintiffs retained independent experts to determine the Property's highest and best use ("HBU") and FMV.

17. The due diligence performed by these experts indicated the Property's HBU was the development of a crushed stone quarry and processing operation due to the Property's significant mineral reserves.

18. An independent appraiser valued the Property at its HBU using the discounted cash flow ("DCF")/income valuation methodology.

19. Using the DCF/income valuation methodology, the appraiser determined that the FMV of the Property was approximately $40,745,000.

5

20.     The appraiser further determined that, if Franklin Woods donated a conservation easement over the Property that prohibited mining, the FMV of the Property would be $245,000.

21.     Using the "before-and-after" valuation methodology for conservation easements, the appraiser accordingly determined that the FMV of the conservation easement would be worth approximately $40,500,000.

22.     To participate in the transaction, the investors of Franklin Woods Partners contributed, in aggregate, $7,904,650 for interests in Franklin Woods Partners through a private placement.

23.     Franklin Woods Partners purchased a 98% interest in Franklin Woods pursuant to an agreement dated December 13, 2021.

24.     The investors in Franklin Woods Partners voted to donate a conservation easement under 26 U.S.C. § 170(h) over the Property, which Franklin Woods donated to the Southern Conservation Trust, Inc., by deed dated December 29, 2021.

25.     Following the donation of the conservation easement, the appraiser prepared a qualified appraisal dated February 22, 2022 for tax purposes to substantiate the FMV of the donated conservation easement.

26.     The appraiser concluded in the qualified appraisal that the FMV of the donated conservation easement was $40,500,000.

27.     Franklin Woods reported a $40,500,000 noncash charitable deduction on its 2021 Form 1065 for the donation of the conservation easement based on the appraisal.

28.     Because Franklin Woods is a partnership for federal tax purposes, 98% of the reported deduction, or $39,690,00, was reported on Franklin Woods Partners' 2021 Form 1065.

29.     Because Franklin Woods Partners is also a partnership for federal tax purposes, the investors in Franklin Woods Partners claimed the full deduction reported by Franklin Woods Partners on their respective tax returns in 2021 and later years.

### III.     The Policy

30.     In connection with the conservation easement donation, the investors in Franklin Woods Partners were presented with the opportunity to purchase a specialized insurance policy that serves one fundamental purpose—to protect and indemnify Franklin Woods Partners and its investors if the IRS rejected or reduced the amount of the tax deduction claimed by Franklin Woods for its donated conservation easement.

31.     Volante Specialty was formed in November 2019 for the primary purpose of placing 170(h) policies with partnerships that had donated conservation easements.

32.     Volante Specialty was at all relevant times acting as an agent of Volante Global Limited.

33.     When the investors in Franklin Woods Partners voted to conserve the Franklin Woods property, they further voted to require Franklin Woods Partners to use partnership funds to acquire the Policy to insure the claimed deduction for Franklin Woods' donated conservation easement.

34.     On December 28,2021, Franklin Woods Partners informed Volante Specialty that the private placement had closed and that the majority of Franklin Woods Partners' investors had voted to obtain a 170(h) insurance policy.

35.     In connection with the underwriting process for the requested policy, Volante Specialty was provided with significant due diligence and background materials regarding Franklin Woods' conservation easement donation, including the corporate documents of Franklin

7

Woods Partners and Franklin Woods, the private placement memorandum explaining the transaction and identifying its risks, and the appraisal used to determine the value of the deduction.

36.    On December 28, 2021, Volante Specialty issued an Investor 170(h) Liability Quote and an invoice for the required premiums for the requested 170(h) policy.

37.    On December 28, 2021, Volante Specialty received the executed Quote to bind coverage as outlined in the Quote. A copy of the executed Quote and Invoice is attached as **Exhibit A**.

38.    By December 31, 2021, Franklin Woods Partners paid the full premium pursuant to the invoice.

39.    Also on December 31, 2021, Volante Specialty confirmed that the Policy had been bound.

40.    In return for the payment of a $554,750 premium, Fidelis issued the Policy (No. VFP/FL/20451/2021/1). The Policy is attached as **Exhibit B**. (Policy at p. 1.)

41.    David Hamilton of Volante Specialty is listed in the Policy declarations as the authorized representative of Fidelis.

42.    The policy period is from December 31, 2021 through October 15, 2022, with an extended reporting period to October 15, 2025. (*Id.* at p. 1.)

43.    The "**Named Insured**" on the Policy is Franklin Woods Partners. (*Id.*)

44.    Franklin Woods and the investors in Franklin Woods and Franklin Woods Partners are insureds under the Policy. (*Id.* at p. 1, 4-5.)

45.    The Policy's Insuring Agreement provides:

> **We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold you liable for **a wrongful act**, provided the **loss** results from a

> **proceeding** first initiated against **you** and reported to **us** during the **policy period**.
> 1. On behalf of an **insured person**, **we** will pay **loss** that the **insured person** becomes legally obligated to pay and that is not indemnified by an **insured organization**.
> 2. On behalf of an **insured organization**, **we** will pay **loss** that the **insured organization** pays as indemnification to an **insured person** to the extent permitted or required by law or the applicable operating agreement.

(*Id.* at p. 4.)

46.    "**Loss**" means "damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**." (*Id.* at p. 5.)

47.    "**Insured**" means "each **insured person** and each **insured organization**." (*Id.* at p. 4.)

48.    "**Insured person**" means "a person or entity who, at any time during the **policy period**, is: 1. an **investor**; or 2. a **member** in a **company**." (*Id.*)

49.    "**Insured organization**" means "at any time during the **policy period**: 1. the **named insured**; 2. any **company**; and 3. any **controlled entity**." (*Id.* at p. 5.)

50.    "**Wrongful act**" means "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an **insured** or third party retained by an **insured** for whose conduct the **insured** can be held legally liable concerning a report or filing with a **taxing authority** with respect to the purpose, value, partnership tax treatment, or any other aspect of the **named insured's** conservation easement or fee simple donation of real property." (*Id.* at p. 6.)

51.    "**Company**" means "any entities or partnerships as stated in Item 1 of Declarations page or identified as such by endorsement to this policy." (*Id.* at p. 4.)

52. **"Investor"** means "an individual or entity that is a **member** of at least one **controlled entity** or **company** at any time during the **policy period**." (*Id.*)

53. **"Member"** means "the individuals or entities identified as such for any **insured organization** by the articles of incorporation, bylaws, operating agreement, or partnership agreement of such **insured organization** at any time during the **policy period**." (*Id.* at p. 5.)

54. **"Controlled entity"** means "any entity which: 1. the **named insured** controls or otherwise has the ability to direct the managerial decisions of such entity at any time during the performance of the business operations giving rise to the **proceeding**; and 2. is created for the purpose of owning and controlling a specific property from which a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170 is made." (*Id.* at p. 4.)

55. **"Proceeding"** means "an investigation, audit, administrative action, or judicial action against **you**, initiated or brought by any **taxing authority**, concerning the tax treatment of a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170. A mere inquiry by a **taxing authority** is not a **proceeding**. An inquiry will become a **proceeding** only after **you** have received a "Notice of Beginning of Administrative Proceedings" or equivalent notice." (*Id.* at p. 5.)

56. Through its agent Volante Specialty, the Insurer was provided due diligence related to the purchase of the Franklin Woods interest, the donation of the conservation easement, and the valuation of that donation.

57. At the time of binding, the Insurer was aware of the risks associated with transactions involving conservation easement donations, including IRS scrutiny of transactions identified as Syndicated Conservation Easement Transactions ("SCETs"), which were identified

as listed transactions by the IRS in its Notice 2017-10, 2017-4 I.R.B. 544 issued on December 23, 2016 and the IRS's coordinated compliance campaign focused on SCETs.

### IV.    *The IRS Audit*

58.     Franklin Woods received notice that the IRS selected its 2021 tax return for examination on or about October 5, 2023.

59.     Between October 1, 2023 and October 1, 2024, the United States Tax Court ("Tax Court") issued seven opinions resolving twelve cases that involved the valuation of conservation easements.

60.     In each of these seven opinions, the Tax Court (i) found in favor of the IRS on the valuation of the subject conservation easement, allowing the taxpayer to claim no more than 10.07% of the reported deduction, (ii) rejected the taxpayer's use of the DCF/income valuation methodology to value the subject easement, and (iii) imposed a 40% strict liability penalty on the taxpayer.

61.     By notice IR-2024-174 dated June 26, 2024, the IRS announced a time-limited settlement offer for certain taxpayers under examination who participated in SCETs ("Nondocketed Settlement Program").

62.     The IRS issued a letter to Franklin Woods dated July 9, 2024 inviting it to resolve its tax dispute in full through the participation in the Nondocketed Settlement Program ("Election Letter"). The Election Letter is attached as **Exhibit C**.

63.     Under the terms of the Nondocketed Settlement Program, the IRS proposed to (i) disallow the $40,500,000 noncash charitable deduction for the conservation easement donation; (ii) instead, allow an "other deduction" of $7,904,650; (iii) set the applicable tax rate for

establishing the liability to 21%, (iv) reduce the applicable tax penalty from 40% to 5%, and (v) require statutory interest to continue to accrue until the liability is paid in full ("IRS Settlement").

64.     The Plaintiffs provided the Insurer with notice of the proposal outlined in the IRS Settlement by email on July 10, 2024, and requested that the Insurer consent to the acceptance of the offer.

65.     The IRS Settlement guarantees Franklin Woods a deduction of $7,904,650, or 19.52% of Franklin Woods' reported deduction (a higher percentage of deduction than allowed in any of the recently decided Tax Court cases), and a reduced penalty rate of 5% (a lower penalty rate than the rate imposed in any of the recently decided Tax Court cases).

66.     Based on the terms of the IRS Settlement and the current status of case law regarding the valuation of conservation easements, including the recent Tax Court decisions adopting the IRS's valuation methodology for similarly situated conservation easement cases, the investors in Franklin Woods Partners voted to elect into the Nondocketed Settlement Program.

67.     Since October 1, 2024, the Tax Court has issued eight additional opinions resolving fourteen additional cases that involved the valuation of conservation easements.

68.     In each of these eight opinions, the Tax Court once again (i) found in favor of the IRS on the valuation of the subject conservation easement, allowing the taxpayer to claim no more than 13.36% of the reported deduction, (ii) rejected the taxpayer's use of the DCF/income valuation methodology to value the subject easement, and (iii) imposed a 40% strict liability penalty on the taxpayer

## V.    *The Claim and Claim Communications*

69.    Plaintiffs notified the Insurer of the start of the IRS examination on November 3, 2023 by email and provided the Insurer with regular updates regarding the IRS examination throughout the examination process.

70.    At the end of the examination, Plaintiffs were provided with the IRS Settlement, which, as stated, offered to resolve the examination by fixing Franklin Woods' allowable deduction at $7,904,650, applying a reduced 5% penalty, and otherwise establishing Plaintiffs' tax liability on terms significantly more favorable than those imposed in recent Tax Court decisions.

71.    The Plaintiffs provided the Insurer with notice of the proposal outlined in the IRS Settlement by email on July 10, 2024, and requested that the Insurer consent to the acceptance of the offer.

72.    Plaintiffs reiterated their request that the Insurer consent to the IRS Settlement on August 23, 2024, and detailed the reasons that the IRS Settlement is reasonable. Plaintiffs requested that the Insurer consent to the acceptance of the settlement offer by August 30, 2024.  A copy of the correspondence is attached as **Exhibit D**.

73.    Plaintiffs responded to requests for information from the counsel for Insurer regarding the IRS Settlement on August 30, 2024 and November 4, 2024. Copies of the correspondence are attached as **Exhibits E** and **F**, respectively.

74.    By email dated September 3, 2024, the Insurer indicated to Franklin Woods Partners that the Insurer did not view election into the Nondocketed Settlement Program to be a settlement that required Insurer consent under the Policy. A copy of the correspondence is attached as **Exhibit G**.

75.     Plaintiffs communicated the investors' vote to elect into the Nondocketed Settlement Program to the Insurer on September 9, 2024, based on the Insurer's position that such an election was not a settlement that required Insurer consent under the Policy.

76.     By email dated September 13, 2024, the Insurer reiterated to Delta Partners that the Insurer did not view election into the Nondocketed Settlement Program to be a settlement that required Insurer consent under the Policy. A copy of the correspondence is attached as **Exhibit H**.

77.     Based on the Insurer's position that such an election was not a settlement that required Insurer consent under the Policy, Franklin Woods elected into the Nondocketed Settlement Program.

78.     On February 10, 2025, Franklin Woods received the Form 906 (Closing Agreement on Final Determination Covering Specific Matters) for the final resolution of the IRS Settlement ("Form 906").

79.     By letter dated February 28, 2025, Franklin Partners provided the Insurer with a copy of the Form 906 and demanded that the Insurer provide consent to the IRS Settlement or agree to waive the consent requirement for the IRS Settlement and further provide its coverage position with respect to the IRS Settlement. A copy of the correspondence is attached as **Exhibit I**.

80.     By letter dated March 14, 2025, counsel for the Insurer indicated that (i) the Insurer would not provide a position regarding the substantive coverage aspects of the IRS Settlement, and (ii) the Insurer would not accommodate Franklin Woods Partners' request for consent or an agreement not to raise lack of consent as to the IRS Settlement. A copy of the correspondence is attached as **Exhibit J**

81.    By letter dated August 8, 2025, Franklin Woods Partners demanded that the Insurer: (i) provide either consent to the IRS Settlement or agree to waive the consent requirement for the IRS Settlement, (ii) agree to fund the amounts that would be due under the Policy as a result of the IRS Settlement, (iii) provide its coverage position with respect to the IRS Settlement, and (iv) provide copies of any policy for this matter that purports to affect the rights of any insurer under the Policy ("Demand Letter"). A copy of the Demand Letter is attached as **Exhibit K**.

82.    The Insurer never responded to the Demand Letter and has been unable to articulate a reasonable theory of success in this case or identify an expert who will opine on the reasonableness of the Insurer's position.

83.    Since receiving the Election Letter, Plaintiffs have consistently communicated with the Insurer regarding relevant IRS deadlines related to the settlement offer. The current deadline for accepting the IRS Settlement and paying the liability owed is September 30, 2025.

84.    Plaintiffs offered to make tax counsel available to discuss the reasonableness of the IRS Settlement on multiple occasions, including in the letter dated August 30, 2024, the letter dated November 4, 2024, and the Demand Letter. The Insurer refused to accept these offers despite counsel for the Insurer discussing the reasonableness of the IRS Settlement with tax counsel for other similarly situated cases on July 22 and 23, 2025, who unanimously confirmed the reasonableness of the IRS Settlement in light of the state of the law in the Tax Court regarding the valuation of conservation easements.

85.    The amount due to accept the IRS Settlement exceeds the aggregate limits of the Policy.

86.     Plaintiffs have sufficient funds to pay the $237,750 retention under the Policy and the difference between the aggregate limits payable under the Policy and the liability due under the IRS Settlement.

87.     In light of the plain reasonableness of the IRS Settlement, the Insurer has violated its obligations under the Policy by baselessly refusing to provide the coverage Plaintiffs purchased. The Insurer was aware of the risks associated with conservation easement donations when it issued the Policy and accepted over half a million dollars in premiums. Having assumed that risk, the Insurer must be held accountable to honor its bargain and indemnify Plaintiffs under the clear terms of the Policy.

## COUNT I – BREACH OF CONTRACT
(Against Fidelis)

88.     The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 87 of this Complaint as if fully restated herein.

89.     The insuring provision of the Investor 170(h) Liability Policy obligates Fidelis to indemnify Plaintiffs' loss resulting from a proceeding, as defined in the policy, that was reported to the Insurer during the policy period, so long as the loss is determined by either a final, non-appealable order or "the settlement of a proceeding with [the Insurer's] prior written consent."

90.     Under the Policy, the Insurer promised as follows with respect to its consideration of any settlement offer:

> You agree not to undertake settlement negotiations or enter into any settlement agreements that would result in a loss without our prior written consent, *which we agree not to withhold unreasonably*.

(Policy at p. 9) (emphasis added).

91.     The IRS Settlement is clearly reasonable as a potential resolution and should have been consented to by the Insurer. That reasonableness is blatantly obvious because the IRS

Settlement provides Franklin Woods with a larger percentage of its previously reported deduction than the Tax Court has allowed in any case since October 2023.

92.     Additionally, the IRS Settlement (i) reduces the applicable penalty percentage from the 40% strict liability penalty that the Tax Court has applied in every decided case since October 2023 to 5%, (ii) caps the effective tax rate for any tax liability to 21%, and (iii) allows Franklin Woods to avoid the cost to litigate this matter and the continued accrual of interest on any potential liability.

93.     While the Insurer has refused to accept Plaintiffs' repeated offers to discuss the reasonableness of the IRS Settlement with Franklin Woods' tax counsel, tax counsel for other similarly situated taxpayers have unanimously advised the Insurer of the reasonableness of the IRS Settlement. To date, the Insurer and its counsel have not identified any authority suggesting that the IRS Settlement is somehow unreasonable.

94.     In the fifteen opinions that the Tax Court has issued since October 2023, the Tax Court has rejected each argument that the Insurer has raised as a basis for withholding its consent to settle this case, as well as other similar arguments. Of those cases, the best outcome that any taxpayer received was *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6, where the taxpayer was allowed a deduction of 13.36% of its reported deduction, assessed a 40% strict liability penalty, and was subjected to a 39.6% maximum tax rate. By contrast, the IRS Settlement offered to Franklin Woods secures a larger deduction of 19.52% of Franklin Woods' reported deduction, imposes only a 5% penalty, and caps the applicable tax rate to 21%. This outcome is materially more favorable than even the most taxpayer-friendly Tax Court decision issued in nearly 2 years, further confirming the reasonableness of the IRS Settlement, as illustrated in the chart below.

17

| Case Name | Percentage of Deduction Allowed | Penalty Percentage Applied | Maximum Potential Tax Rate |
|---|---|---|---|
| IRS Settlement Offer for Franklin Woods | 19.52% | 5% | 21% |
| *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6 | 13.36% | 40% | 39.6% |

95.    The Insurer has failed to provide any rational basis, let alone the required reasonable basis, for withholding its consent to allow Franklin Woods to settle this case.

96.    Franklin Woods' deadline for accepting the IRS Settlement is September 30, 2025.

97.    The Insurer has the duty to perform its obligations under the Policy with good faith and fair dealing and has the express obligation to consent to a reasonable settlement agreement between Franklin Woods and the IRS.

98.    The Insurer breached this duty to the Plaintiffs by withholding consent for Franklin Woods' acceptance of the IRS Settlement when such a withholding of consent is unreasonable considering the circumstances, particularly since the Insurer's actions appear calculated in hope of causing Franklin Woods to lose the opportunity to accept the IRS Settlement.

99.    Plaintiffs suffered damages as a direct and proximate result of Insurer's breach, including but not limited to incurring additional defense costs and fees related to their negotiations with the IRS and the failure to receive the benefit of its bargain, including the insurance policy limits that were purchased by payment of the policy premiums.

## COUNT II – DECLARATORY JUDGMENT
### (Against Fidelis)

100.    The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 99 of this Complaint as if fully restated herein.

101.    This Court is authorized to grant declaratory judgment relief under the Georgia Declaratory Judgment Act, O.C.G.A. § 9-4-2 *et seq*.

102.    In Georgia, insurance contracts are liberally construed in favor of coverage, and conditions and provisions of insurance contracts are strictly construed against the insurer.

103.    Under the Policy, the Insurer promised as follows:

We will indemnify you for loss in excess of any applicable retention resulting from any proceeding against you seeking to hold you liable for a wrongful act, provided the loss results from a proceeding first initiated against you and reported to us during the policy period.

(Policy at p. 4.)

104.    Franklin Woods' acceptance of the IRS Settlement would trigger a covered "Loss" under the Policy, as the definition of "Loss" includes "damages, judgments and settlements incurred by an insured as a result of a wrongful act by such insured causing a reduction in tax savings to an investor by reason of an adjustment." (*Id.* at p. 5.)

105.    A "wrongful act" is

any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an insured or third party retained by an insured for whose conduct the insured can be held legally liable concerning a report or filing with a taxing authority with respect to the purpose, value, partnership tax treatment, or any other aspect of the . . . conservation easement.

(*Id.* at p. 6.)

106.    An "adjustment" is:

a reduction in the allowable tax deduction ordered by a taxing authority claimed by an insured that causes the actual tax deduction allowed by such taxing authority multiplied by 41% to be less than the sum of (a) such insured's original contribution to a company or the controlled entity that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties and interest where insurable by law imposed by any taxing authority due to such a covered reduction in tax savings.

(*Id.* at p. 4.)

107.    The losses are due to alleged errors related to the valuation of the donated conservation easement and in the reporting of the Franklin Woods deduction.

108.    Acceptance of the IRS Settlement would result in a reduction in the investors' tax savings from the conservation easement donation by reason of an "adjustment." The allowed deduction under the IRS Settlement of $7,904,650, multiplied by 41%, is $3,240,906.50. This is less than $10,039,759.70, which represents the investors' original capital contribution, plus any penalties and interest resulting from the settlement.

109.    Despite the Policy's clear language, the Insurer has expressly not acknowledged that the liabilities resulting from an adjustment to Franklin Woods' reported deduction for the conservation easement, including the liability that would result from Franklin Woods' acceptance of the IRS Settlement, would trigger a covered "Loss" under the Policy.

110.    If such liabilities do not result in a covered Loss, the Policy could not bind the Insurer to any risk at all, transforming the parties' agreement into an improper, illusory insurance policy.

111.    By reason of the foregoing, an actual, justiciable, and substantial controversy exists between Plaintiffs and Insurer, and a declaratory judgment order pursuant to O.C.G.A. § 9-4-5 is warranted to declare liabilities resulting from an adjustment to Franklin Woods' reported deduction for the conservation easement, including the liability that would result from Franklin Woods' acceptance of the IRS Settlement, constitutes a covered "Loss" under the Policy.

## COUNT III – COMMON LAW BAD FAITH

112.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 111 of this Complaint as if fully restated herein.

113.    At all relevant times, a valid contract of insurance existed between Plaintiffs and Insurer, as set forth in the Policy.

114.    At all relevant times, the Insurer owed Plaintiffs a duty to act reasonably and prudently when presented with an opportunity to settle, and to give Plaintiffs' interests the same faithful consideration it gives its own interests.

115.    Plaintiffs complied with all conditions precedent under the Policy and provided timely notice of their claim, including notice of the IRS Settlement, the investor vote to elect into the Nondocketed Settlement Program, and Form 906 to accept the IRS Settlement. Plaintiffs also responded in good faith to all requests for information from the Insurer and their representatives, including providing relevant documentation and making tax counsel available to facilitate the Insurer's evaluation of the claim.

116.    The IRS Settlement further substantially mitigates Plaintiffs' exposure to losses and was objectively reasonable based on available legal authority and factual developments.

117.    The IRS Settlement constitutes a reasonable opportunity to resolve Plaintiffs' liability within the Policy's aggregate limits, as Plaintiffs have sufficient funds to satisfy the $237,750 retention under the Policy and to cover any liability above the Policy's aggregate limits.

118.    Plaintiffs repeatedly requested that the Insurer consent to the IRS Settlement or, alternatively, waive the consent requirement under the Policy so that Plaintiffs can protect themselves from further loss.

119.    Despite full knowledge of the relevant facts, and despite repeated requests by Plaintiffs, the Insurer has unreasonably refused to consent to the IRS Settlement (or, alternatively, waive the consent requirement), has deliberately withheld providing a formal coverage position, and has failed and refused to provide the contractual indemnity afforded by the Policy for the IRS Settlement.

120.    The Insurer's refusal to act reasonably and as an ordinarily prudent insurer would, under the circumstances—including its refusal to consent, refusal to provide a coverage position, and refusal to pay the covered loss—is a breach of its obligations of good faith and fair dealing under Georgia law.

121.    As a direct and proximate result of the Insurer's breaches, Plaintiffs have suffered damages.

## COUNT IV – NEGLIGENT MISREPRESENTATION
### (In the alternative)

122.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 121 of this Complaint as if fully restated herein.

123.    Volante Specialty served as the managing agent for the Insurer.

124.    Prior to the procurement of the Policy, Plaintiffs engaged in extensive conversations with Volante Specialty and its representatives as to the needs of the Plaintiffs and the intended purpose of the Policy was specifically a policy that would provide insurance coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement for the Property in 2021.

125.    Volante Specialty procured the quote for the Policy, presented the quote to the Plaintiffs, and expressly represented that the quote would be for a policy that would provide the requested coverage.

126.    Based on the representations of Volante Specialty, Plaintiffs agreed to purchase the Policy.

127.    Plaintiffs' reliance on the representations of Volante Specialty and its agent was reasonable as Volante Specialty served as the managing agent for the Insurer (and David Hamilton would be identified as the "Authorised Representative" on the declarations page of the Policy).

128.    Volante Specialty knew or should have known that the Insurer would deny this type of claim, or alternatively, that the requested coverage was not available under the Policy.

129.    Plaintiffs would not have purchased the Policy if no coverage existed for tax deductions claimed due to the donation of a conservation easement under 26 U.S.C. § 170(h). Rather, Plaintiffs would have sought an alternative insurance policy to insure the specific risks related to coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement for the Property.

130.    As a direct and proximate result of Volante Specialty's negligent misrepresentation, Plaintiffs suffered damages, including and not limited to all potential benefits under the insurance policy, plus any additional costs incurred by the Plaintiffs based on the Insurer's delay and failure to pay.

## COUNT V – NEGLIGENT PROCUREMENT
### (In the alternative)

131.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 130 of this Complaint as if fully restated herein.

132.    Prior to the procurement of the Policy, Plaintiffs engaged in extensive conversations with Volante Specialty and its representatives regarding the needs of the Plaintiffs and the intended purpose of the Policy: to provide insurance coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement in 2021.

133.    Volante Specialty held itself out as an expert in the field of insurance and with respect to the specific coverage that Plaintiffs requested with respect to their 2021 conservation easement donation.

134.    Volante Specialty procured the quote for the Policy, presented the quote to the Plaintiffs, expressly represented that the quote would be for a policy that would provide the requested coverage, and procured the Policy for Plaintiffs.

135.    If the Court finds that the Policy does not provide the requested coverage, then Volante Specialty is liable for negligent procurement of the Policy.

136.    Plaintiffs were damaged by Volante Specialty's negligent procurement in the amount of the policy limits, plus its attorneys' fees.

## COUNT VI – ATTORNEYS' FEES AND EXPENSES OF LITIGATION
### (In the alternative)

137.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 136 of this Complaint as if fully restated herein.

138.    As demonstrated above, the Insurer and Volante Specialty have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense, requiring the institution of this litigation.

139.    Pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover their costs and expenses of litigation, including reasonable attorneys' fees.

140.    Therefore, Plaintiffs request that this Court award attorneys' fees, court costs, and any other expenses as permitted under Georgia law.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for relief as follows:

a.  The Plaintiffs request that this Court enter judgment in their favor and against the Defendants.

24

b.  The Plaintiffs request a declaration that the Plaintiffs' acceptance of the IRS Settlement would constitute a covered "Loss" under the Policy.

c.  The Plaintiffs request that this Court hold that the Insurer has breached its contractual obligations to the Plaintiffs by unreasonably withholding its consent to allow Franklin Woods to accept the IRS Settlement, unreasonably refusing to agree to not raise lack of consent as a basis for denying any claim under the Policy, and failing to indemnify Franklin Woods, and award the Plaintiffs all legally recoverable damages proximately caused by the Insurer's breach and bad faith conduct, to include compensatory and punitive damages, costs of the action, attorneys' fees, and pre- and post-judgment interest;

d.  The Plaintiffs request that this Court award all damages caused by the Insurer's bad faith conduct, including losses in excess of policy limits, interest accrual, reasonable attorneys' fees, and other damages proximately resulting from the Insurer's refusal to act reasonably in connection with the IRS Settlement.

e.  The Plaintiffs request, alternatively, that this Court hold that Volante Specialty negligently misrepresented the coverage of the insurance policy to the detriment of the Plaintiffs, and award Plaintiffs all legally recoverable resulting damages, to include compensatory damages, costs of the action, attorneys' fees, and pre- and post-judgment interest.

f.  The Plaintiffs request, alternatively, that this Court hold that Volante Specialty negligently procured the requested insurance policy to the detriment of the Plaintiffs, and award Plaintiffs all legally recoverable resulting damages, to include the entire

value of the claim, compensatory damages, costs of the action, attorneys' fees, and pre- and post-judgment interest.

g. The Plaintiffs further request an award of their costs and expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

h. The Plaintiffs request such other and further relief as the Court deems proper.

Respectfully submitted this 22nd day of September, 2025.

/s/ D. Austin Bersinger
D. Austin Bersinger
Georgia Bar No. 144792
Bradley Arant Boult Cummings LLP
Promenade Tower
1230 Peachtree Street NE, Suite 2100
Atlanta, Georgia 30309
Tel. 404.868.2042
ABersinger@bradley.com

*Counsel for Plaintiffs*

26

# Exhibit A



**INVESTOR 170(h) LIABILITY QUOTE**

Please find below Investor 170(h) Liability Quote for Franklin Woods Partners, LLC. This is a summary of the terms and conditions:

| | |
|---|---|
| NAMED INSURED: | Franklin Woods Partners, LLC |
| MAILING ADDRESS: | 2015 3rd Ave N, Birmingham, AL 35203 |
| CARRIER: | Fidelis Underwriting Limited |
| PROPOSED POLICY PERIOD: | 12/31/2021 – 10/15/2022<br>12:01 A.M. Standard Time at the Mailing Address shown above<br>Policy periods are based on Insureds Federal Tax Return being filed on an extension basis |
| EXTENDED REPORTING PERIOD: | 10/15/2025 |
| PRIOR ACTS DATE: | 1/1/2021 |
| POLICY LIMIT: | $7,925,000 |
| POLICY RETENTION: | $237,750 |
| POLICY PREMIUM: | $554,750 (Plus applicable taxes) |
| MINIMUM EARNED PREMIUM: | 100% |



**SURPLUS LINES DISCLOSURE**

Alabama

"This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33-5." [33-5-26]

## POLICY PREMIUM AND SURPLUS LINES TAXES SUMMARY

SURPLUS LINES TAX CALCULATION:

| Description | State | Taxable Premium | Stamping Fee | Rate | Tax |
|---|---|---|---|---|---|
| Surplus Lines Tax | Alabama | $554,750 | n/a | 6% | $33,285 |

Total Surplus Lines Taxes & Fees: $33,285

IMPORTANT NOTICE: THE NONADMITTED & REINSURANCE REFORM ACT (NRRA) WENT INTO EFFECT ON JULY 21, 2011. ACCORDINGLY, SURPLUS LINES TAX RATES AND REGULATIONS ARE SUBJECT TO CHANGE WHICH COULD RESULT IN AN INCREASE OR DECREASE OF THE TOTAL SURPLUS TAXES AND FEES OWED ON THIS PLACEMENT. IF A CHANGE IS REQUIRED, WE WILL PROMPTLY NOTIFY YOU. ANY ADDITIONAL TAXES OWED MUST BE PROMPTLY REMITTED TO VOLANTE.

# VOLANTE
### SPECIALTY RISK

# Request to Bind Coverage

**Franklin Woods Partners, LLC**

We have reviewed the proposal and agree to the terms and conditions of the coverages presented. We are requesting coverage to be bound as outlined by coverage line below:

**Coverage:**
Investor 170(h) Liability Policy      ☒

This Authorization to Bind Coverage also acknowledges receipt and review of all disclaimers and disclosures,

including exposures used to develop insurance terms, contained within this proposal

**Signature of Authorized Insurance Representative Date**

CEO
**Title**

Chris Devine
**Print Name**

12/28/21
**Date**

**This proposal does not constitute a binder of insurance. Binding is subject to final carrier approval. The actual terms and conditions of the policy will prevail.**

Alabama License #3000731652



**GREEN ROCK**

To Underwriter:

Re: Warranty Statement for Tax Liability Coverage – Franklin Woods Partners, LLC

After inquiry, the Chief Executive, President and General Counsel has not had any claims or knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim. It is understood and agreed that if such knowledge or information exists any claim or action arising there from is excluded from this proposed coverage.

This warranty statement and all other information which is provided are incorporated into and form the basis of any contract of insurance.

I HEREBY DECLARE that the above statements and particulars are true and I have not suppressed or misstated any material fact and that I agree that this warranty statement shall be the basis of the contract with you, the Underwriters.

Signature:

Date:    (12/28/21)

The signature must be of a person authorized to execute on behalf of the applicant. A copy of this should be retained for your records.

---

**2015 3ᴿᴰ AVE N BIRMINGHAM, AL 35203**          **205-580-1180**



1595 Peachtree Parkway
Ste 204-376
Cumming, GA 30041

Email: annie@vsrlondon.com

| Sponsor: | **Green Rock** | Invoice #: | **99347** |
| RE: | **Franklin Woods Partners, LLC** | Invoice Date: | **12/31/2021** |
| Address: | **2015 3rd Ave N** | Contact: | **Chris Devine** |
| | **Birmingham, AL 35203** | | |

| Effective Date | Policy Type | Description | Total |
|---|---|---|---|
| 12/31/2021 | 170(h) Investor Liability | Premium | $554,750.00 |
| 12/31/2021 | 170(h) Investor Liability | Surplus Lines Taxes and Fees | $33,285.00 |
| | | **Total** | $588,035.00 |

Wiring
Instructions:

(Include Invoice #)
**Volante Specialty Risk, LLC**
**JP Morgan Chase Bank, N.A.**
Account #█████████
Routing #█████████

# Exhibit B

**Investor 170(h) Liability Insurance** 

# Declarations

|  |  |
|---|---|
| **Policy Number:** | **VFP/FL/20451/2021/1** |
| **THIS POLICY IS ISSUED BY:** | Fidelis Underwriting Limited |

**Item 1:**  **Named Insured:**  Franklin Woods Partners, LLC
**Address:**  2015 3rd Ave N, Birmingham, AL 35203

**Item 2:**  **Policy Period:**  From: 12/31/2021
To: 10/15/2022
Both days at 12.01 a.m. Local Standard Time at the Insured's Principal Address

**Item 3:**  **Extended Reporting Period:**  From: 10/15/2022
To: 10/15/2025
Both days at 12.01 a.m. Local Standard Time at the Insured's Principal Address

At the expiration of the **Policy Period** you will have an automatic **Extended Reporting Period** in which to give us written notice of loss arising from **Proceedings** that:

   - are first made against you and reported to us during the **Extended Reporting Period;** and

   - arise from your **Wrongful Acts** performed on or after the **Prior Acts/notice/knowledge** date as specified in Item 8 of the Declarations, but prior to the expiration of the **Extended Reporting Period.**

The premium in respect of the **Extended Reporting Period** is included in the original policy premium as specified in Item 6 of the Declarations and is fully earned at the inception of the **Policy Period.**

The Limit of Liability applicable during the **Extended Reporting Period** will be the remaining available **Limit of Liability**. There will be no separate or additional **Limit of Liability** available for the **Extended Reporting Period**.

**Item 4**  **Limit of Liability:**  USD 7,925,000  Policy Aggregate Limit of Liability
**Per Entity Limit of Liability:**  Not Applicable

| | | | |
|---|---|---|---|
| **Item 5:** | **Retention:** | USD 237,750 | Any one claim |
| **Item 6:** | **Premium:** | USD 554,750 | for the period |
| **Item 7:** | **Continuity Date:** | 1/1/2021 | |
| **Item 8:** | **Prior Acts/notice/knowledge:** | 1/1/2021 | |
| **Item 9:** | **Notice of Loss:** | To Underwriters via: claims@volanteglobal.com | |
| **Item 10:** | **Endorsements:** | Not applicable | |

---

**THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY**

---

**Investor 170(h) Liability Insurance**   VOLANTE GLOBAL

| | | |
|---|---|---|
| *Neil Hamilton* | 1/25/2022 | David Hamilton |
| **Signed** | **Date** | **Authorised Representative** |

# Investor 170(h) Liability Form

**I.    Insuring agreements**

**We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold you liable for a **wrongful act**, provided the **loss** results from a **proceeding** first initiated against **you** and reported to **us** during the **policy period**.

1.    On behalf of an **insured person**, **we** will pay **loss** that the **insured person** becomes legally obligated to pay and that is not indemnified by an **insured organization**.

2.    On behalf of an **insured organization**, **we** will pay **loss** that the **insured organization** pays as indemnification to an **insured person** to the extent permitted or required by law or the applicable operating agreement.

However, **we** will not pay any **loss** unless such **loss** is determined by the:

a.    final, non-appealable adjudication of a **proceeding**; or

b.    the settlement of a **proceeding** with **our** prior written consent.

## II.    Definitions

A.    **Adjustment**    means a reduction in the allowable tax deduction ordered by a **taxing authority** claimed by an **insured** that causes the actual tax deduction allowed by such **taxing authority** multiplied by 41% to be less than the sum of (a) such **insured's** original contribution to a **company** or the **controlled entity** that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties and interest where insurable by law imposed by any **taxing authority** due to such a covered reduction in tax savings.

B.    **Company**    any entities or partnerships as stated in Item 1 of Declarations page or identified as such by endorsement to this policy.

C.    **Claim**    Means **Proceeding**

D.    **Controlled entity**    means any entity which:

1.    the **named insured** controls or otherwise has the ability to direct the managerial decisions of such entity at any time during the performance of the business operations giving rise to the **proceeding**; and

2.    is created for the purpose of owning and controlling a specific property from which a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170 is made.

E.    **Continuity date**    means the date stated as such in Item 7 of the Declarations

F.    **Extended Reporting Period**    means the dates stated as such in Item 3 of the Declarations

G.    **Insured**    means each **insured person** and each **insured organization**.

H.    **Insured person**    means a person or entity who, at any time during the **policy period**, is:

1.    an **investor**; or

2.    a **member** in a **company**.

I.    **Investor**    means an individual or entity that is a **member** of at least one **controlled entity** or **company** at any time during the **policy period**.

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| J. | **Insured organization** | means, at any time during the **policy period**: |

        1.    the **named insured**;

        2.    any **company**; and

        3.    any **controlled entity**.

K. **Limit of Liability** means the amount stated in Item 4 of the Declarations

L. **Loss** means damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**.

**Loss** does not include:

1. amounts for which **you** are not liable;

2. the cost of complying with injunctive relief or any other form of non-monetary relief, compensation, severance, salary, wages, fees, benefits, or overhead of any **insured**;

3. unjust enrichment or the return, restitution, or disgorgement of any fees, costs, expenses, or profit to which **you** are not legally entitled,

4. any reduction in disbursements from tax deductions, dividends, profits, or similar payments due to an **insured person** from an **insured organization**;

5. any amounts paid to an insured person or insured organization in excess of the original capital contribution of that insured person or organization;

6. Amounts associated with defending any proceeding.

7. Fines and Penalties associated with economic gain. As defined in **Penalties & interest**

M. **Member** means the individuals or entities identified as such for any **insured organization** by the articles of incorporation, bylaws, operating agreement, or partnership agreement of such **insured organization** at any time during the **policy period**.

N. **Named insured** means the entity identified in Item 1 of the Declarations.

O. **Penalties & interest** any penalties and interest, where insurable by law, levied upon an Insured by any authorized taxing authority and as determined by final non-appealable adjudication, for the understated amount of taxes which would have originally been owed on the investment amount prior to their investment.

P. **Policy period** means the period of time identified in Item 2 of the Declarations and any Extended Reporting Period identified in Item 3 of the Declarations.

Q. **Pollutants** means any solid, liquid, gaseous, biological, radiological, or thermal irritant or contaminant, including smoke, vapor, asbestos, silica, dust, nanoparticles, fibers, soot, fumes, acids, alkalis, chemicals, germs, and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned, or reclaimed.

R. **Prior Acts/notice/ knowledge** Means the date shown in Item 8 of the Declarations.

S. **Proceeding** means an investigation, audit, administrative action, or judicial action against **you**, initiated or brought by any **taxing authority**, concerning the tax treatment of a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170. A mere inquiry by a **taxing authority** is not a **proceeding**. An inquiry will become a **proceeding** only after **you** have received a "Notice of Beginning of Administrative Proceedings" or equivalent notice.

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| T. | **Related wrongful acts** | means **wrongful acts** that have as a common nexus of any fact, circumstance, event, situation, transaction, cause, or origin, or series of facts, circumstances, events, situations, transactions, causes, or origins. |
| U. | **Retention** | means the amount stated as such in Item 5 of the Declarations with respect to each Coverage Part **you** have purchased. |
| V. | **Taxing authority** | means the Internal Revenue Service (IRS), any State Department of Revenue (DOR), or any municipality or other local government agency. |
| W. | **We**, **us**, or **our** | means the Underwriters identified in the Declarations as issuing this policy. |
| X. | **Wrongful act** | means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an **insured** or third party retained by an **insured** for whose conduct the **insured** can be held legally liable concerning a report or filing with a **taxing authority** with respect to the purpose, value, partnership tax treatment, or any other aspect of the **named insured's** conservation easement or fee simple donation of real property. |
| Y. | **You** or **your** | means each **insured**. |

## III.    Exclusions

**We** will have no obligation to pay any sums under this policy for **loss** incurred in connection with any **proceeding**:

A.  Antitrust/deceptive trade practices

based upon or arising out of any actual or alleged:

1.  false, deceptive, or unfair trade practices;

2.  unfair competition, impairment of competition, restraint of trade, or antitrust violations; or

3.  violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, all including as may be amended, or any similar federal, state, or local statutes, rules, or regulations in or outside the U.S.; or

4.  deceptive or misleading advertising.

B.  Bodily injury/property damage/personal injury

for any actual or alleged:

1.  bodily injury, sickness, disease, death, emotional distress, or mental anguish of any person;

2.  physical damage to, destruction of, or loss of use of any tangible property; or

3.  invasion of privacy, abuse of process, malicious prosecution, libel, slander, defamation, trespass, nuisance, wrongful entry or eviction, false arrest or imprisonment, assault, battery, or loss of consortium.

C.  Breach of contract

based upon or arising out of any actual or alleged breach of any contract or agreement, or any liability of others **you** assume under any contract or agreement; however, this exclusion will not apply to:

1.  liability **you** would have in the absence of the contract or agreement; or

2.  any actual or alleged breach of the articles of incorporation, by-laws, operating agreement, partnership agreement, or other agreement on which the formation and/or management of an **insured organization** is based.

# Investor 170(h) Liability Form

| | | | |
|---|---|---|---|
| D. | Controlled entity outside control of named insured | 1. | based upon or arising out of **wrongful acts** committed by a past or present **controlled entity** while the **named insured** does not have majority ownership or management control of it; or |
| | | 2. | made against a **controlled entity** or anyone acting on its behalf while the **named insured** does not ultimately have majority ownership or management control of it. |

E.  Fraudulent/intentional acts

based upon or arising out of any actual or alleged fraudulent, intentional, malicious, or knowingly wrongful acts or omissions, if a final, non-appealable adjudication establishes that such act or omission was committed.

This exclusion will apply:

1. to an **insured organization** only if the conduct was committed or known by the **manager**, General Partner, Chief Executive Officer, Chief Financial Officer, or General Counsel of the **insured organization**; and

2. separately to each **insured person** and will not apply to any **insured person** who did not commit or have knowledge of such conduct committed by another **insured person**.

F.  Change in Law or Legislation

Any legislative changes in law or amended procedures and or guidance from any taxing authority that impacts the current, future or retroactive tax treatment of an insured person or insured organization

G.  Pollution

for any actual, alleged, or threatened existence, growth, release, discharge, dispersal, or escape of **pollutants**, including any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **pollutants**,

H.  Prior acts/notice/ knowledge

based upon or arising out of any **wrongful act** that:

1. was the subject of any notice given under any other policy of which this policy is a renewal or replacement;

2. was the subject of, or is related to, any prior or pending litigation, **proceeding,** written demand, administrative or regulatory proceeding or investigation, or licensing proceeding that was filed or commenced against **you** and of which **you** had notice prior to the **policy period**; or

3. you had knowledge of before the **Prior Acts/notice/knowledge date** as specified in Item 8 of the Declarations, and there was a reasonable basis to believe that the act, error, or omission could result in a **proceeding**.

This exclusion also applies to any **loss** arising out of the same **wrongful acts** or **related wrongful acts** related to the matters in 1, 2, or 3 above.

# Investor 170(h) Liability Form

| IV. | Order of payments | In the event **loss** resulting from any **proceeding** covered by this policy exceeds the remaining available **Limit of Liability**, **we** will: |
|---|---|---|

|   |   | A. | first pay **loss** covered under Insuring agreement 1. If the **loss** owed under this policy to the **investors** in any one **insured organization** exceeds the remaining **Limit of Liability** applicable to that **insured organization**, **we** will pay **loss** to each **investor** on a pro rata basis according to its equity participation in the **insured organization**. |
|   |   | B. | then pay **loss** covered under Insuring agreement 2. If the **loss** owed under this policy to multiple **insured organizations** exceeds the remaining **Limit of Liability**, **we** will pay **loss** to each **insured organization** on a pro rata basis in proportion to the ratio of the **Limit of Liability** applicable to each **insured organization**. |

**Your** bankruptcy or insolvency will not relieve **us** of any of **our** obligations to prioritize payments under this section of the policy.

| V. | Limits of liability | The maximum **we** will pay for covered **loss** resulting from all **proceedings** first initiated against **you** during the **policy period** or **extended reporting period**, will be as follows: |
|---|---|---|
| A. | Aggregate limit | The Policy Aggregate **Limit of Liability** stated in Item 4 of the Declarations is the maximum amount **we** will pay for all covered **loss** under this policy. **Our** obligations under the policy will cease once the Policy Aggregate **Limit of Liability** is exhausted. |
| B. | Per-entity limit | Coverage for each **company** and each **controlled entity** will be subject to the Per-Entity **Limit of Liability** stated in Item 4 of the Declarations, which the maximum amount **we** will pay for all covered **loss** incurred by that **company** or **controlled entity** and the **members** of such **company** or **controlled entity** in their capacities as such. The Per-Entity **Limit of Liability** will be in excess of any applicable **retention** and will be a part of the Policy Aggregate **Limit of Liability**. Only one Per-Entity **Limit of Liability** will apply to an entity and its **members** even if such entity constitutes both a **company** and a **controlled entity**. |
| C. | Retention | **Our** obligation to pay **loss** under this policy is in excess of any applicable **retention**, as stated in Item 5 of the Declarations, which **you** must pay before **we** will make any payment. Each **insured organization** is responsible for any amount within the **retention** applicable to any **loss** or **proceeding** that affects such **insured organization**. Payments **you** make to avoid or mitigate **loss** under this policy will be credited towards the **retention**, if such payments are made from an escrow account maintained for the benefit of an **investor** or an **insured organization**. Notwithstanding the above, if an **insured organization** affected by any covered **loss** or **proceeding** is unable to pay any applicable **retention** because it is insolvent, an **investor** in such **insured organization** may pay its proportionate share, based on its membership interest in such **insured organization**, of the **retention**. The maximum **we** will pay to any such **investor** is that **investor's** proportionate share, based on its membership interest in such **insured organization**, of the applicable **Limit of Liability**. |
| D. | Related proceedings/wrongful acts | All **proceedings** based upon or arising out of the same **wrongful act** or related **wrongful acts** will be treated as a single **proceeding**, and will be deemed to have been made against **you** on the date the first such **proceeding** was initiated. If, by operation of this provision, the **proceeding** is deemed to have been brought during any period when **we** insured **you**, it will be subject to only one **retention** and one applicable **Limit of Liability**, regardless of the number of claimants, **insureds**, or **proceedings** involved. |

## Investor 170(h) Liability Form

| VI. | **Notice** |
|---|---|

**We** must receive written notice of any **proceeding** or **loss** affecting an **insured organization** as soon as possible after that **insured organization's** Risk Manager, General Counsel, Chief Financial Officer, Managing Partner, or equivalent position, becomes aware of such **proceeding** or **loss**, but in any event, no later than 60 days after the end of the **extended reporting period**; provided.

All notices under this policy must be made in writing by one of the individuals identified above, include a copy of any documents provided to you with in connection with such **proceeding** or **loss**, and be submitted to **us** via the designated email address or mailing address identified in Item 9 of the Declarations.

| VII. | **Defense and settlement** | |
|---|---|---|
| A. | Defense | **We** will have no obligation to: defend any covered **proceedings**, even if such **proceeding** is groundless, false, or fraudulent, or to pay any costs associated with **your** defense, investigation, inquiry, or appeal as to any such **proceeding**. Each **insured** named in any **proceeding** shall undertake to defend such proceeding in good faith and shall not admit liability without Underwriters' prior written consent. |
| B. | Settlement | **You** agree not to undertake settlement negotiations or enter into any settlement agreements that would result in a **loss** without **our** prior written consent, which **we** agree not to withhold unreasonably. |

| VIII. | **Allocation** | | |
|---|---|---|---|
| | | 1. | **We** will not make any payments on account of any portion(s) of **loss** not covered by this policy. If **you** incur both covered **loss** and uncovered loss in connection with the same **proceeding**, whether due to the presence of covered and uncovered persons or matters, **we** and **you** agree to allocate such amounts between covered **loss** and uncovered loss based on **our** and **your** relative exposures. |
| | | 2. | If **you** incur both covered **loss** and uncovered loss as a result of the same **proceeding**, **we** and **you** agree to use reasonable best efforts to agree on an allocation. If **we** and **you** cannot agree on a fair allocation, no presumption as to allocation will exist in any proceeding to determine such allocation. |

# Investor 170(h) Liability Form

| IX. | **Assistance and cooperation** | |
|---|---|---|
| A. | Named insured responsibilities | It will be the responsibility of the **named insured** to act on behalf of all **insureds** with respect to the following: |

1. timely giving and receiving notice of cancellation or non-renewal;

2. timely payment of premium;

3. receipt of return premiums;

4. timely acceptance of changes to this policy; and

5. the right to exercise the Extended Reporting Period.

Notwithstanding the above, an **investor** may exercise the Extended Reporting Period for its own benefit if the **named insured** is unable to meet that obligation. The maximum **we** will pay to any such **investor** is that **investor's** proportionate share, based on its membership interest in the **insured organization** of which it is a **member**, of the applicable limit of liability.

| B. | Duty to cooperate | **You** agree to provide **us** with such information, assistance, and cooperation as **we** may reasonably require in connection with **our** performance under this policy. **You** also agree not to take any action that increases **our** exposure under this policy, prejudices **our** position, or prejudices **your** rights of recovery from others. |
|---|---|---|
| C. | No voluntary payments | Except as it relates to defense of any **proceeding, you** agree not to incur any expense, admit any liability, or assume any obligation without **our** prior written consent. If **you** do so, it will be at **your** own cost and expense. However, this condition does not apply to payments **you** make to avoid or mitigate **loss** under this policy, if such payments are made from an escrow account maintained for the benefit of an **investor** or an **insured organization**. |

| X. | **Other provisions affecting coverage** | |
|---|---|---|
| A. | Alteration and assignment | No change in, modification of, or assignment of interest under this policy will be effective unless made by written endorsement to this policy signed by **our** authorized representative. |
| B. | Bankruptcy or insolvency | **Your** bankruptcy or insolvency will not relieve **us** of any of **our** obligations under this policy. |
| C. | Cancellation | 1. This policy may be cancelled at any time by the **named insured** by giving written notice, which must include the date the cancellation will be effective, to **us** at the address stated in the Declarations. |

2. This policy may be cancelled by **us** by mailing to the **named insured** by registered, certified, or other first class mail, at the **named insured's** address stated in Item 1 of the Declarations, written notice which must include the date the cancellation will be effective. **We** will not cancel this policy for any reason other than non-payment of premium, and the effective date of the cancellation will be no less than ten days after the date of the notice of cancellation.

3.  The mailing of the notice will be sufficient proof of notice, and this policy will terminate at the date and hour specified in the notice.

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| D. | Change in control | If, during the **policy period**, the **named insured** consolidates with, merges into, or sells all or substantially all of its assets to any other person or entity, or any other person or entity acquires ownership or control of the **named insured**, then the **named insured** will provide **us** written notice no later than 30 days after the effective date of such change in control, together with any other information **we** may require. |
| | | Unless **you** and **we** agree in writing otherwise, after the effective date of any change in control, this policy will cover only **loss** arising from **wrongful acts** that took place prior to the change in control. |
| E. | Coverage territory | This Policy applies to **wrongful acts** that take place anywhere in the world. |
| F. | Estates, heirs, legal representatives, spouses, and domestic partners | In the event of an **insured person's** death or disability, this policy will also apply to a **proceeding** brought against the **insured person**: |

1. heirs, executors, administrators, trustees in bankruptcy, assignees, and legal representatives; or

2. lawful spouse or lawful domestic partner,

but only:

1. for a covered **proceeding** arising from the **insured person's wrongful acts**; or

2. in connection with their ownership interest in property sought as recovery in a **covered proceeding** arising from the **insured person's** wrongful acts.

| | | |
|---|---|---|
| G. | Other insurance | Any payment due under this policy is specifically excess of and will not contribute with any other valid and collectible insurance, unless such other insurance is written specifically as excess insurance over this policy. |
| H. | Representations | **You** warrant that all representations made and all materials submitted by **you** or on **your** behalf in connection with the **application** for this policy are, to the best of your knowledge, true, accurate, and not misleading, and agree they were relied on by **us** and were material to **our** decision to issue this policy to **you**. If **you** were aware at the time they were submitted to **us** that any representations or materials were untrue, inaccurate, or misleading in any material respect, **we** are entitled to rescind this policy, but only as to persons or entities with actual knowledge, as follows: |

1. with respect to an **insured person**, **we** will not impute the knowledge of one **insured person** to any other **insured person**;

2. with respect to an **insured organization**, only knowledge possessed by the Manager, Chief Executive Officer, Chief Financial Officer, or General Counsel of an **insured organization** will be imputed to the **insured organization**; and

3. with respect to Insuring agreement 1 of the Investor 170(h) Liability Coverage Part only, **we** will not rescind the coverage otherwise available under that section except as to an **insured person** who had actual knowledge that the representations made or materials submitted were untrue, inaccurate, or misleading.

# Investor 170(h) Liability Form

I.    Subrogation    In the event of a payment by **us** under this policy, **we** will be subrogated to all of **your** rights of recovery to that payment. **We** will not, however, subrogate against any **insured**

                                      **You** will do everything necessary to secure and preserve **our** subrogation rights, including but not limited to the execution of any documents necessary to allow **us** to bring suit in **your** name.

                                      **You** will do nothing to prejudice **our** subrogation rights without **our** prior written consent.

J.    Titles    Titles of sections of and endorsements to this policy are inserted solely for convenience of reference and will not be deemed to limit, expand, or otherwise affect the provisions to which they relate.

K    Intended beneficiaries    Each **insured** is an intended beneficiary of this policy and has the right to enforce this policy with respect to his, her, or its own **Loss**.

# XI.  Service of Suit Clause (U.S.A.)

This service of suit clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided for in the arbitration provision within this Policy. This clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

California
Jonathan Bank
Locke Lord LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, California 90071
Tel: 213-687-6700
Email: jbank@lockelord.com

Maine*
C T Corporation System

128 State Street, # 3
Augusta, Maine 04330
(*serves in the capacity of registered agent for service of process for Locke Lord)

All Other States
Locke Lord LLP
200 Vesey Street, Brookfield Place
New York, NY 10281

and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Named Insured to give a written undertaking to the Named Insured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this Polcy, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

---

## XII. Arbitration Clause

In the event of a dispute in connection with this Policy, the insurers and the Named Insured shall, in the first instance, try to resolve such dispute through mediation. The mediation will be commenced by either party providing written notice to the other party requesting such mediation ("the Mediation Request"). The parties will select a mediator by their mutual agreement, within 30 days. If there can be no such agreement, each party will submit a list of five mediator choices to the other, rank ordered by preference. The mediator will then be selected based on a further discussion, unless an individual is on both lists and then that person would have preference. If the process does not result in the selection of the mediator, then the parties agree to let the American Arbitration Association select the mediator. Subject to mutual agreement of the parties, the mediation will be held in the State of Georgia, not later than 60 days after the date of the Mediation Request and shall last for at least a one-day session. Any settlement agreement reached at mediation and fully executed by all parties, however, will be binding on all parties. If the Mediation does not resolve the dispute within 60 days of the first mediation session or when the mediator declares an impasse, the parties agree that the dispute shall be resolved by final and binding arbitration in accordance with the Commercial Rules of the American Arbitration Association before a single Arbitrator, unless the amount of coverage in dispute exceeds five million dollars, in which case the parties may choose to have the arbitration before a panel of three arbitrators chosen pursuant to the rules of the AAA. The arbitration panel will all be neutral. The arbitration will be held within 100 miles of where the insured resides or at an agreed upon location in the United States. The arbitrator(s) may award the prevailing party costs and/or attorneys' fees for the Arbitration. Any State's law invalidating this paragraph shall not affect the validity of the first paragraph herein. The parties understand that arbitration is final and binding and that they are waiving their rights to other resolution processes (such as court action or administrative proceeding).



**Department of the Treasury**
**Internal Revenue Service**
**Large Business & International Division**
2203 North Lois Avenue, Suite 500
Mail Stop: 4104:SKH
Tampa, Florida 33607

**Date:**
07/09/2024

**Taxpayer ID number (last 4 digits):**
█████

**Tax years:**
202112

**Person to contact:**
Name: SONIAMAE KING-HUNTE
ID number: 1004274461
Telephone: (813) 367-8403

Green Rock Management LLC
Attn: Brian Robbins
2015 3rd Ave N
Birmingham, AL 35203

Dear Brian Robbins:

**Why you're receiving this letter**
This letter is a time-limited offer to resolve the tax consequences related to your syndicated conservation easement transaction. Our proposed resolution is based on the terms outlined in the enclosed Attachment 1, Syndicated Conservation Easement Resolution Terms and Election.

**Why we're proposing this resolution**
We've identified syndicated conservation easement transactions as a significant compliance concern. These transactions have appeared on the IRS "Dirty Dozen" list of tax scams several times.

We've litigated and won syndicated conservation easement cases for failures to meet the requirements of Internal Revenue Code (IRC) Section 170 and overvaluation of the conservation easement. Penalties asserted by the government have been sustained. The U.S. Tax Court and appellate courts have issued opinions favorable to the IRS in syndicated conservation easement cases where the true value of the easement was found to be a small fraction of the claimed value.

We expect we'll continue to prevail in syndicated conservation easement litigation. However, we're offering to resolve your transaction now in the interest of sound tax administration and considering recent legislation.

**What you need to do to accept our offer**
If you wish to accept the terms outlined in Attachment 1 and enter into a resolution for this transaction, please follow the steps outlined in Attachment 1, Section A. **You have 30 days from the date of this letter to confirm your acceptance and to provide the requested documents.**

**What will happen if you don't accept our offer**
We'll continue to examine and litigate the tax consequences of your transaction under our normal procedures.

Examination results may include:
- Full disallowance of your charitable contribution deduction, and
- Imposition of civil penalties, which could include the 40% gross valuation misstatement penalty under IRC Section 6662(h). Some cases may be subject to the 75% fraud penalty under IRC Section 6663.

You will have the right to petition the U.S. Tax Court or file an action in a U.S. District Court or the U.S. Court of Federal Claims if you disagree with the examination results.

**Letter 6532 (12-2023)**
Catalog Number 93125Q

We encourage you to speak with a qualified, independent advisor about this settlement offer.

If you have questions, you can call the contact person shown above.

Sincerely,

Digitally signed by Dustin R. Gaston
Date: 2024.07.09 08:15:21 -04'00'

Dustin Gaston
LB&I-ECPA-Team Manager-Group 1405

Enclosure:
Attachment 1

Cc: Kristy Caron-POA

Attachment 1
Franklin Woods LLC, ▮▮▮▮▮▮▮

## Syndicated Conservation Easement (Non-Docketed)
## Resolution Terms and Election

Below are the terms of the 2024 Syndicated Conservation Easement (Non-Docketed) Resolution. The Internal Revenue Service (IRS) will not entertain counteroffers to these terms.

This form provides Franklin Woods, LLC ▮▮▮▮▮▮▮ (Partnership) an opportunity to elect to participate in a settlement initiative to resolve a transaction described in Section 2 of Notice 2017-10[1], 2017-4 I.R.B. 544, or a substantially similar transaction (collectively, SCE transactions).

This resolution is being offered to the entity listed above and is not available to partners on an individual basis. The terms of the resolution are outlined below.

### A. Election to Participate

1. The election to participate must be received by the IRS within **30 calendar days** of the date of the offer letter.

2. To elect into the resolution:

   a. An Authorized Signer[2] must initial each page and sign the last page of this form in the spaces provided.

   b. Partnership must provide its Form 1065 or, if applicable, the Form 1065 of the entity in which individual investors purchased their interest and from whom the individual investors received a Schedule K-1 (investment-tier partnership) reflecting the claimed charitable contribution deduction.

   c. A Partnership with less than one year remaining on the statute of limitation must sign a consent to extend the statute for no less than one year. A statute extension is enclosed with this letter, if needed, and must be signed and returned within 30 calendar days of this letter to participate in the settlement resolution.

---

[1] A Notice of Proposed Rulemaking (NPRM) was issued on December 8, 2022, providing that certain syndicated conservation easement transactions are listed transactions.

[2] For cases governed by Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, the Authorized Signer is the Tax Matters Partners (TMP). For cases governed by the Bipartisan Budget Act of 2015 (BBA), the Authorized Signer is the Partnership Representative (PR) (or the Designated Individual of the PR, if the PR is an entity). For Non-TEFRA and BBA elect-out cases, the Authorized Signer is all partners. All partners must sign the supplemental signature page of the form to signal all partners wish to participate. They do not have to initial each page.

Initials _____

Attachment 1
Franklin Woods LLC, ████████

3. The items listed in A.2.a. through c. must be timely returned to the IRS by email[3] to sce.settlement@irs.gov or faxed to (855) 579-6647. A courtesy copy must be sent to the contact person listed on the offer letter.

4. Please refer any questions regarding the settlement to the contact person listed on the offer letter. Questions or other communications sent to the mailbox will not be addressed.

5. Failure to satisfy any portion of paragraphs A.1 through 3 will be treated as an invalid election.

6. The Authorized Signer's signature will be treated as a non-binding consent to participate in this resolution. Formal agreement will be memorialized as described in paragraph B.17.

## B. Resolution Terms

### Deduction, Tax, and Penalties

1. <u>Charitable Contribution Deduction</u>: The Partnership is not entitled to a charitable contribution deduction claimed for a conservation easement, donation of a fee simple interest in real property, or other noncash charitable contributions.

2. <u>Allowable Deduction (estimated out-of-pocket costs)</u>: The Partnership is entitled to a deduction for estimated out-of-pocket costs (i.e., the estimated amount the investors paid to either the Partnership or an investment-tier entity for an interest in the SCE transaction) allocable to the SCE transaction being settled. The IRS will calculate this amount. In general, the allowable deduction will be the amount reported on the Partnership's (or investment-tier partnership's) Schedule M-2, Capital Contributed (Cash).

3. <u>Tax Rate</u>: The IRS will calculate the tax due at the partnership level using a tax rate of 21%.

4. <u>Penalties</u>: An accuracy-related penalty for a gross valuation misstatement under section 6662(h) applies at a rate of 5%.

5. <u>Amount Due</u>: Once an election to participate is received, the IRS will provide the Authorized Signer with the necessary computational information, including the disallowed charitable contribution deduction, the estimated out-of-pocket costs allowed and the tax, penalties, and interest that will be aggregated into the Settlement Payment (as defined in section B.9.).

### Interest

6. Deficiency interest will be calculated as required by law.

---

[3] Communication by unencrypted email is not secure. Therefore, taxpayers, TMPs, and PRs electing via email should transmit any potentially sensitive information, including personally identifiable information (PII), only via encrypted, password-protected attachments. See IRS User Guide at irs.gov/usingemail for more information on signing and sending documents electronically.

Initials _____

Attachment 1
Franklin Woods LLC, ███████

7. IRS will compute interest ending 30 calendar days after the date IRS sends the Form 906, Closing Agreement on Final Determination Covering Specific Matters (Closing Agreement). If Partnership fails to sign the Closing Agreement and pay the Settlement Payment within 30 calendar days of the date the IRS sends the Closing Agreement, additional interest will accrue.

8. Interest suspension under section 6404(g) is not permitted.

**Payment**

9. The Partnership must make one payment (Settlement Payment) for all tax, penalties, and interest due as determined under this settlement agreement.

10. If a partner has made a section 6603 deposit, they can request a refund by following Revenue Procedure 2005-18.

11. A Partnership subject to the centralized partnership audit regime enacted by BBA must agree to be liable for an imputed underpayment equal to the Settlement Payment determined under paragraph B.9. For purposes of this resolution, the term Settlement Payment includes the imputed underpayment described in this paragraph. The Partnership cannot elect modification or push-out.

**General**

12. The Partnership and partners must fully cooperate with the IRS, including meeting stringent deadlines, or face removal from the resolution.

13. In the case of an entity governed by TEFRA, all partners must participate in the resolution.

14. The Partnership and partners agree to fully cooperate with the IRS during the resolution, which includes, but is not limited to, providing additional information if requested by the IRS.

15. If the Partnership or partners take steps inconsistent with facilitating the resolution, the IRS reserves the right to remove the Partnership from the resolution. The removal determination is final.

16. The Partnership and partners agree that they are responsible for their own costs and fees associated with participation in this resolution and section 7430 does not apply.

17. To finalize the settlement:

   a. In the case of an entity governed by TEFRA, Non-TEFRA, and BBA Elect-Outs, the Partnership, and all direct partners, including spouses if married filing joint, will be required to execute a Closing Agreement, consistent with terms and conditions outlined herein. Among other terms, the Closing Agreement will provide that the amount paid will not be refundable or deductible for Federal income tax purposes under any circumstance.

   b. In the case of an entity governed by BBA, the Partnership will be required to execute a Closing Agreement, consistent with terms and conditions

Initials _____

Attachment 1
Franklin Woods LLC, ▮▮▮▮▮

outlined in this term sheet. The Closing Agreement must be signed by the PR for the taxable year at issue as well as an individual with authority under state law to bind the partnership. Among other terms, the Closing Agreement will also provide that the Settlement Payment will not be refundable or deductible for Federal income tax purposes under any circumstance.

18. Neither this resolution, nor any settlement executed therefrom, will have any effect, limitation or prohibition against the IRS asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

19. The deduction allowed under paragraph B.2. cannot be inferred to represent a value of the property and/or the value of the conservation easement.

20. Nothing in this resolution precludes the IRS from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in an SCE transaction for violation of any criminal statute.

21. The terms contained herein do not constitute an interpretation of the law as it applies to SCE transactions.

22. The parties agree that this settlement is limited to this specific case and may not be used in any court proceeding involving the United States and/or the Commissioner of the Internal Revenue Service as a party.

23. Permission to participate in this resolution in no manner indicates, nor should be interpreted as, an opinion as to whether there is fraud with respect to the Partnership's SCE transaction.

_____

Print Name and Title

_____        _____

Signature                                Date

Initials _____

# Exhibit D

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



August 23, 2024

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Demand for Coverage Position and Consent or Waiver of Consent for Acceptance IRS Settlement Offer**

|  |  |
|---|---|
| Insured: | Franklin Woods Partners, LLC ("Franklin Partners" or "Named Insured") |
| Insurer: | Fidelis Underwriting Limited |
| Policy No.: | VFP/FL/20451/2021/1 |
| Claimant: | Franklin Woods Partners, LLC |

Dear Mr. Stafford:

    The undersigned and this firm represent Franklin Partners as coverage counsel in connection with the above referenced insurance policy. As you know, Franklin Woods, LLC ("Franklin Woods," and collectively with Franklin Partners, "Insureds") is in an ongoing dispute with the Internal Revenue Service ("IRS"). Recently, the IRS has offered a settlement to Franklin Woods. After consultation with its tax counsel, the Insureds recognize that this settlement offer is reasonable. Please accept this correspondence as the Insureds' formal demand that the Insurers consent to the Insureds' acceptance of the proposed settlement and that the Insurers agree to fund amounts under the Policy, up to the policy limit, that will be due to the IRS. In the event the insurer cannot commit to providing consent or commit to fund the IRS settlement, the Insureds respectfully request that the insurer agree not to raise lack of consent or other related policy provisions as an impediment to coverage. In order to meet the IRS deadline, the Insured requests that the Insurer provide a written response to this correspondence by August 30, 2024.

    As you are further aware, Franklin Partners, Franklin Woods, and other entities and individuals, are insureds under the above-referenced Investor 170(h) Liability Insurance Policy issued by Volante Global on behalf of Fidelis Underwriting Limited (collectively, "Insurers"). By letter dated July 9, 2024, the IRS extended a settlement offer to resolve its dispute with Franklin Woods in full ("IRS Settlement"). A copy of the IRS Settlement is attached to this letter. The original deadline for accepting and electing into the IRS Settlement was August 8, 2024. The IRS has extended the deadline for considering the IRS Settlement to September 7, 2024.

    Under the terms of the policy, an insured cannot enter into any settlement agreement "that would result in a **loss** without [the Insurers] prior written consent, which [the Insurers] agree not

Joseph J. Stafford
Wilson Elser
August 23, 2024
Page 2

to withhold unreasonably."[1]  Franklin Partners provided the Insurers with notice of the IRS Settlement by email on July 10, 2024, and requested the Insurers approve acceptance of the offer. The Insurers responded by making several information requests.  Franklin Partners will be responding to those requests under separate cover.  Franklin Partners renews its request that the Insurers consent to Franklin Woods' acceptance of the IRS Settlement or, in the alternative, waive the provision of the policy requiring the Insurer's consent for Franklin Woods to accept the IRS Settlement.

## I.    Background: Conservation Easements and Current IRS Settlement Offer

The Named Insured was created to raise funds through a private placement and use the proceeds from the capital raise to purchase a controlling interest in Franklin Woods.  At the time, Franklin Woods held a fee simple interest in 164.09 acres in Elmore County, Alabama ("Property").  The Named Insured then solicited investments through a private placement to purchase the interest in Franklin Woods with the intention of using the Property in one of three ways: (1) develop it to its "highest and best use" ("HBU") as an aggregate mine, producing an income stream for the investors and a valuable asset that could be sold; (2) donate a conservation easement to protect the conservation values of the Property, producing a tax deduction for the investors; or (3) holding the Property for long term appreciation.  The investors voted for the second option, and Franklin Woods thereafter donated a conservation easement over the Property ("Conservation Easement") to a qualified organization.

As a result of the donation, Franklin Woods claimed a deduction on its 2021 tax return under Section 170(h), which allows a taxpayer to deduct the value of a "qualified real property interest" donated to a "qualified organization" exclusively for a "conservation purpose."  The amount of the deduction was based on the contemporaneous due diligence that Franklin Woods commissioned regarding the Property.  The Insurers reviewed this due diligence at the time of binding.  As you are aware, this due diligence indicated that the fair market value ("FMV") of the Property before the donation date was $40,745,000 based on a discounted cash flow ("DCF") analysis of the expected cash flows of a mining operation on the Property.  It further indicated that the FMV value of the Property after the donation of the Conservation Easement was $245,000. Using the "Before and After" methodology required for the valuation of conservation easements, Franklin Woods reported a $40,500,000 deduction for the donation of the Conservation Easement. Based on its ownership in Franklin Woods, a portion of this deduction passed through to the Named Insured to the investors according to their ownership interest in the Named Insured.

The IRS selected Franklin Woods' 2021 tax return for examination.  As you are well aware, the IRS has indicated its intent to disallow all noncash charitable contribution deductions arising from what it identifies as a syndicated conservation easement transaction ("SCET") due to alleged failures of the deduction to comply with the Tax Code, including, but not limited to, (i) defects with the donation under Section 170(h), (ii) failure to properly substantiate the deduction,

---

[1] Unless otherwise defined, all terms have the meanings ascribed to them in the policy.  Bolded terms quoted from the policy are bolded in this letter for purposes of consistency.

Joseph J. Stafford
Wilson Elser
August 23, 2024
Page 3

and (iii) inaccuracies in the valuation of the Conservation Easement. In addition to disallowance of the deductions, the IRS also generally asserts various penalties in cases involving SCETs, including the strict liability 40% "gross valuation misstatement" penalty under I.R.C. § 6662(h). The IRS has identified Franklin Woods's donation as involving a SCET and it would be unreasonable to believe that the IRS would act any differently in this case. Based on the IRS's consistent pattern and assuming that the IRS does not raise additional issues or alternative positions, the Insureds' exposure for tax, penalties, and interest under the IRS's positions would be approximately $24,701,754 (with interest calculated through September 7, 2024).

While the IRS has not yet issued a notice disallowing the Insureds' deductions, it recently issued the IRS Settlement to Franklin Woods and is requiring a response to its offer before it will complete its examination. The offer in this case is as follows: (1) the IRS will disallow the $40,500,000 noncash charitable deduction for the Conservation Easement donation; (2) instead, the IRS will allow an "other deduction" of $7,904,000; (3) the IRS will compute the tax due on the net disallowance of $32,596,000 at a tax rate of 21% instead the 37% highest marginal tax rate that would normally apply, (3) the IRS will reduce the application of the gross valuation misstatement penalty from 40% to 5%, and (4) statutory interest will continue to accrue until the liability is paid in full, as required by law. The Insureds' acceptance of this offer would result in a total liability of tax, penalties, and interest of approximately $8,462,836 (with interest calculated through September 7, 2024). The IRS has further indicated that if the Insureds do not accept its offer, it will move forward with litigating the case to decision.

## II.    Acceptance of the IRS Settlement Would Result in a Loss Under the Policy

As noted above, Franklin Woods and Franklin Partners are insureds for purposes of the policy. As the Insuring Agreements of the policy make clear, the Insurers promised as follows:

> **We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold **you** liable for a **wrongful act**, provided the **loss** results from a **proceeding** first initiated against **you** and reported to **us** during the **policy period**.

Subject to certain exclusions that are not relevant here, a "loss" includes "damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**." Acceptance of the IRS Settlement would cause a reduction in the tax savings of all investors as a result of an "adjustment," which is "a reduction in the allowable tax deduction ordered by a **taxing authority** claimed by an **insured** that causes the actual tax deduction allowed by such **taxing authority** multiplied by 41% to be less than the sum of (a) such **insured's** original contribution to a **company** or the **controlled entity** that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties

Joseph J. Stafford
Wilson Elser
August 23, 2024
Page 4

and interest where insurable by law imposed by any **taxing authority** due to such a covered reduction in tax savings."[2]

Thus, if Franklin Woods accepts the IRS Settlement, the resulting liability would constitute a covered "loss" under the policy.

### III.    Refusal to Consent to the IRS Settlement Would Be Unreasonable

Due to the reasonableness of the IRS Settlement, the Named Insured demands the Insurer grant their consent to the acceptance of this offer or, alternatively, waive their right to consent under the policy. Two factors confirm the reasonableness of the IRS Settlement.

*First*, recent caselaw from the Tax Court regarding the valuation of conservation easements indicate that Franklin Woods's deduction was based on a valuation approach that is now disfavored by the Tax Court. As discussed above, in determining the value of the Conservation Easement, Franklin Woods valued the Property before the donation using a DCF income approach based on the net present value of future cash flows. Specifically, the appraiser determined that the FMV of the Property based on the net present value of the cash flows from the crushed stone operation on the Property would be $40,745,000.

Over the past year, the Tax Court has issued six opinions addressing the valuation of conservation easements in cases involving what the IRS identifies as SCETs.

-    In *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, the Tax Court found in favor of the taxpayer on multiple technical issues. Nevertheless, the Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 10% of the claimed value based on its application of the comparable sales approach and the principle of substitution. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

-    In *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25, the Tax Court found in favor of the IRS on multiple technical issues, which resulted in the complete disallowance of the claimed deduction or, in the alternative, limitation of the deduction to the taxpayer's basis in the subject property. In reaching the value of the conservation easement for penalty purposes, the Tax Court determined that the FMV of the subject property before the donation of the easement could not be more than 25.77% of the claimed before value based on its application of the comparable sales methodology. Notably, the Tax Court did not determine that the FMV of the conservation easement was in fact this amount; rather it determined that the FMV simply could be no more than this amount. Because the FMV of the easement was less

---

[2] The actual deduction allowable under the IRS Settlement would be $7,904,000 instead of $40,500,000 as originally claimed. This number multiplied by 41% is $3,240,640, which is less than the sum of (i) $7,904,000, representing the original capital contribution, and (ii) $1,617,676, representing the penalties and interest to be due under the terms of the IRS Settlement.

Joseph J. Stafford
Wilson Elser
August 23, 2024
Page 5

than 50% of the claimed FMV, the adjustment resulted in the application of a 40% gross valuation misstatement penalty.

- In *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, the Tax Court again found in favor of the taxpayer on multiple technical issues. Once again, however, Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 2.5% of the claimed before value based on its use of the comparable sales approach and its acceptance the IRS's argument regarding the availability of other properties with similar mineral resources. This adjustment also resulted in the application of a 40% gross valuation misstatement penalty. Notably, the *Savannah Shoals* case involved the same HBU (*i.e.*, aggregate mining) as the HBU identified by the appraiser in the present case.

- In *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, the Tax Court again found in favor of the taxpayer on multiple technical issues. Once again, however, the Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 14.6% of the claimed before value, based on its acceptance of the IRS's comparable sales methodology and its analysis of other transactions involving the subject property. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

- In *Excelsior Aggregates v. Commissioner*, T.C. Memo. 2024-60, the Tax Court only addressed the value of two conservation easements and fee simple interests in other property. In valuing the conservation easements, the Tax Court determined the FMVs of the subject properties before the donation of the easements were approximately 4.15% and 5.42% of the claimed before values. The Tax Court arrived at these values by placing substantial weight on the most recent transactions involving the subject properties, which it tested using the comparable sales method. It further rejected the taxpayers' proposed valuations through a detailed critique of the DCF analysis performed by the taxpayer's expert for trial.

- In *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, the Tax Court found in favor of the IRS on a technical issue, which resulted in the complete disallowance of the claimed deduction for the donation of a façade easement. In reaching the value of the easement for penalty purposes, the Tax Court determined that the FMV of the subject property before the donation of the easement was, at most, 12.63% of the claimed before value. To arrive at this value, the Tax Court once again placed substantial weight on the most recent transaction involving the property, which it tested using the comparable sales method. In reaching this conclusion, the Tax Court once again rejected the taxpayer's proffered valuation through another detailed critique of the DCF analysis performed by the taxpayer's expert for trial. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

Joseph J. Stafford
Wilson Elser
August 23, 2024
Page 6

These recent opinions have changed how taxpayers can reasonably expect the Tax Court to value conservation easements, especially SCETs, at trial. The Court has now indicated that it will favor valuing a conservation easement using the comparable sales approach or recent transactions involving the Property. Given this recent line of cases, the Court will likely disfavor any approach to value predicated solely on a DCF income approach. Thus, even assuming that Franklin Woods prevails on the technical issues that the IRS may raise, it is reasonable to expect the Tax Court to value Franklin Woods's donation under a methodology that would result in a total liability significantly in excess of the Insureds' liability under the IRS Settlement. See Ex 2. Excel Spreadsheet Explaining Liability to Insured by taking settlement and by refusing settlement.

*Second*, while the IRS has made prior settlement offers to other taxpayers, it has structured its current offer in a manner to make it significantly more favorable for taxpayers. As the following table shows, the reduction the effective tax rate to 21% and the applicable penalty rate to 5% greatly reduces the out-of-pocket liability for the Insureds as compared to any other resolution while also limiting partnership's costs to litigate its case:

| Resolution | Taxes, Penalties, & Interest[3] |
|---|---|
| Acceptance of IRS's Expected Position | $24,701,754 |
| IRS Counsel Settlement Offer[4] | $15,620,745[5] |
| Current IRS Settlement | $8,462,836 |

To put the IRS Settlement into perspective, to accomplish a similar result through litigation, Franklin Woods would have to (1) prevail on all of the technical arguments that the IRS may raise, (2) achieve a valuation of the Conservation Easement of $21,074,546 (52.04% of the claimed deduction), and (3) convince the Tax Court that it had reasonable cause for the remaining adjustment to avoid application of a 20% accuracy-related penalty. Alternatively, if the Tax Court does not find that reasonable cause applies, Franklin Woods would have to achieve a valuation of $24,312,122 million (60.99% of the claimed deduction). Even then, the additional interest and litigation costs associated with achieving such outcome would likely result in a total liability that would significantly exceed the Insureds' liability under the IRS Settlement.

Franklin Woods currently has access to sufficient funds to pay the policy retention of $237,750, the excess liability amount of $300,086, and any additional interest that may accrue after September 7, 2024, provided that the Insurers honor their promises under the policy up to the coverage limit of $7,925,000. In light of the Tax Court's recent opinions, the structure of the IRS's settlement, and the significant time and resources it would take to achieve an equivalent result through litigation (if possible), the IRS Settlement is reasonable. *Johansen v. California State*

---

[3] Interest calculated through September 7, 2024.

[4] This settlement offer is only available for certain docketed cases and this calculation is only being offered for demonstrative purposes. Franklin Woods has not received this settlement offer and cannot reasonably expect to receive it if it rejects the IRS's current offer.

[5] Calculated assuming disallowance of the noncash charitable contribution, allowance of an "other deduction" equal to $7,904,000, computation of the tax liability using the highest marginal tax rate of 37%, application of a 10% gross valuation misstatement penalty, and interest calculated as required by law.

Joseph J. Stafford
Wilson Elser
August 23, 2024
Page 7

*Auto. Ass'n Inter-Ins. Bureau*, 15 Cal. 3d 9, 16 (1975) (The touchstone of reasonableness is "whether, in light of the victim's injuries and the probable liability of the insured, [the] ultimate judgment is likely to exceed the amount of the settlement offer."). The Insurers should accordingly consent to Franklin Woods's acceptance of the IRS Settlement or waive its right to consent to the same.

**IV.    Conclusion**

Please confirm by the **close of business on August 30, 2024** that the Insurers will consent to Franklin Woods's acceptance of the IRS Settlement or, in the alternative, waive the consent requirement in the policy for acceptance of the settlement. To the extent the Insurer requires additional information to evaluate this settlement, the Insureds invites the Insurer to make any additional information requests as soon as possible. Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures

**Department of the Treasury**
**Internal Revenue Service**
**Large Business & International Division**
IRS 2203 North Lois Avenue, Suite 500
Mail Stop: 4104:SKH
Tampa, Florida 33607

**Date:**
07/09/2024
**Taxpayer ID number (last 4 digits):**
███

**Tax years:**
202112
**Person to contact:**
Name: SONIAMAE KING-HUNTE
ID number: 1004274461
Telephone: (813) 367-8403

Green Rock Management LLC
Attn: Brian Robbins
2015 3rd Ave N
Birmingham, AL 35203

Dear Brian Robbins:

**Why you're receiving this letter**
This letter is a time-limited offer to resolve the tax consequences related to your syndicated conservation easement transaction. Our proposed resolution is based on the terms outlined in the enclosed Attachment 1, Syndicated Conservation Easement Resolution Terms and Election.

**Why we're proposing this resolution**
We've identified syndicated conservation easement transactions as a significant compliance concern. These transactions have appeared on the IRS "Dirty Dozen" list of tax scams several times.

We've litigated and won syndicated conservation easement cases for failures to meet the requirements of Internal Revenue Code (IRC) Section 170 and overvaluation of the conservation easement. Penalties asserted by the government have been sustained. The U.S. Tax Court and appellate courts have issued opinions favorable to the IRS in syndicated conservation easement cases where the true value of the easement was found to be a small fraction of the claimed value.

We expect we'll continue to prevail in syndicated conservation easement litigation. However, we're offering to resolve your transaction now in the interest of sound tax administration and considering recent legislation.

**What you need to do to accept our offer**
If you wish to accept the terms outlined in Attachment 1 and enter into a resolution for this transaction, please follow the steps outlined in Attachment 1, Section A. **You have 30 days from the date of this letter to confirm your acceptance and to provide the requested documents.**

**What will happen if you don't accept our offer**
We'll continue to examine and litigate the tax consequences of your transaction under our normal procedures.

Examination results may include:
- Full disallowance of your charitable contribution deduction, and
- Imposition of civil penalties, which could include the 40% gross valuation misstatement penalty under IRC Section 6662(h). Some cases may be subject to the 75% fraud penalty under IRC Section 6663.

You will have the right to petition the U.S. Tax Court or file an action in a U.S. District Court or the U.S. Court of Federal Claims if you disagree with the examination results.

Case 2:25-cv-00341-RWS    Document 1-1    Filed 10/23/25    Page 65 of 130

We encourage you to speak with a qualified, independent advisor about this settlement offer.

If you have questions, you can call the contact person shown above.

Sincerely,

Dusti Gaston

Digitally signed by Dustin R.
Gaston
Date: 2024.07.09 08:15:21 -04'00'

Dustin Gaston
LB&I-ECPA-Team Manager-Group 1405

Enclosure:
Attachment 1

Cc: Kristy Caron-POA

Attachment 1
Franklin Woods LLC, ▮▮▮▮▮▮

## Syndicated Conservation Easement (Non-Docketed)
## Resolution Terms and Election

Below are the terms of the 2024 Syndicated Conservation Easement (Non-Docketed) Resolution. The Internal Revenue Service (IRS) will not entertain counteroffers to these terms.

This form provides Franklin Woods, LLC ▮▮▮▮▮▮(Partnership) an opportunity to elect to participate in a settlement initiative to resolve a transaction described in Section 2 of Notice 2017-10[1], 2017-4 I.R.B. 544, or a substantially similar transaction (collectively, SCE transactions).

This resolution is being offered to the entity listed above and is not available to partners on an individual basis. The terms of the resolution are outlined below.

### A. Election to Participate

1. The election to participate must be received by the IRS within **30 calendar days** of the date of the offer letter.

2. To elect into the resolution:

    a. An Authorized Signer[2] must initial each page and sign the last page of this form in the spaces provided.

    b. Partnership must provide its Form 1065 or, if applicable, the Form 1065 of the entity in which individual investors purchased their interest and from whom the individual investors received a Schedule K-1 (investment-tier partnership) reflecting the claimed charitable contribution deduction.

    c. A Partnership with less than one year remaining on the statute of limitation must sign a consent to extend the statute for no less than one year. A statute extension is enclosed with this letter, if needed, and must be signed and returned within 30 calendar days of this letter to participate in the settlement resolution.

---

[1] A Notice of Proposed Rulemaking (NPRM) was issued on December 8, 2022, providing that certain syndicated conservation easement transactions are listed transactions.

[2] For cases governed by Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, the Authorized Signer is the Tax Matters Partners (TMP). For cases governed by the Bipartisan Budget Act of 2015 (BBA), the Authorized Signer is the Partnership Representative (PR) (or the Designated Individual of the PR, if the PR is an entity). For Non-TEFRA and BBA elect-out cases, the Authorized Signer is all partners. All partners must sign the supplemental signature page of the form to signal all partners wish to participate. They do not have to initial each page.

Initials _____

Attachment 1
Franklin Woods LLC, ██████████

3. The items listed in A.2.a. through c. must be timely returned to the IRS by email[3] to sce.settlement@irs.gov or faxed to (855) 579-6647. A courtesy copy must be sent to the contact person listed on the offer letter.

4. Please refer any questions regarding the settlement to the contact person listed on the offer letter. Questions or other communications sent to the mailbox will not be addressed.

5. Failure to satisfy any portion of paragraphs A.1 through 3 will be treated as an invalid election.

6. The Authorized Signer's signature will be treated as a non-binding consent to participate in this resolution. Formal agreement will be memorialized as described in paragraph B.17.

## B. Resolution Terms

### Deduction, Tax, and Penalties

1. <u>Charitable Contribution Deduction</u>: The Partnership is not entitled to a charitable contribution deduction claimed for a conservation easement, donation of a fee simple interest in real property, or other noncash charitable contributions.

2. <u>Allowable Deduction (estimated out-of-pocket costs)</u>: The Partnership is entitled to a deduction for estimated out-of-pocket costs (i.e., the estimated amount the investors paid to either the Partnership or an investment-tier entity for an interest in the SCE transaction) allocable to the SCE transaction being settled. The IRS will calculate this amount. In general, the allowable deduction will be the amount reported on the Partnership's (or investment-tier partnership's) Schedule M-2, Capital Contributed (Cash).

3. <u>Tax Rate</u>: The IRS will calculate the tax due at the partnership level using a tax rate of 21%.

4. <u>Penalties</u>: An accuracy-related penalty for a gross valuation misstatement under section 6662(h) applies at a rate of 5%.

5. <u>Amount Due</u>: Once an election to participate is received, the IRS will provide the Authorized Signer with the necessary computational information, including the disallowed charitable contribution deduction, the estimated out-of-pocket costs allowed and the tax, penalties, and interest that will be aggregated into the Settlement Payment (as defined in section B.9.).

### Interest

6. Deficiency interest will be calculated as required by law.

---

[3] Communication by unencrypted email is not secure. Therefore, taxpayers, TMPs, and PRs electing via email should transmit any potentially sensitive information, including personally identifiable information (PII), only via encrypted, password-protected attachments. See IRS User Guide at irs.gov/usingemail for more information on signing and sending documents electronically.

Initials _____

Attachment 1
Franklin Woods LLC, ▮▮▮▮▮

7. IRS will compute interest ending 30 calendar days after the date IRS sends the Form 906, Closing Agreement on Final Determination Covering Specific Matters (Closing Agreement). If Partnership fails to sign the Closing Agreement and pay the Settlement Payment within 30 calendar days of the date the IRS sends the Closing Agreement, additional interest will accrue.

8. Interest suspension under section 6404(g) is not permitted.

**Payment**

9. The Partnership must make one payment (Settlement Payment) for all tax, penalties, and interest due as determined under this settlement agreement.

10. If a partner has made a section 6603 deposit, they can request a refund by following Revenue Procedure 2005-18.

11. A Partnership subject to the centralized partnership audit regime enacted by BBA must agree to be liable for an imputed underpayment equal to the Settlement Payment determined under paragraph B.9. For purposes of this resolution, the term Settlement Payment includes the imputed underpayment described in this paragraph. The Partnership cannot elect modification or push-out.

**General**

12. The Partnership and partners must fully cooperate with the IRS, including meeting stringent deadlines, or face removal from the resolution.

13. In the case of an entity governed by TEFRA, all partners must participate in the resolution.

14. The Partnership and partners agree to fully cooperate with the IRS during the resolution, which includes, but is not limited to, providing additional information if requested by the IRS.

15. If the Partnership or partners take steps inconsistent with facilitating the resolution, the IRS reserves the right to remove the Partnership from the resolution. The removal determination is final.

16. The Partnership and partners agree that they are responsible for their own costs and fees associated with participation in this resolution and section 7430 does not apply.

17. To finalize the settlement:

   a. In the case of an entity governed by TEFRA, Non-TEFRA, and BBA Elect-Outs, the Partnership, and all direct partners, including spouses if married filing joint, will be required to execute a Closing Agreement, consistent with terms and conditions outlined herein. Among other terms, the Closing Agreement will provide that the amount paid will not be refundable or deductible for Federal income tax purposes under any circumstance.

   b. In the case of an entity governed by BBA, the Partnership will be required to execute a Closing Agreement, consistent with terms and conditions

Initials _____

Attachment 1
Franklin Woods LLC, ████

outlined in this term sheet. The Closing Agreement must be signed by the PR for the taxable year at issue as well as an individual with authority under state law to bind the partnership. Among other terms, the Closing Agreement will also provide that the Settlement Payment will not be refundable or deductible for Federal income tax purposes under any circumstance.

18. Neither this resolution, nor any settlement executed therefrom, will have any effect, limitation or prohibition against the IRS asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

19. The deduction allowed under paragraph B.2. cannot be inferred to represent a value of the property and/or the value of the conservation easement.

20. Nothing in this resolution precludes the IRS from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in an SCE transaction for violation of any criminal statute.

21. The terms contained herein do not constitute an interpretation of the law as it applies to SCE transactions.

22. The parties agree that this settlement is limited to this specific case and may not be used in any court proceeding involving the United States and/or the Commissioner of the Internal Revenue Service as a party.

23. Permission to participate in this resolution in no manner indicates, nor should be interpreted as, an opinion as to whether there is fraud with respect to the Partnership's SCE transaction.

_____

Print Name and Title

_____     _____

Signature                              Date

Initials _____

## Settlement Calculation - 2021 Partnership Donation
### FRANKLIN WOODS- Non-Docketed Settlement Offer

| | | | | | |
|---|---|---|---|---|---|
| Orig. Deduction | $ | 40,500,000 | Initial Tax Return Due Date: | | 4/15/2022 |
| Capital Raise | $ | 7,904,000 | Assumed Payoff Date: | | 9/7/2024 |
| | | | Total Interest (est.) | | |
| Settlement Tax Rate | | 21% | (per online calculator) | $ | 1,275,418 |
| Settlement Penalty Rate | | 5% | | | |
| 170(h) Insurance - Deemed Tax Rate | | 41% | | | |
| 170(h) Insurance - Policy Limit | $ | 7,925,000 | | | |
| 170(h) Insurance - Retention | $ | 237,750 | | | |
| | | | | | |
| **Settlement Calculation:** | | | | | |
| Deduction Allowed | $ | 7,904,000 | | | |
| Deduction Disallowed | $ | 32,596,000 | | | |
| Tax Owed Now | $ | 6,845,160 | | | |
| Penalty Owed Under Settlement | $ | 342,258 | | | |
| Interest Owed Under Settlement | $ | 1,275,418 | | | |
| **Total Settlement Payment:** | $ | 8,462,836 | | | |

## Settlement Calculation - 2021 Partnership Donation
### FRANKLIN WOODS - Full Disallowance

| | | | | | |
|---|---|---|---|---|---|
| Orig. Deduction | $ | 40,500,000 | Initial Tax Return Due Date: | | 4/15/2022 |
| Capital Raise | $ | 7,904,000 | Assumed Payoff Date: | | 9/7/2024 |
| | | | Total Interest (est.) | | |
| Tax Rate | | 37% | (per online calculator) | $ | 3,722,754 |
| Penalty Rate | | 40% | | | |
| 170(h) Insurance - Deemed Tax Rate | | 41% | | | |
| 170(h) Insurance - Policy Limit | $ | 7,925,000 | | | |
| 170(h) Insurance - Retention | $ | 237,750 | | | |
| | | | | | |
| **Liability Calculation:** | | | | | |
| Deduction Allowed | $ | - | | | |
| Deduction Disallowed | $ | 40,500,000 | | | |
| Tax Owed Now | $ | 14,985,000 | | | |
| Penalty Owed Preliminary Report | $ | 5,994,000 | | | |
| Interest Owed | $ | 3,722,754 | | | |
| **Total Settlement Payment:** | $ | 24,701,754 | | | |

**Settlement Calculation - 2021 Partnership Donation**

**FRANKLIN WOODS, LLC - IRS Counsel Settlement Offer**

| | | | | |
|---|---|---:|---|---:|
| Orig. Deduction | $ | 40,500,000 | Initial Tax Return Due Date: | 4/15/2022 |
| Capital Raise | $ | 7,904,000 | Assumed Payoff Date: | 9/7/2024 |
| | | | Total Interest (est.) | |
| Settlement Tax Rate | | 37% | (per online calculator) | $      2,354,173 |
| Settlement Penalty Rate | | 10% | | |
| 170(h) Insurance - Deemed Tax Rate | | 41% | | |
| 170(h) Insurance - Policy Limit | $ | 7,925,000 | | |
| 170(h) Insurance - Retention | $ | 237,750 | | |
| | | | | |
| **Liability Calculation:** | | | | |
| Deduction Allowed | $ | 7,904,000 | | |
| Deduction Disallowed | $ | 32,596,000 | | |
| Tax Owed Now | $ | 12,060,520 | | |
| Penalty Owed | $ | 1,206,052 | | |
| Interest Owed | $ | 2,354,173 | | |
| **Total Settlement Payment:** | $ | **15,620,745** | | |

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



August 30, 2024

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Response to Information Requests**

|            |                                                                       |
|------------|-----------------------------------------------------------------------|
| Insured:   | Franklin Woods Partners, LLC ("Franklin Partners," or "Named Insured") |
| Insurer:   | Fidelis Underwriting Limited                                          |
| Policy No.:| VFP/FL/20451/2021/1                                                   |

Dear Mr. Stafford:

I am writing in furtherance of our ongoing communications regarding our client, Franklin Partners, the Named Insured under the above-referenced Policy. Specifically, I am writing in response to various emails and information requests from your firm. Please see our responses below. We are further providing the requested documents via an access link that will be sent to you in a separate email.

**1.      The IRS' claims/arguments.**

The IRS has not yet concluded its examination of Franklin Woods's 2021 tax return, and therefore has not yet memorialized its claims/arguments or issued a Notice of Proposed Partnership Adjustments ("NOPPA"). We further do not anticipate that the IRS will issue any such document at this time, as it is requiring the partnership to accept or reject the terms of its settlement offer before it will complete its examination.

This case, however, involves a transaction that the IRS identifies as syndicated conservation easement transaction ("SCET"). As detailed in my prior letter, the IRS's consistent patten in cases involving an SCET is to disallow the claimed noncash charitable contribution deduction due to alleged failures of the deduction to comply with the Tax Code, including, but not limited to, (i) defects with the donation under Section 170(h), (ii) failure to properly substantiate the deduction, and (iii) inaccuracies in the valuation of the donated easement. In addition to disallowance of the deductions, the IRS also generally asserts various penalties in cases involving SCETs, including the strict liability 40% "gross valuation misstatement" penalty under Section 6662(h). It would be unreasonable to believe that the IRS would act any differently in this case.

Joseph J. Stafford
Wilson Elser
August 30, 2024
Page 2

**2.    The Insureds' defenses/arguments.**

As I previously noted, attorney-client privilege and/or the attorney work product doctrine protects the information and materials responsive to this request from disclosure. Waiving such protections as to any information or materials would be detrimental to Franklin Partners and Franklin Woods in the ongoing dispute with the IRS. Please provide any authority you have that supports the contention that providing these materials to you would not constitute a waiver of any applicable privilege. Alternatively, we are happy to help arrange a call with tax counsel to discuss the dispute generally and the reasonableness of the IRS's settlement offer.

**3.    The parties' respective position statements (if any).**

Please see our response to request 2, above.

**4.    Any written reports or recommendations provided by tax counsel.**

Please see our response to request 2, above.

**5.    Copies of the articles of incorporation, bylaws, operating agreement, and partnership agreements for the Named Insured and any entity which the Named Insured controlled or otherwise had the ability to direct the managerial decisions of at any time during the performance of the business giving rise to any IRS proceeding ("Relevant Entities").**

We are providing copies of the requested organizational documents.

**6.    Copies of any information or communications that has been conveyed by the Relevant Entities to the respective investors.**

We are providing a copy of the letter to investors in Franklin Partners regarding the IRS's settlement offer.

**7.    Copies of any communications, statements, or indication from the principals of (or anyone at) the Relevant Entities, indicating their belief that the IRS settlement offer is reasonable and should be accepted, including the reasoning supporting such positions.**

Please see my letter dated August 23, 2024, for a detailed explanation of why the insureds believe the IRS settlement offer is reasonable. See also the provided letter to investors in Franklin Woods regarding the settlement offer.

**8.    A listing of each of the investors in connection with each respective transaction, including their equity participation in the any of the Relevant Entities/partnership/conservation easement transaction and whether or not they participated in/paid toward the respective Investor 170(h) Liability insurance policy.**

Joseph J. Stafford
Wilson Elser
August 30, 2024
Page 3

We are providing a list of the investors in Franklin Partners. As Franklin Partners purchased the policy, all investors participated in the insurance policy.

**9.      When are the investor voting dates scheduled to take place?**

We are providing a copy of the voting ballot for investors in Franklin Partners, which includes the applicable information regarding the proposed vote.

**10.     What is the manner, process, and procedure by which the voting will take place?**

We are providing a copy of the voting ballot for investors in Franklin Partners, which includes the applicable information regarding the proposed vote. Franklin Partners is using DocuSign to send the ballots and will tally the responses in accordance with each investor's interest.

**11.     A listing of all investors that have inquired regarding the Insurers' coverage positions, including the nature, extent, and substance of their respective inquiries.**

Investors have inquired about the insurance policy and the specifics of the applicable coverage; however, such requests have been ongoing and frequently through oral communications.

**12.     Provide the PPM.**

We are providing a copy of the Private Placement Memorandum.

**13.     Provide a calculation of the IRS Settlement Offer vs. not accepting.**

Please see my prior letter dated August 23, 2024, which included the requested pro forma.

**14.     Copies of any interviews of witnesses, independent expert reports or appraisals obtained, and/or any materials related to the evaluation of the conservation easement property valuation for the transaction.**

Please see our response to request 2, above.

**15.     Advise as to whether any of the Insureds have any other potential insurance coverage, as well as any notice and/or correspondence between such other insurer and Insureds.**

Neither Franklin Woods nor Franklin Partners have any other potential insurance coverage.

Joseph J. Stafford
Wilson Elser
August 30, 2024
Page 4


Should you have any additional questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures provided by separate link

# Exhibit F

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



November 4, 2024

<u>**VIA EMAIL ONLY**</u>

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:     **Response to Information Requests**

|        |        |
|--------|--------|
| Insured: | Franklin Woods Partners, LLC ("Franklin Partners," or "Named Insured") |
| Insurer: | Fidelis Underwriting Limited ("Insurer") |
| Policy No.: | VFP/FL/20451/2021/1 |

Dear Mr. Stafford:

I am writing in furtherance of our ongoing communications regarding our client, Franklin Partners, the Named Insured under the above-referenced Policy. Specifically, I am writing to supplement our prior responses to the various emails and information requests that we have received your firm. Please see our responses below. We are further providing additional requested documents via an access link that will be sent to you in a separate email.

**Prior Request 2: The Insureds' defenses/arguments.**

We understand from Sarah Adam in your office that this request does not seek any information or documents that would be protected by the attorney-client privilege and/or the attorney work product doctrine. As you are aware, waiving such protections as to any information or materials would be detrimental to Franklin Partners and Franklin Woods, LLC ("Franklin Woods") in the ongoing dispute with the IRS, and the partnerships are in no way waiving such protections by responding to your requests. At this time, are no Tax Court pleadings or similar documents related to the Insureds' defenses/arguments. We continue to be willing to help arrange a call with tax counsel to discuss this matter and the reasonableness of the IRS's settlement offer.

The foregoing notwithstanding as you are aware, the ultimate issue in this case remains the FMV of the donated conservation easement ("Conservation Easement"). Franklin Woods relied on significant due diligence to support the reported fair market value ("FMV") of the donation. The Insurer received and reviewed all such due diligence at the time of binding. This due diligence supported the appraiser's use of the discounted cash flow ("DCF") valuation methodology to determine the FMV of the donated easement, and Franklin Woods would have to rely on similar due diligence at trial to prevail on the valuation issue. If Franklin Woods does not prevail on the

Joseph J. Stafford
Wilson Elser
November 4, 2024
Page 2

valuation issue, it will be mathematically impossible for it to secure a result that is better than or even equivalent to the IRS's current settlement offer.

Recent caselaw from the Tax Court regarding the valuation of conservation easements indicates that this valuation approach is now disfavored by the Tax Court. These cases are (i) *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129; (ii) *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25; (iii) *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35; (iv) *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52; (v) *Excelsior Aggregates v. Commissioner*, T.C. Memo. 2024-60; (vi) *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72; and (vii) *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93. We are enclosing copies of these opinions with this letter. As explained below, these cases indicate that the Tax Court is unlikely to accept any valuation of a conservation easement that depends on a DCF/income approach absent unique facts that do not appear to be present in Franklin Woods' case. It would thus be unreasonable for the Insurer to refuse to consent to Franklin Woods' acceptance of the IRS's settlement offer or waive its right to consent to the same.

    a.    *J L Minerals*

The Tax Court's most recent opinion involving the valuation of a conservation easement is *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, which it issued on October 8, 2024. In this case, the Honorable Patrick J. Urda joined the growing list of Tax Court judges who have rejected the use of the DCF/income valuation methodology in cases involving SCETs.

To value the easement at issue, the court first looked to prior transactions involving the subject property. Specifically, members of the partnership acquired a tract that included the subject property approximately two years before the deduction. This transaction provided a per-acre before value that was approximately 0.95% of the reported value. The court concluded that this transaction provided "strong evidence of the value of the easement property." *J L Minerals, LLC*, T.C. Memo. 2024-93, at *56–57.

The court next reiterated that the comparable sales methodology remains its preferred approach for valuing vacant land. On this point, the taxpayer's experts did not identify any comparable sale that supported the taxpayer's valuation. It instead relied solely on the underlying due diligence regarding the property's mineral reserve to assert that the property was sufficiently unique to value it using the DCF/income methodology. Rejecting this conclusion, the court stated as follows:

> "In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation.'" *Oconee Landing*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24); *see also Excelsior Aggregates*, T.C. Memo. 202460, at *38; *Savannah Shoals*, T.C. Memo. 2024-35, at *35. "The comparable sales approach is usually the most reliable indicator of value when sufficient information exists" because "the

Joseph J. Stafford
Wilson Elser
November 4, 2024
Page 3

> market place is the best indicator of value, based on the conflicting
> interests of many buyers and sellers." *Corning Place*, T.C. Memo.
> 2024-72, at *32 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24).

*J L Minerals, LLC*, T.C. Memo. 2024-93, at *58. The court thus focused on the comparable sale analysis that the IRS's expert performed, which resulted in a per-acre before FMV of 0.96% of the reported value. The court concluded that this analysis was "persuasive," as it "generally confirm[ed] the results of the actual transactions involving the easement property." *Id.* at *59–60.

After accepting the comparable sales valuation methodology, the court fully explained why it rejected the partnership's valuation that relied on a DCF/income valuation approach:

> "The income capitalization [approach] is most reliable when used to
> determine the value of an existing business with a track record of
> income, expenses, profits, and growth rates. A historical track
> record provides real-world inputs that supply a plausible basis for
> projecting future revenue." *Excelsior Aggregates*, T.C. Memo.
> 2024-60, at *43–44 (citing *Whitehouse III*, 139 T.C. at 325 (noting
> that the income approach "has been judged an unsatisfactory
> valuation method for property that does not have a track record of
> earnings")).

> "Income valuation methods are not favored when valuing vacant
> land with no income-producing history because they are inherently
> speculative and unreliable." *Savannah Shoals*, T.C. Memo. 2024-
> 35, at *36; *see also Whitehouse Hotel III*, 139 T.C. at 324–25;
> *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–
> 44 (1968), aff'd per curiam, 406 F.2d 288 (2d Cir. 1969); *Excelsior
> Aggregates*, T.C. Memo. 2024-60, at *33. "The income approach is
> rarely appropriate when seeking to determine the value of
> undeveloped property with no existing cashflow." *Corning Place,*
> T.C. Memo. 2024-72, at *37; *see Excelsior Aggregates*, T.C. Memo.
> 2024-60, at *44 ("[C]ourts have often noted 'the folly of trying to
> estimate the value of undeveloped property by looking to its
> anticipated earnings.'" (quoting *Pittsburgh Terminal Corp v.
> Commissioner*, 60 T.C. 80, 89 (1973), aff'd, 500 F.2d 1400 (3d Cir.
> 1974) (unpublished table decision))); *see also Chapman Glen*, 140
> T.C. at 327; *Whitehouse Hotel III*, 139 T.C. at 324–25; *Ambassador
> Apartments*, 50 T.C. at 243–44; *Savannah Shoals*, T.C. Memo.
> 2024-35, at *36. "Absent a financial track record, every input into
> the DCF analysis necessarily involves speculation." *Excelsior
> Aggregates*, T.C. Memo. 2024-60, at *44; *see also Corning Place*,
> T.C. Memo. 2024-72, at *37 ("Lacking reliable data, the appraiser
> would have to rely on a lengthy series of assumptions, estimates,

Joseph J. Stafford
Wilson Elser
November 4, 2024
Page 4

and guesstimates."). "That problem would be at its apogee here—attempting to predict the future revenues and expenses of a nonexistent business for a 30-year period." *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*44; *see also Corning Place Ohio*, T.C. Memo. 2024-72, at \*37–38.

*J L Minerals, LLC*, T.C. Memo. 2024-93, at \*61–62.

Under such circumstances, the court rejected the taxpayer's DCF/income appraisal as it did "not [value] the property at all, but what a speculative business could do with the property. But a discounted cashflow method geared to what a business could earn is of limited utility in determining what a property is worth." *Id.* at \*63. The court instead concluded that the FMV of the subject property before the donation of the subject easement was 1.04% of the reported before FMV of the subject property. It further offered the following warning for future litigants on the valuation issue in conservation easement cases:

> That is the point: Use of the discounted cashflow method with so few reliable inputs and so many variables and unknowns is simply an exercise in imagination. ***As such it is altogether unreliable, and we would ignore the laughable results it generated even if we thought mining were the easement property's highest and best use. We caution taxpayers in the future who choose to use this method without strong support that we will view the income approach and the discounted cashflow method with skepticism, particularly in the conservation easement context.***

*J L Minerals, LLC*, T.C. Memo. 2024-93, at \*64–65 (emphasis added).

**b.    *Savannah Shoals***

The Tax Court issued its opinion in *Savannah Shoals, LLC v. Commissioner* on March 26, 2024. Like the taxpayer in *J L Minerals*, the taxpayer's experts in *Savannah Shoals* utilized a DCF/income valuation to support the reported before FMV of the subject property. This case, however, involved a property in northeast Georgia that the taxpayer identified as having an aggregate mining HBU. As you are aware, this HBU is the same HBU that the appraiser determined in this case to measure the FMV of the Conservation Easement.

Unlike *J L Minerals*, there was no recent transaction of the subject property in *Savannah Shoals*. Without this data point, the Tax Court focused its valuation analysis on identifying the subject property's HBU and the price that membership interests in the partnership sold for as part of the transaction. Specifically, it focused on determining the demand for aggregate material from the proposed quarry. While the parties' experts agreed that an aggregate quarry's market area could be as large as 50 miles, the Tax Court indicated that competition from other quarries in the region effectively limited the market area to 25 miles. *Savannah Shoals*, T.C. Memo. 2024-35, at

Joseph J. Stafford
Wilson Elser
November 4, 2024
Page 5

*38–39. The court then determined this 25-mile market area was relatively rural and would thus not support the taxpayer's demand estimates, as other quarries were located closer to nearby population centers. *Id.* at *40–41. The court concluded that the taxpayer had not established that existing quarries in the market area failed to meet the available demand. *Id.* at *41–42.

Based on the foregoing, the Tax Court concluded that development of the subject property as an aggregate quarry was not the property's HBU, as it was not financially feasible. *Id.* at 43. Importantly, the court further concluded that, even if it had determined that aggregate mining was the property's HBU, the valuation result would not change. *Id.* at *45.

The court further agreed with the IRS's expert, who "opined that there were negligible differences (approximately 1.5%) in prices paid for land with known [mineral] deposits . . . . He explained that there is no price premium for land with known aggregate deposits because aggregate is abundant. He testified that the easement property is not unique and that he would consider property to be unique if the market demonstrated a preference for the property." *Id.* at *46. While the court ultimately did not rely on the IRS expert's mineral property analysis in its valuation, it indicated that the analysis "confirms that New Shoals claimed an exorbitantly high, baseless value for the unencumbered easement property." *Id.* The court instead placed significant weight on the IRS's comparable sale analysis, which resulted in a before FMV of the subject property of approximately 2.08% of the originally reported value.

c.    ***Excelsior Aggregates***

The Tax Court issued its opinion in *Excelsior Aggregates* on May 30, 2024. These consolidated cases focused on the valuation of two conservation easements and one fee simple interest in Alabama that the taxpayers had valued using a DCF/income valuation. Specifically, the taxpayer valued the properties based on a sand and gravel mining HBU.

In analyzing the value of the subject properties, the Tax Court first looked at recent transactions involving the properties, recognizing that one of the properties involved sold the same year as the donation for between 3% and 5% of the taxpayers' reported before values. The court concluded that "this is the best available evidence as to the 'before' value of [the] parcels on the valuation date." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *31–32. The court further determined that the properties lacked sufficient sand and gravel reserves to support a mining HBU. *Id.* at *41–42. Instead, the court determined the IRS correctly valued the subject properties based on the recent transaction and the IRS expert's comparable sales analyses, which were largely consistent with the prior transactions in the subject property.

The court further rejected the taxpayers' arguments that the sand and gravel resources of the subject properties justified a higher FMV or the taxpayers' use of the DCF/income methodology, stating: "The record is replete with reliable historical evidence of the prices that knowledgeable buyers paid to purchase acreage with potential for commercial [sand and gravel] mining. Petitioner does not contend (and could not plausibly contend) that the . . . parcels had any unique features that made them especially valuable." *Id.* at *40. The court further agreed with the

Joseph J. Stafford
Wilson Elser
November 4, 2024
Page 6

IRS's expert regarding the unreliability of a DCF/income valuation, stating that the lack of reliable data required "the appraiser to . . . rely on a lengthy series of assumptions, estimates, and guesstimates. *Performed under these constraints, the DCF method becomes highly speculative, making it inferior to the sales comparison method, which draws its conclusions from the market.*" *Id.* at \*44 (emphasis added).

### d.  *Mill Road; Oconee Landing; Buckelew Farm; Corning Place*

*J L Minerals*, *Savannah Shoals*, and *Excelsior Aggregates* have the most direct applicability to the present case, as all three cases involve the Tax Court's analysis of properties with a claimed mining HBU. But, it is important to note that the court in *J L Minerals* also cites its opinions involving easements over vacant properties with proposed development HBUs, including *Mill Road, Oconee Landing, Buckelew,* and *Corning Place.* These opinions further highlight several of the key principles that the Tax Court has recently applied in valuing conservation easements.

- First, the Tax Court will focus on prior transactions in the subject property, if available, as it has indicated that it believes such transactions are "the best evidence if a property's FMV." *See Corning Place*, T.C. Memo. 2024-72, at \*28–29; *Buckelew*, T.C. Memo. 2024-52, at \*56.

- Second, the comparable sale methodology is the Tax Court's preferred method for vacant property. *See Corning Place*, T.C. Memo. 2024-72, at \*34–35; *Buckelew*, T.C. Memo. 2024-52, at \*54–56; *Oconee Landing*, T.C. Memo. 2024-25, at \*66–67; *Mill Road*, T.C. Memo. 2023-129, at \*50–52.

- Third, the Tax Court expects a taxpayer to present significant unique facts regarding a conserved property to justify the Tax Court's use of the DCF/income valuation approach. *See Corning Place*, T.C. Memo. 2024-72, at \*38; *Buckelew*, T.C. Memo. 2024-52, at \*55–56; *Oconee Landing*, T.C. Memo. 2024-25, at \*70; *Mill Road*, T.C. Memo. 2023-129, at \*15.

### e.  The IRS's Settlement Offer Remains Reasonable

The foregoing analysis shows why the IRS's offer to settle this case is reasonable. Indeed, the evidence that Franklin Partners and Franklin Woods have provided the Insurer further shows that many facts of this case are substantially similar to facts that the Tax Court identified in its opinions as grounds to refuse to value the Property using a DCF/income methodology. These similarities lead to the reasonable expectation that the Tax Court would reach a similar result in this case. Because of this expectation, the terms of the IRS's settlement offer are reasonable. Moreover, as our prior correspondence confirms, the Insurer's refusal to consent to Franklin Woods's acceptance of the offer or waive the requirement under the Policy for consent would significantly increase the investors' exposure to additional tax, penalties, and interest.

Joseph J. Stafford
Wilson Elser
November 4, 2024
Page 7

**Prior Request 3: The parties' respective position statements (if any).**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

**Prior Request 4: Any written reports or recommendations provided by tax counsel.**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

**Prior Request 6: Copies of any information or communications that has been conveyed by the Relevant Entities to the respective investors.**

We are providing responsive communications with the respective investors regarding the IRS's proposed settlement offer. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer.

**Prior Request 7: Copies of any communications, statements, or indication from the principals of (or anyone at) the Relevant Entities, indicating their belief that the IRS settlement offer is reasonable and should be accepted, including the reasoning supporting such positions.**

We are providing responsive communications with the respective investors regarding the IRS's proposed settlement offer. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer.

**Prior Request 11: A listing of all investors that have inquired regarding the Insurer's coverage positions, including the nature, extent, and substance of their respective inquiries.**

We are providing responsive communications with the respective investors regarding insurance policy in this case. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer. Multiple investors have inquired regarding the insurance policy and the Insurers' coverage positions during the member call and during other conversations.

**Prior Request 14: Copies of any interviews of witnesses, independent expert reports or appraisals obtained, and/or any materials related to the evaluation of the conservation easement property valuation for the transaction.**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

Joseph J. Stafford
Wilson Elser
November 4, 2024
Page 8

Should you have any additional questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures provided by separate link

Cc. Sarah Adam (Sarah.Adam@wilsonelser.com)

| From: | Stafford, Joseph J. <Joseph.Stafford@wilsonelser.com> |
|---|---|
| Sent: | Tuesday, September 3, 2024 5:02 PM |
| To: | Mitchum, Lisa; Bersinger, Austin |
| Cc: | Larkin, Peter J.; Adam, Sarah; Alongi, Briana |
| Subject: | RE: Franklin Woods Partners, LLC |
| Attachments: | RE: Green Rock - New Settlement Offers; Call on Conservation Easements: 34 Green Rock matters (Non-Docketed), 25512.00002 (Liberty & Fidelis); Conservation Easements: Franklin Woods (Green Rock), 25512.00003 (Fidelis); 2024-08-17 Franklin Woods - Response to Insurer.pdf; 2024-08-23 Franklin Woods - Waiver of Consent Letter.pdf; 2024-08-30 Franklin Woods - Response to Information Requests.pdf |

Dear Mr. Bersinger,

Please allow this to follow up on our recent emails and telephone call on the above matter. As you know, we are in receipt of your attached letters of August 17, 23 and 30, as well as the documents your office provided on August 30. It is our understanding that the deadline by which Franklin Woods, LLC must respond to the IRS' non-docketed settlement letter (dated July 9, 2024) is Saturday, September 7. Please advise if this remains the deadline, or if it has been extended.

As we have previously advised, the non-docketed settlement letter (which, among other things, lacks certainty in scope, terms, and amount) does not include a "proposed settlement" as suggested in your August 23 letter. Instead, it offers an invitation or overture by the IRS to participate in a non-binding process whereby the partnership would, at a future date, receive an actual proposed settlement offer for consideration. Stated another way, it seeks a non-binding agreement from the partnership to receive and consider a future settlement offer from the IRS that can be rejected at any time – not unlike agreeing to participate in a mediation. Indeed, it is our understanding that even if the members/partners of Franklin Woods vote in favor of participating in this process, acceptance of this invitation/overture would neither require the partnership to actually accept any future proposed settlement offer, nor would it result in any adverse, prejudicial, or negative implications in the event the non-binding process was terminated without a settlement agreement. To the extent you disagree or believe our understanding is inaccurate, please advise immediately and provide an explanation.

Accordingly, there is no actual "proposed settlement" for the insurer to consider in connection with your requests. That is, your letters seek the insurer's position as to coverage and/or consent in connection with accepting a settlement offer that has not been proposed yet. It will only be proposed after there is an election by the partnership to participate in the non-binding process. In this regard, it is our understanding that any decision regarding participation will be determined by a majority vote of the members of the partnership. Kindly provide an update on the status of the voting. If voting has concluded, please advise as to the results (and provide the relevant and necessary documentation to confirm the outcome).

Further, we respectfully reiterate that to the extent a proposed settlement offer is actually received by the insured, it will be necessary for the insurer to adequately review, evaluate, analyze, and consider significant information, materials, and documents as to the unique history, attributes, transactions, valuations, and due diligence related to the conservation easement at issue prior to providing any position as to coverage or consent under the Policy. In this regard, we note initial documents were recently provided; however, the insurer continues to request all documents and information identified in our emails of July 22, August 15, and August 19 (attached again for ease of reference). Moreover, while we understand your concerns about privilege and confidentiality, the documents and information requested are significant, material, and necessary to the insurer's evaluation and determination. Is there any reason your concerns could not be alleviated by way of a confidentiality and common interest agreement, or similar type

agreement? If not, do you have other suggestions or recommendations in this regard? Please advise at your earliest convenience.

Please keep us timely posted as to any developments on this matter. In the interim, the insurer respectfully reserves all rights under the policy, at law, and in equity. Thank you.

Kind Regards,
Joe

Joseph J. Stafford
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
55 West Monroe Street - Suite 3800
Chicago, IL 60603-5001
312.821.6157 (Direct)
815.382.4612 (Cell)
312.704.0550 (Main)
312.704.1522 (Fax)
joseph.stafford@wilsonelser.com

---

**From:** Mitchum, Lisa <lmitchum@bradley.com>
**Sent:** Friday, August 30, 2024 1:47 PM
**To:** Stafford, Joseph J. <Joseph.Stafford@wilsonelser.com>
**Cc:** Bersinger, Austin <abersinger@bradley.com>; Mitchum, Lisa <lmitchum@bradley.com>
**Subject:** Franklin Woods Partners, LLC

| EXTERNAL EMAIL This email originated from outside the organization. |
| --- |

Joseph,

Please see the attached letter. The documents can be accessed here: https://bradleyllp.sharefile.com/d-sb154a8b67336412da050250245d2778f

Please let me know if you cannot access the documents.

Thank you,
Lisa



**Lisa Mitchum**
Legal Assistant
e: lmitchum@bradley.com w: bradley.com
d: 404.868.2099
Bradley Arant Boult Cummings LLP
Promenade Tower, 1230 Peachtree Street NE, 20th Floor
Atlanta, GA 30309

LinkedIn | Facebook | Twitter | Instagram | Blogs

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser
Moskowitz Edelman & Dicker LLP provides to you either in the body
of this or any email or in an attachment without first speaking
with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else
without voice verification. Even if an email looks like it has come
from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE
to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions
you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, please see our website at www.wilsonelser.com or refer to
any of our offices.

Thank you.

| | |
|---|---|
| **From:** | Stafford, Joseph J. <Joseph.Stafford@wilsonelser.com> |
| **Sent:** | Friday, September 13, 2024 3:26 PM |
| **To:** | Mitchum, Lisa; Bersinger, Austin |
| **Cc:** | Larkin, Peter J.; Adam, Sarah |
| **Subject:** | RE: 2024-09-09 Franklin Woods - Response to 9-3-24 Email |
| **Attachments:** | 2024-09-09 Franklin Woods - Response to 9-3-24 Email.pdf |

Dear Mr. Bersinger,

We can respond to your attached letter more substantively under separate cover at the appropriate time; however, I did want to briefly address one aspect. Your September 9 letter provides the following:

> Based on your email, we understand that the Insurers will not raise the prior written consent provision of Paragraph I(b) or any other policy provision as a basis for denying any claim based solely on the partnership's election into the settlement process. Stated differently, because the Insurers do not view the IRS's offer as an "actual 'proposed settlement' for it to consider," no provision of the policy prohibits the partnership's election into the IRS's proposed settlement process. **If you disagree with the foregoing, please contact me immediately to discuss**.

To be clear, based on our understanding, the IRS' non-docketed settlement proposal was not a settlement offer with terms and amounts that could be accepted. It was an invitation to receive an actual settlement offer in the future. As we previously advised, it was our understanding that regardless of any action taken in connection with the IRS' non-docketed, non-binding settlement proposal (*i.e.*, acceptance or rejection), neither would result in an admission of liability or assumption of any obligation by the partnership, nor would it result in an increase in the Insurer's potential exposure under the Policy, prejudice to our position, or prejudice to the partnership's rights of recovery from others. Likewise, acceptance of the proposal would not result in a settlement; but instead, would simply ensure that the IRS will propose a settlement agreement in the future. To the extent an actual settlement offer – with definitive terms, conditions, and amounts – is received, please provide it promptly for consideration. In the interim, the Insurer continues to respectfully reserve all rights under the Policy, at law, and in equity. This includes, but is certainly not limited to, Paragraph I(b) of the Policy, as well as all other policy provisions that may be implicated upon receipt of an actual settlement offer for consideration.

Further, we also note that a number of requested documents remain outstanding. These include, but are not limited to: (1) the Original Operating Agreement (we only have the amended and restated version); (2) the bylaws; (3) acquisition documents (such as the purchase agreement, closing statement, mortgage, etc.); (4) documents and/or photographs (such as aerial, survey maps, studies, etc.) used to establish the condition of the property at the time of the donation; (5) any permit applications and/or correspondence with local/county, state, and federal offices regarding the proposed mineral developed, as requested by the IRS; (6) any and all statements of the IRS' position as it relates to the investigation, examination, valuation, consideration, and determination regarding disallowance of the conservation easement deduction; (7) any and all Minutes of the Partnership in any way involving or related to voting in connection with the IRS' non-docketed settlement proposal; and (8) any and all communications between the partnership/Partnership Representative and the individual members/partners related in any way to the non-docketed settlement proposal and/or the Investor 170(h) Policy issued by the Insurer.

Finally, please advise a time when the partnership's tax counsel is available to discuss this matter. In the interim, please advise the steps that have been taken by the Partnership Representative and tax counsel to defend the partnership from the IRS' claims.

Kind Regards,
Joe

Joseph J. Stafford
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
55 West Monroe Street - Suite 3800
Chicago, IL 60603-5001
312.821.6157 (Direct)
815.382.4612 (Cell)
312.704.0550 (Main)
312.704.1522 (Fax)
joseph.stafford@wilsonelser.com

**From:** Mitchum, Lisa <lmitchum@bradley.com>
**Sent:** Monday, September 9, 2024 2:12 PM
**To:** Stafford, Joseph J. <Joseph.Stafford@wilsonelser.com>
**Cc:** Bersinger, Austin <abersinger@bradley.com>; Mitchum, Lisa <lmitchum@bradley.com>
**Subject:** 2024-09-09 Franklin Woods - Response to 9-3-24 Email

EXTERNAL EMAIL This email originated from outside the organization.

Joe,

Please see the attached letter and Settlement Votes from Austin Bersinger.

Thank you,
Lisa



**Lisa Mitchum**
Legal Assistant
e: lmitchum@bradley.com w: bradley.com
d: 404.868.2099
Bradley Arant Boult Cummings LLP
Promenade Tower, 1230 Peachtree Street NE, 20th Floor
Atlanta, GA 30309

LinkedIn | Facebook | Twitter | Instagram | Blogs

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser
Moskowitz Edelman & Dicker LLP provides to you either in the body
of this or any email or in an attachment without first speaking
with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else
without voice verification. Even if an email looks like it has come
from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE
to verify the information before wiring any money.
Failure to do so is at your own risk.

Be particularly wary of any request to change wire instructions
you have already received.

CONFIDENTIALITY NOTICE: This electronic·message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, please see our website at www.wilsonelser.com or refer to
any of our offices.

Thank you.

# Exhibit I

**D. Austin Bersinger**
Partner
ABersinger@bradley.com
404.868.2042 direct



February 28, 2025

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Demand for Coverage Position and Consent or Waiver of Consent for Acceptance IRS Closing Agreement**

|  |  |
|---|---|
| Insured: | Franklin Woods Partners, LLC ("Franklin Partners") |
| Insurers: | Volante Global, LTD, Volante Specialty Risk LTD, Fidelis Underwriting Limited ("Insurers") |
| Policy No.: | VFP/FL/20451/2021/1 |
| Claimant: | Franklin Woods Partners, LLC |

Dear Mr. Stafford:

I am writing regarding the above-referenced Policy. As you are aware, the IRS extended an offer to Franklin Woods, LLC ("Franklin Woods") on July 9, 2024, to resolve its ongoing tax dispute. Based on recent case law from the Tax Court regarding the valuation of conservation easements, we requested that the Insurers either consent to Franklin Woods's acceptance of the proposed settlement or agree not to raise lack of consent or other related policy provisions as an impediment to coverage. The Insurers determined that the IRS's settlement initiative was an invitation to participate in the non-docketed settlement process and not a settlement offer that required consent under the Policy. The Insurers accordingly allowed the partnership to continue to engage in discussions with the IRS with respect to the non-docketed settlement process.

Franklin Woods recently received the enclosed from the IRS, which contains, among other documents, a Form 906 (Closing Agreement on Final Determination Covering Specific Matters) for the non-docketed settlement process. The partnership has requested that the IRS extend the deadline for responding to the Form 906, and it anticipates that the IRS will grant this request. We will keep you updated regarding the partnership's extension request.

At this time, as Franklin Woods is continuing to work with the IRS with respect to the Form 906, the partnership is not making a demand that the Insurers agree to fund amounts due to the IRS under the settlement up to the limit of the Policy. Instead, for the reasons stated in our letter dated August 23, 2024 as supplemented, Franklin Woods and Franklin Partners recognize that the IRS's settlement offer remains reasonable. Indeed, since our August 23, 2024 letter, the Tax Court has issued four additional opinions related the valuation of conservation easements that

Joseph J. Stafford
Wilson Elser
February 28, 2025
Page 2

further confirm that the court will likely continue to favor valuing a conservation easement using the comparable sales approach or recent transactions involving the subject property and disfavor any approach to value predicated solely on an Income/Discounted Cash Flow valuation approach. *See J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93 (adjusting deduction for conservation easement donation to 0.56% of reported deduction); *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6 (adjusting deduction for conservation easement donation to 14.48% of reported deduction); *Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111 (adjusting deductions for two conservation easement donations to 5.05% and 11.36%, respectively, of reported deductions); *Green Valley Investors, LLC v. Commissioner*, T.C. Memo. 2025-15 (adjusting deduction for conservation easement donation to 5.22% of reported deduction).

We thus reiterate our demand that the Insurers consent to Franklin Woods's acceptance of the IRS's proposed settlement set forth in the Form 906. In the event the Insurers cannot commit to providing consent with respect to the IRS settlement, we respectfully request that the Insurers agree not to raise lack of consent or other related policy provisions as an impediment to coverage. We further request that the Insurers provide their coverage position with respect IRS's settlement offer under the terms of the Policy. In order to meet the IRS's deadline, we request that the Insurers provide a written response to this correspondence by March 14, 2025.

Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosure

 **Department of the Treasury**
**Internal Revenue Service**
**Large Business & International Division**
**IRS** 2203 North Lois Avenue, Suite 500
Mail Stop: 4104:SKH
Tampa, Florida 33607

Franklin Woods LLC
2207 2nd Avenue N
Birmingham, AL 35203-3805

**Date:**
02/10/2025
**Partnership name:**
Franklin Woods LLC
**Partnership ID number: (last 4 digits):**
[REDACTED]
**Tax year ended:**
202112
**Contact person:**
SONIAMAE KING-HUNTE
**Employee ID number:**
1004274461
**Contact hours:**
8:00AM - 4:30PM
**Contact telephone number:**
(813) 367-8403
**Contact fax number:**
(866) 610-5968
**Response due date:**
03/10/2025

Dear Kristy Caron,

Enclosed are three copies of Form 906, Closing Agreement on Final Determination Covering Specific Matters, reflecting agreement under the terms of the Syndicated Conservation Easement Resolution Initiative (SCERI). I have also enclosed an examination report for informational purposes showing the proposed changes to your tax for the periods above, based on the SCERI terms. This report was prepared in response to your election to participate in the SCERI and is only for purposes of the SCERI. The Form 906 and payment must be signed and returned within 30 calendar days of the date of this letter. Please sign, date and return all three copies of the Form 906 to the address shown above. According to the terms of SCERI, Taxpayers must full pay the tax liability prior to IRS executing the Form 906. Include payment for the full amount you owe when you return the signed Forms 906. Make your check or money order payable to the United States Treasury.

If you have any questions, please contact me at the telephone number shown above.

Sincerely,

*Soniamae King-Hunte* Digitally signed by
Soniamae S King-Hunte
Date: 2025.02.10 07:32:49
-05'00'

Soniamae King-Hunte
Rvenue Agent

Enclosures:
Form 906 (3)
Form 14791

Do not process - This Form 14791 is for computational purposes under
Syndicated Conservation Easement Resolution Initiative only.

## Preliminary Partnership Examination Changes, Imputed Underpayment Computation and Partnership Level Determinations as to Penalties, Additions to Tax and Additional Amounts

| Audit control number | Tax year ended *(mm/dd/yyyy)* | | |
|---|---|---|---|
| 2112011939 | 12/31/2021 | | |

**Partnership Information**

| Name | | | Taxpayer ID Number (TIN) |
|---|---|---|---|
| Franklin Woods LLC | | | |

| Street address *(including apartment no.)* | City or town | State | ZIP code |
|---|---|---|---|
| 2207 2nd Avenue N | Birmingham | AL | 35203 |

**Person with Whom the Changes Were Discussed**

| Name | Title |
|---|---|
| Kristy Caron | Power of Attorney |

**General Imputed Underpayment**

| | | Subgroup | Positive Adjustment | Negative Adjustment |
|---|---|---|---|---|
| 1. | Reallocation Grouping | | | |
| A. | | ☒ | | |
| i. | | | | |
| | Subtotal for subgroup | | | |
| 2. | Sum of all net positive Reallocation Grouping adjustments *(only include net positive adjustments in the total. See Line 3 for net negative adjustments)* | | | |
| 3. | Sum of all net negative Reallocation Grouping Adjustments *(only include net negative adjustments in the total. See Line 2 for net positive adjustments)* | | | |
| 4. | Residual Grouping | | | |
| A. | SCE - NonCash Contribution Disallowed | ☒ | 40,500,000 | |
| B. | SCE - Investment Costs Allowed   ' | ☒ | (7,904,650) | |
| C. | | ☒ | | |
| i. | | | | |
| | Subtotal for subgroup | | | |
| 5. | Sum of all net positive Residual Grouping adjustments *(only include net positive adjustments in the total. See Line 6 for net negative adjustments)* | | 32,595,350 | |
| 6. | Sum of all net negative Residual Grouping adjustments *(only include net negative adjustments in the total. See Line 5 for net positive adjustments)* | | | |
| 7. | Sum of all net positive adjustments from Reallocation and Residual Groupings *(add Lines 2 and 5). Total netted partnership adjustments* | | 32,595,350 | |
| 8. | Sum of all net negative adjustments from Reallocation and Residual Groupings *(add Lines 3 and 6). This amount is ignored for calculating the imputed underpayment* | | | |
| 9. | Highest effective tax rate for the tax year ended | | 21% | |
| 10. | Imputed Underpayment before Creditable Expenditures and Credit Groupings *(multiply Line 7 by Line 9)* | | 6,845,024 | |
| 11. | Creditable Expenditures Grouping *(decreases to creditable expenditures are positive adjustments and increases are negative adjustments)* | | | |
| A. | | ☒ | | |
| i. | | | | |
| | Subtotal for subgroup | | | |

Page 2 of 2

| Name of partnership | | Taxpayer ID Number (TIN) | Tax year ended | Audit control number |
|---|---|---|---|---|
| Franklin Woods LLC | | ▬▬▬▬ | 12/31/2021 | 2112011939 |

| | Subgroup | Positive Adjustment | Negative Adjustment |
|---|---|---|---|
| 12. Sum of all net positive adjustments in the Creditable Expenditure Grouping (only include net positive adjustments in the total. See Line 13 for net negative adjustments) | | | |
| 13. Sum of all net negative adjustments in the Creditable Expenditure Grouping (only include net negative adjustments in the total. See Line 12 for net positive adjustments) | | | |

| 14. Credit Grouping (decreases to credits are positive adjustments and increases are negative adjustments) | Subgroup | Positive Adjustment | Negative Adjustment |
|---|---|---|---|
| A. | ☒ | | |
| i. | | | |
| Subtotal for subgroup | | | |
| 15. Sum of all net positive adjustments in the Credit Grouping (only include net positive adjustments in the total. See Line 16 for net negative adjustments) | | | |
| 16. Sum of all net negative adjustments in the Credit Grouping (only include net negative adjustments in the total. See Line 15 for net positive adjustments) | | | |
| 17. Imputed Underpayment (add Lines 10, 12 and 15) | | | 6,845,024 |

| 18. Penalties | Code Section | Penalty Amount |
|---|---|---|
| A.   IRC 6662(h) – Accuracy Related Penalty reduced to 5% | 6662(h) | 342,251 |
| B. | | |
| C. | | |
| 19. Total Penalties with respect to the Imputed Underpayment (add all lines in 18) | | |

20. Estimated interest

| Interest (IRC § 6233(a)(2)) estimated and computed to (mm/dd/yyyy) 6/17/2025 | Amount of interest $1,792,858.70 |
|---|---|

Other information

Prepared for Computational Purposes Based on Form 906.

Closing Agreement With Franklin Woods, LLC  EIN: 

**Form 906**
(Rev. Aug. 1994)
Department of the Treasury—Internal Revenue Service

## CLOSING AGREEMENT ON FINAL DETERMINATION
## COVERING SPECIFIC MATTERS

Under section 7121 of the Internal Revenue Code ("I.R.C." or "Code"), Franklin Woods, LLC (EIN: ▮▮▮▮▮▮) (the "Partnership"),  2207 2nd Ave N, Birmingham, AL 35203, and the Commissioner of Internal Revenue (the "Commissioner") (the Commissioner and the Partnership, collectively, the "Parties") make the following Closing Agreement (the "Closing Agreement"):

WHEREAS, the Partnership filed a Form 1065, U.S. Return of Partnership Income, for the partnership year beginning 08/16/2021 and ending 12/31/2021 (the "2021 Partnership Year").

WHEREAS, the Partnership is subject to the centralized partnership provisions of the Bipartisan Budget Act of 2015, codified at I.R.C. §§ 6221 through 6241 ("BBA") as in effect for tax years beginning on or after January 1, 2018, for the 2021 Partnership Year.

WHEREAS, Green Rock Management, LLC (the "PR") is the partnership representative (as defined in I.R.C. § 6223) of the Partnership for the 2021 Partnership Year. Brian Robbins is the designated individual of the PR for the 2021 Partnership Year.

WHEREAS, Brian Robbins of Green Rock Management LLC is authorized under Alabama law as the State Law Signatory to act for the Partnership at the time of signature.

WHEREAS, on December 29, 2021, the Partnership donated a conservation easement (the "Easement") on the property located in Elmore County, Alabama as described in Exhibit A of the Deed of Easement (the "Property") to Southern Conservation Trust Inc. (the "Donee").

WHEREAS, the Partnership claimed a non-cash charitable contribution deduction of $40,500,000 for the Easement donation on its Form 1065 for the 2021 Partnership Year;

WHEREAS, the Partnership also made a payment of cash of $65,000 to the Donee for which it claimed an additional charitable contribution deduction on its Form 1065 for the 2021 Partnership Year.

WHEREAS, the Partnership's donation of the Easement described herein for the 2021 Partnership Year is collectively defined as the "Transaction."

WHEREAS, the Commissioner examined the Partnership's Form 1065 for the 2021 Partnership Year under the BBA partnership procedures.

1 of 5

Closing Agreement With Franklin Woods, LLC  EIN: 

WHEREAS, the Parties desire to resolve with finality their dispute involving the federal income tax treatment of the Transaction.

NOW THEREFORE THE PARTIES HEREBY DETERMINE AND AGREE for federal income tax purposes that:

1. The charitable contribution deduction and all other items related to the Transaction are adjusted as follows (the "Adjustments"):

    a. Except as provided herein, no deduction, loss, or other tax benefit arising from or in connection with the Transaction, including the deduction claimed for a non-cash charitable contribution of $40,500,000 for the 2021 Partnership Year, is allowed to the Partnership or its Partners for any taxable years.

    b. The Partnership is allowed a deduction for out-of-pocket costs of $7,904,650 for the 2021 Partnership Year.

2. The Partnership is liable for an imputed underpayment under I.R.C.§ 6225 in the amount of $6,845,024 for the 2025 Partnership Year as a result of the Adjustments in determination clause 1 herein.

3. For the 2025 Partnership Year, the Partnership, pursuant to I.R.C. § 6233, is liable for a penalty under I.R.C. § 6662(h) in the amount of $342,251.

4. Prior to the execution of this Agreement, the Partnership made a lump sum payment of $8,980,133 (the "Settlement Payment") to the U.S. Department of the Treasury ("Treasury") in full settlement of the tax, penalties, and interest that could be assessed and collected against the Partnership as a result of the Adjustments in determination clause 1 herein.

5. The Settlement Payment is not refundable or subject to credit, refund, offset, or otherwise reimbursable by the Partnership or the Partners under any circumstances and may be retained by the Treasury regardless of whether it is assessed.

6. No part of the Settlement Payment is deductible, amortizable, or otherwise recoverable for tax purposes by the Partnership or the Partners for any taxable year.

7. The Partnership waives all restrictions on assessment, including the restrictions under I.R.C. § 6232(b), and collection of the imputed underpayment and penalties (and interest on such amounts) determined under this Closing Agreement.

Closing Agreement With Franklin Woods, LLC  EIN: 

8. Any of the following amounts received by the Partnership after the execution of this Closing Agreement are reportable as ordinary income for the taxable year of receipt:

   a. Amounts paid from third-party tax-gap or tax result or tax liability [insurance] policies, audit insurance policies, or similar funds or investments purchased by the Partnership in connection with the Transaction;
   b. Amounts received from promoters, appraisers, legal or tax professionals, donees, or any other person associated with the creation, marketing, execution, or implementation of the Transaction, regardless of whether a civil action is filed against those persons; or
   c. Amounts received from any other third party that is paid as a result of participation in the Transaction and the disallowance of non-cash charitable contribution deduction arising from the Transaction.

9. An inspection of records during the consideration of this Closing Agreement does not preclude or impede, pursuant to I.R.C. § 7605(b), Rev. Proc. 2005-32, 2005-1 C.B. 1206, or any administrative provisions adopted by the Commissioner, a later examination of a return or inspection of records with respect to any tax year needed to resolve any issue outside the scope of this Closing Agreement.

10. Execution of this Closing Agreement does not preclude the Commissioner from asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

11. Execution of this Closing Agreement does not preclude the Commissioner from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in transactions for violation of any criminal statute.

12. Nothing in this Closing Agreement offers any protection against criminal investigation or prosecution.

Closing Agreement With Franklin Woods, LLC  EIN: ███████

13. This Closing Agreement is effective upon execution by the Commissioner or his delegate.

THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:

(1) The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

(2) it is subject to the Code sections that expressly provide that effect be given to their provisions (including any stated exception for I.R.C. § 7122) notwithstanding any other law or rule of law; and

(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

For the BBA Partnership:

Franklin Woods, LLC

By: _____    Date Signed: _____
    Brian Robbins, Designated Individual of Green Rock
    Management LLC, Partnership Representative

By: _____    Date Signed: _____
    Brian Robbins of Green Rock Management LLC
    State Law Signatory of Taxpayer

Commissioner of Internal Revenue

By: _____    Date Signed: _____
    Name and Title:

| I have examined the specific matters and recommend the acceptance of the proposed agreement. | I have examined the specific matters and recommend the acceptance of the proposed agreement. |
|---|---|
| (Receiving Officer)　　　(Date) | (Reviewing Officer)　　　(Date) |
| (Title) | (Title) |

4 of 5

Closing Agreement With Franklin Woods, LLC  EIN: 

**Instructions**

This agreement must be signed and filed in triplicate. (All copies must have original signatures.) The original and copies of the agreement must be identical. The name of the taxpayer must be stated accurately. The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year when a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

(1) the date of the instrument;

(2) that it is or is not of record in any court;

(3) the names of the beneficiaries;

(4) the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to federal tax matters; and

(5) that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship, is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached.

Use additional pages if necessary and identify them as part of this agreement.

Please see Revenue Procedure 68-16, C.B. 1968-1, page 770, for a detailed description of practices and procedures applicable to most closing agreements.



March 14, 2025

Joseph J. Stafford
312.821.6157 (direct)
Joseph.Stafford@wilsonelser.com

**VIA EMAIL ONLY**

D. Austin Bersinger (ABersinger@bradley.com)
Bradley Arant Boult Cummings LLP
1230 Peachtree Street NE, 20th Floor
Atlanta, GA 30309

      Re:    IRS Closing Agreements – Section 170(h) Policies

                Arbor Creek Partners, LLC ("Arbor Partners") (Policy No. VFP/FL/20436/2021/1)
                Franklin Woods Partners, LLC ("Franklin Partners") (Policy No. VFP/FL/20451/2021/1)
                Jones Crossing Partners, LLC ("Jones Partners") (Policy No. VFP/FL/20442/2021/1)

Dear Mr. Bersinger:

On behalf of Fidelis Underwriting Limited as capacity provider for Volante Global ("Insurers"), please allow this letter to respond to your letters dated February 28, 2025, regarding the above matters and set forth the Insurers' current position in connection with the settlement offers received by (1) Arbor Creek, LLC ("Arbor Creek"), (2) Franklin Woods, LLC ("Franklin Woods"), and (3) Jones Crossing, LLC ("Jones Crossing") (collectively, the "Taxpayers" or "PropCos"), from the IRS regarding the audit and disallowance of noncash charitable contribution deductions claimed by each Taxpayer related to conservation easement donations for properties located in Alabama (the "Conservation Easements"). The IRS disallowed the deductions for not meeting the requirements of Section 170(h) because, *inter alia*, the Taxpayers relied on an unqualified and/or overvalued appraisal.

By way of letters dated February 10, 2025 (Arbor Creek and Franklin Woods) and February 25, 2025 (Jones Crossing), the IRS issued each Taxpayer/PropCo a "Form 906, Closing Agreement on Final Determination Covering Specific Matters" (the "IRS Settlement Offers"). Each contains a similar structure: (1) the claimed Conservation Easement deduction will be disallowed; (2) the capital contributions by the investors will be allowed as "a deduction for out-of-pocket costs"; (3) the IRS will calculate the tax due at the partnership level using a tax rate of 21%; (4) the gross valuation misstatement penalty will be applied to any underpayment of tax at a rate of 5%; (5) the PropCo must make one payment for all tax, penalties, and interest due; (6) the entire amount must be paid by the PropCo prior to the execution of the settlement agreement; (7) the IRS is not precluded from asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230; and (8) the IRS is not precluded from investigating any criminal conduct, or pursuing any other investigation or prosecution.

55 West Monroe Street, Suite 3800 • Chicago, IL 60603 • p 312.704.0550 • f 312.704.1522

Alabama • Albany • Atlanta • Austin • Baltimore • Beaumont • Boston • Chicago • Dallas • Denver • Edwardsville • Garden City • Hartford • Houston
Indiana • Kentucky • Las Vegas • London • Los Angeles • Miami • Michigan • Milwaukee • Missouri • Nashville • New Jersey • New Orleans
New York • Orlando • Philadelphia • Phoenix • San Diego • San Francisco • Sarasota • Stamford • Virginia • Washington, DC • Wellington • White Plains

**wilsonelser.com**

309457051v.1



- 2 -

In connection with the foregoing, it is our understanding that your office represents Arbor Partners, Franklin Partners, and Jones Partners (*i.e.*, the **Named Insureds**[1] under the respective policies). In this capacity, your February 28 letters state, in part, the following:

> We thus reiterate our demand that the Insurers consent to [the Taxpayers'/PropCos'] acceptance of the IRS's proposed settlement set forth in the Form 906. In the event the Insurers cannot commit to providing consent with respect to the IRS settlement, we respectfully request that the Insurers agree not to raise lack of consent or other related policy provisions as an impediment to coverage. We further request that the Insurers provide their coverage position with respect IRS's settlement offer under the terms of the Policy. In order to meet the IRS's deadline, we request that the Insurers provide a written response to this correspondence by March 14, 2025.

First, it is important to note that the amount sought in connection with each IRS Settlement Offer exceeds the limits of liability for each relevant Policy. Thus, there is no current opportunity for the Insurers to settle any one of these matters within the available limits of any of the respective Policies.

Additionally, and significantly, in light of the early stage of the IRS proceedings for each of these matters, the absence of any meaningful objective assessment of the due diligence relied upon to value the Conservation Easements, the lack of any meaningful evaluation of the feasibility and reasonable probability that the properties could have been developed into the taxpayer-claimed HBU, the criticism of "out of pocket" settlements and their low acceptance levels, and the unique facts that must be applied to the "surprisingly complicated" tax deductions and matters at issue here, the Insurers simply do not have sufficient information to provide consent to accept the IRS Settlement Offers at this time.

For the reasons set forth below and in prior correspondence, the ***Insurers respectfully advise that, at this time, they are unable to accommodate your request for consent or agreement not to raise lack of consent as to the IRS Settlement Offers issued to Arbor Creek, Franklin Woods, or Jones Crossing***.

## BACKGROUND

### A.  SYNDICATED CONSERVATION EASEMENT (SCE) TRANSACTIONS AND CLAIMED DEDUCTIONS

Each **Named Insured** was created to raise funds through a private placement and use the proceeds from the capital raise to purchase a controlling interest in a property company (*i.e.*, a PropCo), which would purchase tracts of land in Alabama (Property). The **Named Insured** would then solicit investments through the private placement to purchase an interest in PropCo with the intention of using the Property in one of three ways: (1) develop it to its "highest and best use" (HBU) producing an income stream for the investors and a valuable asset that could be sold; (2) donate a conservation easement to protect certain natural attributes inherent in the Property, producing a tax deduction for the investors; or (3) holding the property while maximizing any income potential and waiting for appreciation to resell. The investors in all cases voted for the second option, and the PropCo donated a conservation easement to a qualified charity.

As a result of the donation, PropCo's tax return claimed a deduction under Section 170(h), which allows a taxpayer to deduct the value of a "qualified real property interest" donated to a "qualified organization" exclusively for a "conservation purpose." The deduction relied on an appraisal that first estimated the value of the unencumbered Property (before the donation) based on the fair market value (FMV) if it was developed to its HBU – namely, as crushed stone mining and processing facilities and operations– then

---

[1] **Bold** terms not otherwise defined herein shall have the meaning ascribed in the respective policies.

**WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 3 -

subtracting the FMV of the Property after the donation in its encumbered state to estimate the easement's FMV. Using this "Before and After" HBU valuation, the PropCo combined the appraised value of the easement with cash donated and claimed a deduction of that combined amount. The deduction was passed through the **Named Insured**, which elected to be treated as a partnership for tax purposes, to the investors according to their ownership interests.

### B. IRS ENFORCEMENT EFFORTS AGAINST SCE TRANSACTIONS AND CLAIMED DEDUCTIONS

The IRS and Congress have had a complicated relationship with non-cash charitable donations for a long time, resulting in Section 170 being a lengthy and involved section of the tax code. While there is broad support for the social policy of promoting donations to charitable institutions – and that same notion has expanded the social policy aims of the tax code to also foster donations that preserve open greenspace – there also have been instances of abuse by overzealous taxpayers that have caused the IRS to be wary of these donations. In or about 2017, the IRS began identifying some SCE transactions as abusive and classifying them as tax avoidance schemes (*i.e.*, tax shelters). At that time, the IRS identified SCE transactions in general as "listed" transactions, requiring that they be specifically identified in any tax return taking such a deduction. *See* Treas. Reg. § 1.6011-4(b)(2) and I.R.C. §§ 6111 and 6112. In 2019, the IRS added SCE transactions to its annual "Dirty Dozen" list of tax scams. As a result, the IRS began auditing 100% of all SCE tax deductions and disallowing most if not all.

### C. THE NAMED INSUREDS' PPMs AND THE TAXPAYERS'/PROPCOs' CLAIMED DEDUCTIONS

Against this backdrop, the following PPMs were issued: (1) Arbor Partners' PPM, dated August 6, 2021; (2) Franklin Partners' PPM, dated December 15, 2021; and (3) Jones Partners' PPM, dated October 22, 2021 (collectively referred to as the "*Named Insureds' PPMs*"). Consistent with the *Named Insureds' PPMs*, each solicited investments and raised funds to purchase a controlling interest in each respective PropCo. Once the funds were raised, the investors voted for the PropCo to donate the Property as a Conservation Easement to protect certain natural attributes inherent in the Property, producing a tax deduction for the investors.

Significantly, each of the *Named Insureds' PPMs* provided the following language (emphasis in original):

> Only investors who qualify as "**accredited investors**", as defined in Section 501(a) of Regulation D promulgated under the Securities Act may participate in this Offering. No public market currently exists for the Units, and no such market will develop as a result of this Offering. **INVESTORS CONSIDERING AN INVESTMENT IN THE COMPANY SHOULD DO SO ONLY AFTER CAREFULLY CONSIDERING THE RISKS, INCLUDING, BUT NOT LIMITED TO, THE NON-EXCLUSIVE RISK FACTORS DISCLOSED ELSEWHERE IN THIS MEMORANDUM, AND INVESTORS WHO ARE NOT GENERALLY FAMILIAR WITH THE DRILLING AND EXTRACTION OF MINERAL AGGREGATE AND QUALIFIED CONSERAVTION CONTRIBUTIONS OF CONSERVATION EASEMENTS UNDER FEDERAL TAX LAW SHOULD DISCUSS THE INVESTMENT RISKS OF THE COMPANY'S PROPOSED BUSINESS PLANS WITH THEIR PERSONAL TRUSTED FINANCIAL AND TAX ADVISORS AND INDUSTRY EXPERTS BEFORE MAKING AN INVESTMENT.**

> \*            \*            \*

> Each prospective Investor, or his, her, or its advisors and representatives, is expected to have familiarity with all of the issues which are found in investments which may involve



- 4 -

charitable contributions as a part of their tax and business features.

(*See Named Insureds' PPMs* at p. VII).

Stated another way, only sophisticated investors who were familiar with "qualified contributions of conservation easements" were invited to participate in these transactions. Further, the *Named Insureds' PPMs* also clearly and explicitly outlined the "significant risks" associated with each conservation easement option. Indeed, in relevant part, the *Named Insureds' PPMs* specifically state (emphasis in original):

> **(2) IF THE CONSERVATION OPTION IS SELECTED BY THE MEMBERS**, it is estimated that the aggregate charitable contribution deduction that would be allocated to the Company would be approximately $26,126,100.00 of the total estimated charitable contribution deduction applicable to the Real Property (approximately $26,390,000.00), which exceeds an amount of two and one-half times (2.5x) the amount invested by the Members in the Company. **AS SUCH, PURSUANT TO INTERNAL REVENUE SERVICE ("IRS") NOTICE 2017-10, SUCH CHARITABLE CONTRIBUTION OF THE CONSERVATION EASEMENT WOULD, UNDER CURRENT RULES, BE A "LISTED TRANSACTION" FOR PURPOSES OF TREASURY REGULATION SECTION 1.6011-4(B)(2). A "LISTED TRANSACTION" IS A TYPE OF "REPORTABLE TRANSACTION" THAT IS THE SAME AS OR SUBSTANTIALLY SIMILAR TO ONE OF THE TYPES OF TRANSACTIONS THAT THE IRS HAS DETERMINED TO BE A TAX AVOIDANCE TRANSACTION.**
>
> \*                    \*                    \*
>
> Each Investor is strongly recommended to consult with independent legal, accounting, tax, and other advisors to assure that each Investor understands completely all tax consequences of an investment in the Company, including the implications of Notice 2017-10.
>
> **<u>The IRS routinely audits "qualified conservation contributions" involving conservation easements, and typically attacks the procedures in making such a charitable contribution, as well as the amount of deduction claimed (i.e., the valuation)</u>**. Investors should anticipate that if the IRS chooses to audit Arbor Creek, the charitable contribution deduction from the Charitable Contribution, and/or the Company, the IRS's initial position will most likely be to disallow such deduction entirely and impose on the Members penalties, increased taxes, and interest attributed to such disallowed deduction and for participating in a listed transaction. <u>See</u> **"IRS POSITIONS CONCERNING THE CHARITABLE CONTRIBUTION OF THE CONSERVATION EASEMENT ON THE REAL PROPERTY."**

(*See Named Insureds' PPMs* at p. VI). Additionally, the *Named Insureds' PPMs* also expressly outline various "RISK FACTORS", including but certainly not limited to (emphasis in original):

> **21. Potential for Evolution in Case Law.** New case law pertaining to federal income taxation is consistently being released. There can be no assurances that case law will not evolve in such a manner as to alter the present form of computing the federal income tax liability of the Members or to otherwise change in a materially adverse way the potential federal income tax consequences of an investment in the Company. These types of changes, if they come to pass, would have a material adverse effect on the tax benefits which might otherwise arise from an investment in the Company.

309457051v.1



- 5 -

22. **Potential Change in IRS Position**. The Internal Revenue Service ("**IRS**") is consistently developing new position as the state of tax law evolves. There can be no assurances that the IRS's position on any issue will not be amended in such a manner as to alter the present form of computing the federal income tax liability of the Members, or to otherwise change in a materially adverse way the potential tax consequences of an investment in the Company. This could potentially include a position that the IRS has not advanced to date in relation to the Company's use of a combination of Code Sections, such as Code Sections 170(e), 170(h), 702(a)(4), 1223(2), and 263(c) as well as Treasury Regulation Section 1.612-4(a). These types of changes, if they come to pass, would have a material adverse effect on the tax benefits which might otherwise arise from an investment in the Company.

(*See* Arbor PPM at p. 67; Franklin PPM at p. 69; Jones PPM at p. 68).

Significantly, there is likewise an entire "risk factors" section of the *Named Insureds' PPMs* dedicated to "**ADDITIONAL TAX RISK FACTORS RELATED TO QUALIFIED CONSERVATION CONTRIBUTIONS WITH RESPECT TO THE REAL PROPERTY**." These sections expressly advise that "[c]onservation easements under Section 170(h) of the Code have received significant attention and scrutiny from the IRS in recent years, including a perceived increase in audit activity." This includes an expected IRS challenge to the "[a]ppraiser's 'highest and best use' of the Real Property in questioning the valuation of the Charitable Contribution."

As a result of the "heightened scrutiny on conservation easements," the *Named Insureds' PPMs* expressly advise the investors that "the IRS is likely to audit" these offerings and that "there can be no assurances that the value of the Conservation Easement will be determined by a court not to result in valuation penalties." Moreover, they also explicitly instruct that in any audit and IRS challenge, "there may not be a final determination on the merits of the conservation value until many years later on appeal." (*See* Arbor PPM at pp. 67-71; Franklin PPM at pp. 69-73; Jones PPM at pp. 68-72). Accordingly, the *Named Insureds' PPMs* advise, emphasize, and reiterate in capitalized, bold terms:

> **OUT OF PRUDENCE, PROSPECTIVE INVESTORS SHOULD ASSUME THAT THE IRS WILL AUDIT THE TAX RETURNS OF [ARBOR CREEK, FRANKLIN WOODS, JONES CROSSING] AND OF THE COMPANY AND THAT SUCH AUDITS COULD RESULT IN THE PROPOSED DISALLOWANCE OF SOME OR ALL OF THE TAX BENEFITS ANTICIPATED TO BE DERIVED FROM AN INVESTMENT IN THE COMPANY...**
>
> \*        \*        \*
>
> **PROSPECTIVE INVESTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISOR CONCERNING WHETHER THE POTENTIAL CHARITABLE DEDUCTION, OR OTHER FEATURES OF THE COMPANY'S BUSINESS PLAN AND TAX OBJECTIVES MAY INVOLVE AN UNACCEPTABLE RISK OF AUDIT OR MAY OTHERWISE CAUSE AN INVESTMENT IN THE COMPANY TO BE INAPPROPRIATE, GIVEN SUCH PARTICULAR INVESTOR'S INDIVIDUAL CIRCUMSTANCES.**

(*See* Arbor PPM at p. 69; Franklin PPM at pp. 70-71; Jones PPM at p. 70).

Furthermore, the *Named Insureds' PPMs* also contain detailed, lengthy, and explicit sections on

**WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 6 -

"**FEDERAL TAX CONSIDERATIONS.**" These sections expressly detail recent, anti-syndicated conservation easement developments, including but certainly not limited to IRS "campaigns" and initiatives (including labeling conservation easements on its "dirty dozen" list), Congressional investigations and proposed legislation, administrative enforcement actions and efforts, Department of Justice litigation, and case law development. They likewise advise as to the impact of IRS Notice 2017-10 on syndicated qualified conservation contributions of property and note that any conservation easement transaction with a claimed deduction greater than 2.5x the amount of the investors' investment in the transaction (i.e., each transaction here) will be disclosed as a "listed transaction" to the IRS and result in an audit. (*See* Arbor PPM at pp. 75-93; Franklin PPM at pp. 77-96; Jones PPM at pp. 76-94). Indeed, the *Named Insureds' PPMs* state in capitalized, bold terms:

> **IT IS STRONGLY RECOMMENDED THAT EACH PROSPECTIVE INVESTOR CONSULT WITH HIS, HER, OR ITS OWN INDEPENDENT LEGAL, ACCOUNTING, TAX, AND OTHER ADVISORS TO ASSURE THAT HE, SHE, OR IT UNDERSTANDS COMPLETELY THE HIGH TAX RISK OF AN INVESTMENT IN THE COMPANY, INCLUDING THE IMPLICATIONS OF NOTICE 2017-10, THE CONSEQUENCES OF DISCLOSING PARTICIPATION IN A REPORTABLE TRANSACTION ON IRS FORM 8886, BEING SUBJECT TO AN IRS AUDIT, THE POTENTIAL LOSS OF THEIR ENTIRE INVESTMENT INLCUDING A COMPLETE DISALLOWANCE OF POTENTIAL DEDUCTIONS BY THE IRS, AND IMPOSITION OF SIGNIFICANT PENALTIES AND INTEREST, INCLUDING POTENTIAL ELIMINATION OF ANY REASONABLE CAUSE AND GOOD FAITH DEFENSE WITH RESPECT TO THE IMPOSITION OF SUCH PENALTIES, ON THE MEMBERS.**

(*See* Arbor PPM at p. 79; Franklin PPM at p. 82; Jones PPM at pp. 80-81).

Finally, the *Named Insureds' PPMs* also contain specific, relevant sections on "**IRS POSITIONS CONCERNING THE QUALIFIED CONSERVATION CONTRIBUTION OF THE CONSERVATION EASEMENT ON THE REAL PROPERTY.**" These sections focus on informing the prospective investors that the appraisals relied upon in the PPMs will be challenged by the IRS, and "[t]he IRS will likely maintain that the Real Property's actual fair market value was well below [PropCo's appraiser's valuation] at the time of the charitable contribution." Notably, these sections also advise the investors that "an initial position of the IRS may be based on the valuation by an IRS 'engineer' who does not abide by the Uniform Standards of Professional Appraisal Practice." Stated a different way, the *Named Insureds' PPMs* acknowledge the IRS will almost certainly disallow the claimed deductions based on inflated appraisal valuations; however, those IRS positions may themselves be based on unqualified appraisers and subject to challenge by the PropCos. Ultimately, these are "factual matter[s] to be resolved by the court 'on the basis of the entire record.'" (*See* Arbor PPM at pp. 93-101; Franklin PPM at pp. 97-104; Jones PPM at pp. 95-102).

Upon review, consideration, and independent consultation with legal, accounting, tax, and other advisors on the significant tax risks, the inevitability of an audit, and the high likelihood that the IRS would challenge and disallow the deduction on the basis of an alleged inflated appraisal valuation, the investors still decided to participate in the PPM, contribute funds to purchase ownership interests in these partnerships, and voted to donate a conservation easement in exchange for a tax deduction.

Subsequently, as expected, the IRS selected each of the PropCos' tax returns for examination and disallowed the deductions as part of the examination, asserting that they were improper for various technical reasons, and grossly overvalued. The IRS had its own appraisers perform a before and after valuation of the FMV of the subject properties before and after being encumbered by the conservation easements—the

 WILSON ELSER
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 7 -

difference being the value of the conservation easement. As the *Named Insureds' PPMs* anticipated, the resulting valuations were significantly lower (millions of dollars less) than those relied upon by the PropCos in taking their deductions. The IRS also assessed a "gross valuation misstatement" penalty of 40% plus interest. It is our understanding that, as to each of these matters, the IRS tax proceedings against the PropCo remain ongoing, are in the IDR stage and have not received preliminary reports, Notice of Preliminary Partnership Adjustments (NOPPAs), or Final Partnership Adjustments (FPAs).

### D. THE IRS'S NON-DOCKETED SYNDICATED CONSERVATION EASEMENT RESOLUTION INITIATIVE

As noted above, in or around 2019, the IRS added SCE transactions to its annual "Dirty Dozen" list of tax scams and began auditing 100% of all SCE tax deductions and disallowing most if not all. As more SCE deductions were disallowed, more cases headed to the Tax Courts resulting in a significant backlog of cases. Accordingly, in early-2024, the IRS issued settlement offers to taxpayers that had filed Petitions with the Tax Court challenging the IRS' disallowance of their tax deductions. The terms offered in early 2024 were somewhat more favorable than a series of earlier offers (in 2020) that never gained any traction.

More recently, in July 2024, the IRS began its "Syndicated Conservation Easement Resolution Initiative" (SCERI). In connection with this initiative, the IRS issued invitations to certain taxpayers (that were in some phase of the examination process but had not yet filed Tax Court petitions) as "an opportunity to elect to participate in a settlement initiative to resolve a transaction described in Section 2 of Notice 2017-10." By way of letters from the IRS dated July 9, 2024, each PropCo identified herein (Arbor Creek, Franklin Woods, and Jones Crossing) received an invitation to participate in the IRS's SCERI initiative.

### E. NOTICE TO INSURERS OF SCERI INITIATIVE AND REQUEST FOR INFORMATION

On July 10, 2024, Brian Robbins at Green Rock, LLC (as partnership representative for the **Named Insureds** and PropCos/Taxpayers) provided notice under the Policies regarding the IRS's SCERI initiative. Shortly thereafter, our office requested no less than fourteen (14) separate categories of relevant documents and materials necessary for the Insurers to adequately review, evaluate, analyze, and consider the unique history, attributes, transactions, valuations, and due diligence related to Arbor Creek, Franklin Woods, and Jones Crossing. In response, your office provided some initial documents; however, many of our requests were not addressed and there were significant omissions and/or withholding of materials.

Over the next few months, our office continued to follow up on these requests, as well as suggested a common interest agreement to allay any privilege or confidentiality concerns. While these efforts did result in additional, limited, rolling productions by your office, many of our requests remain outstanding. Our prior correspondence detail these requests and our efforts to obtain such necessary and relevant information. Regardless, in the interest of clarity – as we have continually advised – the Insurers' position is based on the materials provided to date. To the extent additional information exists and has not been provided, the Insurers continue to request such information and expressly reserve their right to consider and evaluate such information, and to the extent necessary, modify their determination at the appropriate time.

### THE POLICIES

The Insurers issued the above-referenced, Investor 170(h) Liability Insurance Policies, as "indemnity-only" policies, with aggregate limits of liability of: (1) Arbor Partners – $5,220,000 (excess a $156,600 retention); (2) Franklin Partners – $7,925,000 (excess a $237,750 retention); and (3) Jones Partners – $5,725,000 (excess a $171,750 retention). The Insurers will refer to certain provisions of the Policies in this letter; however, it is not intended to be exhaustive. The Insurers respectfully direct you to the Policies themselves for a more detailed recitation of the relevant language, conditions, definitions, and provisions.

 **WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 8 -

The Policies' definition of **insured** includes: (i) the **Named Insured**; (ii) any entity created to own and control specific property from which a conservation easement donation is made pursuant to Section 170 that the **Named Insured** controls or has the ability to direct the management decisions of during the performance of the business operations giving rise to the **proceeding** (*i.e.*, a **controlled entity**); and (iii) the individuals or entities that were **members** of the **Named Insured** or any **controlled entity** at any time during the **policy period** (*i.e.*, **investors**).

Relevant to your current requests, the Policies' Insuring Agreement states: "**we** will not pay any **loss** unless such **loss** is determined by the: ... (b) settlement of a **proceeding** with **our** prior written consent."

Further, Section VII.B. of the Policies provides:

> B.    Settlement
>
> **You** agree not to undertake settlement negotiations or enter into any settlement agreements that would result in a **loss** without **our** prior written consent, which **we** agree not to withhold unreasonably.

Additionally, Section IX., also sets forth the following relevant provisions:

> B.    Duty to cooperate
>
> **You** agree to provide **us** with such information, assistance, and cooperation as **we** may reasonably require in connection with **our** performance under this policy. **You** also agree not to take any action that increases **our** exposure under this policy, prejudices **our** position, or prejudices **your** rights of recovery from others.
>
> C.    No voluntary payments
>
> Except as it relates to defense of any **proceeding, you** agree not to incur any expense, admit any liability, or assume any obligation without **our** prior written consent. If **you** do so, it will be at **your** own cost and expense. However, this condition does not apply to payments **you** make to avoid or mitigate **loss** under this policy, if such payments are made from an escrow account maintained for the benefit of an **investor** or an **insured organization**.

## CONSIDERATION OF THE IRS SETTLEMENT OFFERS

Given the nature of your current requests (*i.e.*, consent or agreement not to raise lack of consent to accept the IRS Settlement Offers) and their time-sensitivity, we do not address any substantive coverage aspects in this letter. That is, we do not address whether the Policies would provide coverage for any portion of the amount sought to be paid in connection with the IRS Settlement Offers. The Insurers expressly reserve the right to address any and all such issues at the appropriate time and in the appropriate manner. In the interim, the Insurers continue to expressly reserve all rights under the Policies, at law, and in equity.

### A.  INSURERS' REQUESTS FOR INFORMATION AND RELEVANT MATERIALS

As noted above, since at least July 2024, we have been working with your office and the partnership representative for the PropCos/Taxpayers (Brian Robbins) in an attempt to obtain relevant and necessary information related to the IRS's claims and arguments, the taxpayer's defenses and arguments, the parties' respective position statements, tax counsel's reports and recommendations, the IRS settlement communications, an explanation as to why any settlement offer may be reasonable, any communications

309457051v.1

**WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 9 -

between the partnerships and the **investors/members** regarding settlement offers, insurance, or other relevant considerations, and the **investors'/members'** respective initial capital contributions and inquiries related to the IRS proceedings. The Insurers' current position in this letter is based on our receipt and review of this information. To the extent additional information exists and has not been provided, the Insurers reserve all rights under the Policies, at law, and in equity.

### B. FORMULAIC IRS SETTLEMENT OFFERS EXCEED POLICIES' LIMITS OF LIABILITY

There is no dispute that the IRS Settlement Offers are formulaic and neither treat each Taxpayer/PropCo individually nor evaluate each Conservation Easement on its own merits. Moreover, we again note that the amount sought in connection with each IRS Settlement Offer exceeds the limits of liability (and Retention) for each respective Policy. For reference, we provide the below table:

| MATTER: | POLICY LIMITS: | RETENTION | SETTLEMENT AMOUNT: | AMOUNT EXCESS: |
|---------|----------------|-----------|--------------------|----------------|
| Arbor Partners | $5,220,000 | $156,600 | $5,848,636 | *$472,036* |
| Franklin Partners | $7,925,000 | $237,750 | $8,980,133 | *$817,383* |
| Jones Partners | $5,725,000 | $171,750 | $6,509,239 | *$612,489* |

Thus, there is no current or realistic opportunity for the Insurers to settle any one of these proceedings – and resolve all claims and potential liability – within the limits of the Policies.

### C. DISCUSSION OF RECENT TAX AND FEDERAL COURT DECISIONS

The main (and seemingly, only) argument offered to support the Taxpayers' and **Named Insureds'** position that the IRS Settlement Offers are reasonable is the belief that, if litigated, the Tax Court would disallow the Conservation Easement deductions entirely or significantly reduce the amount allowed. These beliefs largely stem from at least eight, post-*Named Insureds' PPMs* decisions involving SCE deductions: (1) *Oconee Landing Prop. v. Comm'r* (Filed November 17, 2022); (2) *Mill Road 36 Henry, LLC v. Comm'r* (Filed October 26, 2023); (3) *Savannah Shoals, LLC v. Comm'r* (Filed March 26, 2024); (4) *Buckelew Farm v. Comm'r* (Filed April 25, 2024); (5) *Corning Place Ohio LLC v. Comm'r* (Filed July 17, 2024); (6) *JL Minerals, LLC v. Comm'r* (Filed October 8, 2024); (7) *Seabrook Prop. v. Comm'r* (Filed January 21, 2025); and (8) *Green Valley Investors, LLC  v. Comm'r* (Filed February 11, 2025).

In *Savannah Shoals*, the key finding by the Tax Court was that the HBU used by the taxpayer's expert was not feasible. The appraiser based his before valuation of the property on a HBU that the property would be used for an aggregate quarry. The IRS's expert opined that the HBU was low-density housing on a speculative hold basis until demand increased. Since there was an abundance of aggregate already coming from active quarries in the area, there was no particular local need for more aggregate, and shipping costs to destinations with demand for aggregate were too great for a quarry to be economically feasible, the Court rejected the HBU selected by the taxpayer's expert. Once that HBU was rejected, the appraisal offered by the IRS' expert was accepted entirely by default, resulting in the deduction being significantly reduced. Thus, the court allowed the deduction but reduced it from $23 million to $480,000.

Similarly, in *Oconee*, when the Tax Court turned to valuation, the question became the taxpayer's selection of the HBU used to underpin the appraisal. The taxpayer's expert assumed the HBU was low density housing for immediate development and sale, but the IRS' expert opined that the HBU should be speculative holding for future development because the housing market was saturated and ongoing developments with available, more desirable lots, were not selling. The Court decided as a matter of fact that there was no market for immediate development and sale of the proposed units, so the Court followed the valuation offered by the IRS' expert instead.



- 10 -

In *Mill Road*, the Court was also faced with disagreement on valuation methodology. The taxpayer's expert utilized immediate development of senior assisted living center, but the IRS expert asserted that there was an abundance of similar undeveloped real estate and no demonstrated need for a senior assisted living center. The Tax Court determined that there was no reason anyone would pay over $200,000 per acre for this undeveloped property when identical property could be acquired and developed in the same way for a fraction of the cost. Thus, the HBU proposed by the IRS that the property should be considered a speculative hold was accepted, and reduced the deduction from $8.9 million to $416,563.

Further, *Buckelew* also turns on a dispute over the correct HBU. The taxpayer's expert proposed development of an upscale residential community with substantial amenities, and the IRS expert countered that there was no demand in the area for such a community and that a speculative hold HBU with the possibility of timber production and limited residential development was more appropriate. Since demographic and economic data supported the IRS' expert, and the property had been marketed unsuccessfully for quite some time at a fraction of the value being proffered by the taxpayer, the Court rejected the taxpayer's HBU and adopted the opinion of the IRS' expert and reduced the deduction from $50.5 million to $4.6 million.[2]

In *Corning Place*, the Tax Court addressed a claimed historic preservation easement; namely, the proposed HBU development was converting an 11-story historic building in downtown Cleveland to a 45-story luxury apartment building. On the issue of valuation, the Tax Court disagreed with the partnership appraisal and expressly stated: "[a]part from being structurally implausible and economically unsound, adding 34 floors of steel and concrete atop the building would have required the partnership to forfeit the federal and Ohio tax credits upon which it relied to finance to renovation." The Court held the taxpayer's appraisal was based on "elaborate drawings for an imaginary 34-story vertical addition, which everyone knew would never be built." As a result, the $22.6 million deduction taken by the taxpayer was reduced to $900,000, and a 40% gross misstatement penalty was awarded.

In *JL Minerals*, the Tax Court focused extensively on the discounted cash flow (DCF) valuation methodology used to determine the FMV submitted by the taxpayer was too high. The Court colorfully expressed its skepticism as a result of a 3-factor approach taken to determine the FMV. In the kaolin mining context, the Tax Court evaluated the behavior of market participants, the history of the property, market factors for the mineral findings, and general mining issues, such as the costs of removing overburden and the ultimate claimed value of the mineral on the property. The Tax Court accepted the FMV proposed by the IRS, which was determined using the Comparable Sales Approach; however, it did not entirely rule out the use of the DCF Income Approach where a track record providing supported inputs existed.

In *Seabrook*, the taxpayer's appraiser proposed a high-end residential development on 622 acres in Liber County, Georgia. Interestingly, Seabrook was unique in that both the Tax Court and the taxpayer agreed that the "before donation" HBU of the Property would be as a residential development. The two diverged, however, on the scale and value of the development itself. First, the Tax Court found the DCF approach was too speculative and unreliable when valuing vacant land. Accordingly, looking to the comparable sales, the Tax Court found that three sales considered in the IRS' appraisal were the most useful, and ultimately found the "before donation" value was $9,000 per acre, or $5,733,000 total. This was more than double the "before donation" value suggested by the IRS ($2,060,000), but still significantly less than the value claimed as a donation by the taxpayer ($37,750,000).

---

[2] The taxpayer in *Buckelew* appealed the Tax Court's decision to the United States Court of Appeals for the Eleventh Circuit, which remains pending as case number 24-12365.

**WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 11 -

Most recently, in *Green Valley*, the taxpayer's appraiser proposed the HBU was development of an aggregate quarry mine on 141.65 acres in North Carolina, reflecting a FMV of $22,559,000. Interestingly, the Tax Court found there was no genuine dispute that such a mine was both physically and legally possible, and that necessary rezoning to effectuate the HBU was a strong possibility. The decision then came down to a "battle of the experts." Ultimately, the Tax Court found issues and flaws in the taxpayer's experts regarding valuation, market competition, and financial feasibility. The court found the IRS's experts to be more convincing; particularly, the testimony of geologist Martin Messmer who had examined the local market, spoke with market participants, and concluded that abundant competition as well as high transportation costs of aggregate were significant entrance barriers for the taxpayer's proposed HBU. Accordingly, the Tax Court determined taxpayer's appraiser overvalued the property (finding the FMV was under $1,500,000), and held that the HBU was agricultural, residential, and/or recreational use with knowledge of minerals on the site and the opportunity to seek entitlements allow for mining.

Alleged overvaluation is seemingly a central theme of the IRS's enforcement efforts. Historically, however, the IRS has succeeded in challenging deductions largely by scrutinizing the taxpayer's compliance with various technical requirements in the regulations (*i.e.*, so called "foot faults"). Notably, not only have taxpayers learned to avoid these "foot faults" in documenting and reporting their donations, but recent court decisions largely reject any continued attempt by the IRS to rely on these types of technical arguments in SCE disputes. Thus, while each of the above Tax Court decisions may be cited as being adverse to the taxpayers in certain regards, such a reading would be too narrow and ignore the favorable aspects.

By way of brief example, while the court ruled against the taxpayer in *Mill Road* as to valuation, it swiftly rejected a number of arguments relied upon by the IRS, including but not limited to: (1) the IRS's argument that the property company lacked the necessary donative intent because it was primarily motivated to monetize the federal income tax deductions for its investors; (2) the IRS's argument that the conservation purpose was not met or "protected in perpetuity"; and (3) the IRS's argument that the appraiser was not "qualified" because he incompetently or carelessly overstated the value of the appraisal. Ultimately, the Tax Court clarified that the desire to obtain tax benefits does not undermine charitable donation status, the concept of partnership is broad, conservation purposes should be liberally interpreted, reserved rights in a deed do not necessarily eliminate perpetual protection, characterizing an appraiser as unqualified is an uphill battle, and civil fraud is extremely difficult for the IRS to prove, especially when a taxpayer has fully disclosed the easement donation on all tax returns.

Additionally, we also direct your attention to *Kiva Dunes Conservation, LLC v Comm'r* (filed June 22, 2009) – which was cited, and discussed in some detail, in the *Named Insureds' PPMs* – where a developer acquired 251 acres of undeveloped property in Alabama and turned it into a golf community, including a golf course, amenities and residential lots for sale. Seven years later, after many of the lots had been sold and built out, the developer donated a conservation easement preserving the golf course from development of more homes. The IRS disallowed the deduction. The Tax Court reviewed the long-standing acceptance of HBU valuation of conservation easements on a before and after basis. After considering the appraisal testimony and evidence submitted by both sides – including public comments by the IRS and certain members of Congress that golf course conservation easements were abusive as a matter of course – the Tax Court found that the FMV was $28,656,004, a slight reduction from the $30,588,235 claimed by the taxpayer. This ruling on valuation by the Tax Court was favorable to taxpayers.

Thus, while certain aspects of recent Tax Court decisions may seem like an assault on "Before and After" valuations of SCEs utilizing HBUs to determine FMV, that is not what they actually hold. Each states that, in the absence of comparable sales of conservation easements themselves (which is always the case), valuation should, in fact, utilize both the HBU for the property to determine the "Before" value, and then follow the "Before and After" methodology to arrive at the FMV of the easement. However, these cases



also pointedly illustrate that the HBU selected by the taxpayer will be scrutinized to determine if it is in fact physically possible, legally permissible, financially feasible, and maximally productive.

Further, contemporaneous rulings by the U.S. District Court for the Middle District of Georgia in *Townley v. United States* are instructive as well. There, the Court provided some context and questioned whether the IRS's aggressive positions on all SCE deductions were grounded in legitimate skepticism or had evolved into generalized cynicism -- the latter of which is counterproductive to the legal issues involved in evaluating each SCE deduction on a case-by-case basis. More specifically, the Court stated:

> From the heated rhetoric flowing from some of the briefing in this case, it is evident that the IRS and its counsel passionately believe that this worthy conservation scheme has been abused by greedy taxpayers assisted by clever lawyers, crafty accountants, and over-zealous appraisers. That rhetoric, some of which rises to the level of hyperbole, is not particularly helpful in focusing on the precise legal issues to be decided in the present case. Quite frankly, when legitimate skepticism evolves into generalized cynicism, such an attitude is typically counterproductive to assisting the Court to objectively evaluate legal requirements on a case-by-case basis. While Congress certainly expected that these types of deductions would be closely scrutinized, it did not intend for the IRS to create "gotcha traps" to ensnare taxpayers who seek the deductions in good faith. An enforcement attitude tempered by an expectation of *substantial* compliance should prevent abuse while accomplishing the worthy public purpose of conservation easements. In this order, the Court intends to focus on the legal requirements and not some global accusation that landowners seeking these tax breaks must be treated with great suspicion and are not entitled to any benefit of the doubt.

2024 U.S. Dist. LEXIS 55519, *8-9 (M.D. Ga. Mar. 27, 2024). In denying the IRS's motions to exclude the Townleys' (*i.e.*, the taxpayer's) expert testimony as to the HBU of the property, the Court stated:

> The Townleys have certainly not concealed their belief that their property has commercial value beyond the value of its pine trees or hunting rights. The fact that they and their neighbors may have originally purchased their property for prices based upon the value of timberland does not forever establish the fair market value of that property. Circumstances change. And here the Townleys' research and investigation have revealed that their property contains valuable mineral deposits in the nature of granite that can be mined and sold as crushed stone. They are not speculating about the presence of such deposits but have hired well-qualified and experienced persons to investigate the presence and extent of the deposits as well as the feasibility of extracting the stone for commercial use. They have also had persons with special expertise in such mining to evaluate the value of these mineral deposits.

> Suggesting that 1,000 acres of timberland with no such mineral deposits should be valued the same as 1,000 acres with marketable mineral deposits cannot be done with a straight face. Only the most stubborn devil's advocate would argue that property with gold or diamonds beneath the surface has value comparable to the property next door that has nothing but red Georgia clay beneath the topsoil, no matter how fertile that topsoil may be. This of course seems silly, but sometimes zealous advocacy leads to Alice's Wonderland. It is not surprising or suspicious that one piece of property (with valuable mineral deposits) has a value many times more than another property (without such deposits), even if the two properties appear identical on the surface. It's common sense.



The value placed on this property by the Townleys' experts certainly grabs the attention of the layperson unfamiliar with mining and the commercial value of minerals. But personal astonishment by the layperson or lawyer is not a reliable standard for evaluating the reasonableness of such valuations. Arguably, it justifies why our rules permit persons with special expertise to help explain to juries why their initial astonishment should not necessarily lead them to premature conclusions.

The point is that evidence exists that the Townleys' property has granite beneath it; that the granite is extractable, and that it adds value to the property. There is of course evidence to the contrary. And that's primarily what this fight should be about.

Whether the property here has such mineral deposits, whether they are feasibly extractable, and the extent to which they increase the value of the property are of course all issues upon which reasonable persons may disagree. And in litigation, when a jury has to resolve these issues, it would certainly be helpful for them to be provided with evidence from well-qualified experts who can provide relevant information based on the reasonable application of reliable methodologies…Each of the IRS's motions to exclude fails to fully grasp this distinction between admissibility and weight.

2024 U.S. Dist. LEXIS 51869, *2-5 (M.D. Ga. Mar. 22, 2024).

Based on our review of the above, as well as our discussions with the partnerships' tax and coverage counsel, it seems clear that the Tax Court will scrutinize the HBU put forth by the Taxpayers and potentially reduce the amount of any deduction to conform with the Tax Court's view of what a feasible HBU should be under the facts of the case. That said, while the IRS has a duty to enforce the Tax Code, "it likewise has a responsibility to treat each taxpayer individually and not as part of some imagined grand conspiracy which has as its purpose theft from the United States Treasury using fabricated transactions." *Townley*, 2024 U.S. Dist. LEXIS at *9 n.3. Here, relevant and material factors to consider include, but are not limited to: (1) the early stage of the IRS proceedings, where there has been no substantive discovery, investigation, or analysis; (2) the fact that no independent experts or appraisers have provided any valuation analysis or opinions; (3) the sophistication level of the investors that entered into these transactions, and the level of knowledge and disclosures available prior to doing so; (4) the fact that there is insufficient information to determine whether these "take it or leave it" settlement offers are reasonable on their face; and (5) the fact the IRS has shown (multiple times) that if taxpayers wait, improved settlement terms may be offered in the future. Moreover, the viability of the PropCos' HBUs has not been tested. Similarly, the expert testimony that was crucial in *Townley* has not been requested or provided at this stage in any of the taxpayers' proceedings. Ultimately, it is not clear at this point that the Tax Court would reject the specific HBUs used as a basis to appraise the properties at issue.

### D. LACK OF INFORMATION TO DETERMINE REASONABLENESS AT THIS STAGE

As noted above and in prior correspondence, the Insurers have engaged in a detailed investigation of the facts and law in an effort to make an intelligent evaluation and legitimate consideration of the current request. Over the past six months, the Insurers have continually sought specific information from both counsel for the **Named Insureds** and the partnership representative/tax matters partner for the PropCos. The Insurers' positions are based on the information received, and the time afforded for reasonable review of such materials.

It is our understanding that, as to each of these matters, the IRS tax proceedings against the PropCo remain ongoing, are in the IDR stage and have not received preliminary reports, NOPPAs, or FPAs. There has been no fact discovery. There has been no expert discovery. The expert to be presented by the IRS at trial



- 14 -

concerning the FMV of the Conservation Easement for each matter has not been identified, nor has a report from an IRS trial expert concerning the appraisal of the Conservation Easement for each matter been presented. Similarly, to our knowledge, no partnership has engaged a consulting or testifying expert concerning the issue of the FMV of the Conservation Easement for any of these matters. Since none of these matters are currently in petition with the Tax Court and unlikely to go to trial within the next year or two, it may be understandable that experts have not been engaged, but that does not change the fact that the information is not available. In any event, no one qualified as an appraiser has been engaged thus far by the partnership to assess the FMV of the Conservation Easements and thereby the defensibility of the amounts claimed as deductions.

The settlement offers presented by the IRS have been a staple in SCE litigation for several years. *See* IRS bulletin IR-2020-130. However, at least some leading tax professionals warned that this type of settlement may not be advisable. *See Questions Remain About the Conservation Easement Settlement Initiative*, by Hale E. Sheppard (chair of international tax section of Chamberlain, Hrdlicka) published in Tax Notes Federal (Sept. 21, 2020). In light of the questions raised about the "out of pocket" settlements proposed by the IRS, it appears that there has been a low rate of acceptance of these offers by the partnerships receiving them. *See Comparing IRS Settlements: Easements and Employee Retention Credits*, by Hale E. Sheppard (chair of international tax section of Chamberlain, Hrdlicka) published in Tax Notes Federal (Feb. 12, 2024). Among other reasons, partnerships presented with these settlement offers may not have taken these offers because their partnerships had conducted substantial due diligence, obtained one or more compelling appraisals, relied on various specialized professionals, and other reasons. *Id.*

### E.  EVALUATION OF CONSERVATION EASEMENTS AT ISSUE HERE

Again, we are mindful of recent Tax Court decisions concerning SCEs, and that each was decided after trial and quite properly noted that the FMV of each donated easement was a question of fact to be determined based on the unique facts of each case. Here, we are dealing with donated conservation easements that each have their own unique history and attributes, and the transactions and valuations must be examined and analyzed on an individual basis. This includes, but is not limited to, a detailed evaluation of the market conditions, capacity, appetite, and/or feasibility for the HBU identified and claimed by the taxpayer. As such, the information, detail, and due diligence involved and communicated to the respective **investors** is significant. Likewise, the documents, materials, and due diligence submitted to the Insurers in connection with the underwriting of the Policies is also significant. Based on the information and materials provided to date – and without any notion of trying to be exhaustive – we provide the following for each matter:

#### 1.  ARBOR CREEK

Arbor Creek involves a 239.04-acre parcel of primarily unimproved real property located in Elmore County, Alabama. A tax deduction of $26,390,000 was taken for placing a conservation easement on the property instead of pursuing an HBU of the construction crushed stone mining and processing facility. The Offer being considered would disallow the $26,390,000 deduction, allow an "Other Deduction" of $5,161,100 (the "out-of-pocket" amount) and limit the gross valuation penalty to 5%.

On February 10, 2025, the IRS presented a Closing Agreement settlement offer to Arbor Creek that would: (1) disallow the entirety of the claimed deduction; (2) allow an "Other Deduction" in the amount of $5,161,000 (the out-of-pocket costs or investor capital contributions); (3) result in an imputed underpayment under IRC § 6225 of $4,458,069; and (4) result in penalties under IRC § 6662(h) in the amount of $222,902 plus interest estimated to June 17, 2025 of $1,167,663.88. In sum, the IRS Settlement Offer to Arbor Creek would require a lump sum payment of $5,848,636 inclusive of tax, penalties, and interest.



At the outset, what is immediately noticeable (and common to all of these matters) is the lack of material, information, analysis, or reasoning to support the IRS's disallowance and valuation. Nor is there any information at all to suggest that the Conservation Easement transaction, the claimed deduction, and the IRS's position regarding disallowance is different in any way from the risks, issues, and considerations expressly and explicitly detailed and disclosed in the Arbor Creek PPM. The absence of any of these materials is particularly stark when juxtaposed with the significant amount of due diligence that was conducted by Arbor Partners in advance of claiming the deduction, and which was provided to the Insurers for evaluation and consideration in connection with the underwriting of the Arbor Partners Policy.

Indeed, this due diligence includes, but is certainly not limited to, the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, the Mine Plan Review Report prepared by Titan Environmental & Construction Co.; all of which seemingly provides detailed, scientific support for the development of a crushed stone mine in the manner set forth in Arbor Creek's proposed HBU. Moreover, there is the appraisal prepared by Scot A. Torkelson ("Torkelson") of Value Consulting Group. In determining the value of the Property before any election of a conservation easement, Torkelson reviewed a combination of reports, United States Census Data, etc., confirming the HBU of the Property for the development of a crushed stone mine. Torkelson concluded that the FMV of the Property before the donation date was $26,880,000 based on a DCF analysis of the expected cash flows of a mining operation on the Property. It further indicated that the FMV value of the Property after the donation of the Conservation Easement was $490,000, making the easement value $26,390,000.

Absent some compelling analysis specific to this particular Property, which reviews and evaluates the appraisal and mining reports, it is not possible at this time to conclude that the settlement offered by the IRS is reasonable. All of these materials were presented during the underwriting of the Arbor Partners Section 170(h) Policy as evidence that the SCE deduction taken by Arbor Creek was well-founded and would be worthy of defending through to a final determination. Due to the preliminary stage of the proceedings with the IRS, where no consultants or experts have been engaged by the partnership and tax counsel has not undertaken any significant efforts to prepare the dispute for final determination, there is no reasoned basis upon which to evaluate the settlement offer. While the recent decisions by the Tax Court addressing SCEs are an important consideration, they do not by themselves establish a reasonable basis to conclude the settlement offer is reasonable.

   2.  *FRANKLIN WOODS*

In 2021, Franklin Woods donated a conservation easement over certain property to a charitable organization and claimed a tax deduction of $40,500,000. The donated property consists of 164.09 acres of unimproved real property (*i.e.*, pine forests, open areas, wildlife food fields, etc.) in Elmore County, Alabama for which the taxpayer's appraisal identified a crushed stone mining and processing operation to be the hypothetical HBU.

On February 10, 2025, the IRS presented a Closing Agreement settlement offer to Franklin Woods that would: (1) disallow the entirety of the claimed deduction; (2) allow an "Other Deduction" in the amount of $7,904,650 (the out-of-pocket costs or investor capital contributions); (3) result in an imputed underpayment under IRC § 6225 of $6,845,024; and (4) result in penalties under IRC § 6662(h) in the amount of $342,251 plus interest estimated to June 17, 2025 of $1,792,858.70. In sum, the IRS Settlement Offer to Franklin Woods would require a lump sum payment of $8,980,133 inclusive of tax, penalties, and interest.

A significant amount of due diligence was conducted by Franklin Partners and provided to Insurers in order to evaluate and consider in connection with the underwriting of the Policy. Further, the amount of the deduction was based on this due diligence. The Technical Due Diligence Business Plan and Market

**WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 16 -

Analysis prepared by Burgex Inc. Mining Consultants, the Geology Engineering & Mining Feasibility Report, and the Mine Plan Review Report prepared by Titan Environmental & Construction Co. all are provided in support of the development of stone mining and processing operation as the HBU for the Property. A Baseline Documentation Report prepared by MTM Environmental, LLC was also prepared in contemplation of potential grant of conservation easement.

The initial appraisal, dated February 22, 2022, was prepared by Rick and Douglas Kenny of Kenny & Associates, Inc. ("Kenny"). In determining the value of the Property before any election of a conservation easement, Kenny reviewed a combination of reports, United States Census Data, etc., confirming the HBU of the Property for the development of a crushed stone mining and processing operation. Kenny concluded that the FMV of the Property before the donation date was $40,745,000 based on a DCF analysis of the expected cash flows of a mining operation on the Property. It further indicated that the FMV value of the Property after the donation of the Conservation Easement was $245,000, making the easement value $40,500,000. In considering the Sales Comparison Approach, Kenny focused on sales either in the Southeast or properties that had similar defining characteristics of the subject Property. Kenny's appraisal notes that there was an inherent weakness in attempting to use the Comparable Sales Approach, as there is a lack of sale transactions that would be suitable for use in comparative analysis for such unique operations.

Further, a review appraisal, dated January 7, 2022, was prepared by David W. Rice of Rice Appraisals, Inc. ("Rice"). Rice found that the value opinion stated in Kenny's December 11, 2021 Appraisal Report was appropriate and credible given the data and analyses presented. An additional appraisal report, dated April 15, 2022, was prepared by Thomas Spears ("Spears"), President & CEO of Global Valuation & Consulting, Inc. ("GVC"). Spears agreed that a crushed stone mining operation was an appropriate HBU before the easement, that the property value before the easement was $41,646,000, that the property value after the easement was $324,000, and that the FMV of the conservation easement was $41,322,000. Both appraisals and the review appraisal strengthen the validity of the HBU and FMV.

As to Mr. Spears, he has 40 years of experience in real estate appraisal, in general, and extensive experience appraising land and infrastructure for conservation easements and other charitable contributions. He had completed over 30 CE appraisals without ever facing questioning or auditing from the IRS (until the recent IRS push to scrutinize all SCE transactions). In fact, Mr. Spears (and other appraisers) actually filed a lawsuit against the IRS to directly challenge the manner in which the IRS has been treating appraisers and valuations in the SCE context.[3] Significantly, in addition to defending his own appraisals, Mr. Spears cited an empirical analysis of decided cases, published in Tax Notes Federal, July 22, 2019, which identified cases involving charitable contributions of easements on real property that were decided within the last 10 years. This study found that:

> Abusive overvaluation of conservation easements is not pervasive in the decided cases. Overall, courts sustained more than 80 percent of the values reported by taxpayers. Notably, the value determined by the court was closer to the value claimed on the taxpayer's return than to the value in the IRS notice more than 70 percent of the time, largely because the IRS took the initial position that the value was zero for approximately 65 percent of the easements. Expert testimony offered by the IRS at trial, however, came closer to the value determined by the court 54 percent of the time. This shift supports a theory that far fewer resources would need to be spent litigating conservation easement cases if the IRS made a good-faith effort to discern the correct value at the audit stage.

---

[3] *Dennis Benson, et al. v. Internal Revenue Service, et al.*, 21-cv-00074, filed on April 2, 2021 in the United States District Court for the Northern District of Georgia.



- 17 -

Given Mr. Spears ardent and unflinching belief in his appraisal methodology and valuation, his apparently reliable work product, and the fact that the IRS does not obtain objective third-party appraisals or other impartial determinations as to the accuracy of the appraisal before disallowing the deduction and assessing a penalty, a court reviewing these matters may be more likely to find that, without additional independent expert/appraiser opinions, there is nothing inherently unreasonable or improper about Mr. Spears' valuation and methodology.

Absent some compelling analysis specific to this particular Property, which reviews and evaluates the appraisal and mining reports, it is not possible at this time to conclude that the settlement offered by the IRS is reasonable. These materials were presented during the underwriting of the Franklin Partners Section 170(h) Policy as evidence that the SCE deduction taken by Franklin Woods was well-founded and would be worthy of defending through to a final determination. Due to the preliminary stage of the proceedings with the IRS, where no consultants or experts have been engaged by the partnership and tax counsel has not undertaken any significant efforts to prepare the dispute for final determination, there is no reasoned basis upon which to evaluate the settlement offer. While the recent decisions by the Tax Court addressing SCEs are an important consideration, they do not by themselves establish a reasonable basis to conclude the settlement offer is reasonable.

3.   *JONES CROSSING*

Jones Crossing involves a 208.17-acre parcel of property located in Coosa County, Alabama for which the taxpayer's appraisal identified a crushed stone mining and processing facility to be the HBU. Jones Crossing claimed a tax deduction of $29,230,000 for placing a conservation easement on the property instead of pursuing the identified HBU. On February 26, 2025, the IRS presented a Closing Agreement settlement offer to Willow Bend that would: (1) disallow the entirety of the claimed deduction; (2) allow an "Other Deduction" in the amount of $5,657.605 (the out-of-pocket costs or investor capital contributions); (3) result in an imputed underpayment under IRC § 6225 of $4,950,203; and (4) result in penalties under IRC § 6662(h) in the amount of $247,510 plus interest estimated to June 29, 2025 of $1,311,526. In sum, the IRS Settlement Offer to Jones Crossing would require a lump sum payment of $6,509,239 inclusive of tax, penalties, and interest.

Similar to the previous matters, there is a lack of materials, information, analysis, or reasoning to support the IRS's disallowance and valuation. Again, there is also no information at all to suggest that the Conservation Easement transaction, the claimed deduction, and the IRS's position regarding disallowance is different in any way from the risks, issues, and considerations expressly and explicitly detailed and disclosed in the Jones Crossing PPM. The absence of any of these materials remains stark when juxtaposed with the significant amount of due diligence that was conducted by Jones Partners in advance of claiming the deduction, and which was provided to the Insurers for evaluation and consideration in connection with the underwriting of the Jones Partners Policy.

Indeed, this due diligence includes, but is certainly not limited to, the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, the Mine Plan Review Report prepared by Titan Environmental & Construction Co.; all of which seemingly provide detailed, scientific support of the development of a crushed stone mine and processing operation in the manner set forth Jones Crossing's proposed HBU. Scott Torkelson of Value Consulting Group performed an appraisal of the donated easement using the before and after approach. In determining the value of the Property before any election of a conservation easement, Torkelson reviewed a variety of information to agree upon the HBU of the Property for the development as a crushed stone mine and processing operation. Torkelson concluded that the FMV of the Property before the donation date was $29,530,000 based on DCF analysis of the expected cash flows of a crushed stone mine and processing operation on the Property. He further indicated that the FMV value of the Property after the donation of the Conservation Easement was $300,000, making



the easement value $29,230,000. Moreover, a review of the Torkelson appraisal was prepared by Rick and Doug Kenny of Kenny & Associates (Kenny) and found that it met the requirements for a qualified appraisal.

Absent some compelling analysis specific to this particular Property, which reviews and evaluates the appraisal and mining reports, it is not possible at this time to conclude that the settlement offered by the IRS is reasonable. These materials were presented during the underwriting of the Jones Partners Section 170(h) Policy as evidence that the SCE deduction taken by Jones Crossing was well-founded and would be worthy of defending through to a final determination. Due to the preliminary stage of the proceedings with the IRS, where no consultants or experts have been engaged by the partnership and tax counsel has not undertaken any significant efforts to prepare the dispute for final determination, there is no reasoned basis upon which to evaluate the settlement offer. While the recent decisions by the Tax Court addressing SCEs are an important consideration, they do not by themselves establish a reasonable basis to conclude the settlement offer is reasonable.

## CONCLUSION

In sum, the Insurers have endeavored to diligently and adequately review the documents and information provided to date as a matter of urgency. As you know, the information we have been provided (and the information that remains outstanding) is highly technical and there is a notable absence of any written recommendations or analysis of any insured or tax counsel evaluation of the IRS's SCERI letters or as to the reasonableness of the IRS Settlement Offers. Relying on the information that has been provided to date, the Insurers have engaged in a detailed investigation, analysis, and evaluation of each of the above SCE transactions (including the due diligence materials provided to Insurers in connection with the underwriting of the Policies, such as market conditions, feasibility studies, appraisals, and other materials) and claimed deductions (including recent and historical case law and regulations) in an effort to adequately respond to the requests in your February 28 letters.

Ultimately, there simply is not enough information at this early stage to allow the Insurers to provide consent or agree not to raise lack of consent in connection with acceptance of the IRS Settlement Offers as to Arbor Creek, Franklin Woods, or Jones Crossing. Indeed, as to these matters, we have not been presented with any information that suggests the appraisers' valuation approach was incorrectly selected or performed, and we have not been presented with any information that undermines or refutes the substantial due diligence performed by the partnerships (which was provided and material to the underwriting of the Policies) prior to moving forward with the donations and claimed deductions.

In fact, these matters have proceeded in the exact manner expected and conveyed to the investors in the *Named Insureds' PPMs* and to the Insurers in connection with the underwriting of the Policies; that is, the investors voted on the "Conservation Option" with full knowledge that their charitable contribution would be a "listed transaction" that would be audited and attacked on valuation. To address those considerations, the investors engaged in significant, costly, and detailed due diligence efforts to support their valuations. The Named Insureds provided all of this due diligence to the Insurers in connection with the underwriting of the Policies and indicated that while an IRS audit and dispute was likely, the due diligence would allow the PropCos to properly and adequately defend themselves through a final adjudication on the merits. Here, that has not occurred. In fact, there has been no material change or development since the Named Insureds provided the due diligence to the Insurers. Stated a different way, by engaging in the transaction, the investors knew the PropCos would get audited and that the IRS examiner would disagree with their claimed valuations and seek to disallow those amounts. That is exactly what happened; however, the proceedings are at such an early stage that no legitimate defense (based on the due diligence performed) or independent valuation has been set forth. There is nothing to indicate that there has been any material change to the underlying due diligence performed and valuations obtained by the Named Insureds such that the Insurers



can deem the IRS Settlement Offers reasonable at this stage.

Accordingly, at this time the Insurers are **_unable to accommodate your request regarding consent or agreement not to raise lack of consent as to Arbor Creek, Franklin Woods, or Jones Crossing_**. The Insurers' positions herein should in no way be construed as a waiver of any of their rights under any provisions of the Policies or applicable law. Further, to reiterate, we do not address whether the Policies would provide coverage for any portion of the amount sought to be paid in connection with the IRS Settlement Offers. The Insurers expressly reserve the right to address any and all such issues at the appropriate time and in the appropriate manner. The Insurers also expressly reserve the right to modify their determination under the relevant Policies if further information warrants. The Insurers expressly reserve (and do not waive) any and all rights, remedies, and defenses at law, in equity and under their Policies including, but not limited to, the right to raise any of the terms, conditions, exclusions and/or provisions as warranted. As we noted at the outset, we invite you to contact us with any additional information or authority that you feel would cause the Insurers to review their position and/or assist in their determination. All such information and authority will be fully and fairly considered. Once you have had an opportunity to review, please feel free to reach out directly to discuss.

Very truly yours,

Wilson Elser Moskowitz Edelman & Dicker LLP

*Joseph Stafford*

Joseph J. Stafford

cc:     Peter J. Larkin, Esq.

# Exhibit K

**D. Austin Bersinger**
Partner
ABersinger@bradley.com
404.868.2042 direct



August 8, 2025

<u>**VIA EMAIL ONLY**</u>

Sarah Adam
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
Email: <u>sarah.adam@wilsonelser.com</u>

Re:    **Demand for Payment**

|  |  |
|---|---|
| Insured: | Franklin Woods Partners, LLC ("Franklin Partners") |
| Insurers: | Volante Global, LTD, Volante Specialty Risk LLC, Fidelis Underwriting Limited ("Insurers") |
| Policy No.: | VFP/FL/20451/2021/1 |
| Claimant: | Franklin Woods Partners, LLC |

Dear Ms. Adam:

I am writing regarding the above-referenced Policy.  This correspondence serves as Franklin Partners' formal demand, as the Named Insured under the Policy, that the Insurers (i) consent to Franklin Woods' acceptance of the IRS settlement offer in this case or waive the consent requirement under the Policy with respect to the same, and (ii) agree to fund amounts due as a result of Franklin Woods' acceptance of the IRS settlement, up to the policy limit.  We request that you provide a written response to this correspondence within 30 days, or by September 8, 2025.  Franklin Partners and Franklin Woods will accept full payment of this demand in lieu of a written response.

I.    **Demand for Consent or Waiver and Payment of Claim**

As you are aware, the IRS extended an offer to Franklin Woods, LLC ("Franklin Woods") on July 9, 2024, to resolve its ongoing tax dispute.  The IRS issued a Form 906 (Closing Agreement on Final Determination Covering Specific Matters) dated February 10, 2025 to finalize this resolution.  As you are further aware, the IRS is issuing revised Forms 906 for partnerships like Franklin Woods that have elected into the IRS's Syndicated Conservation Easement (Nondocketed) Resolution.  The revisions between the original Form 906 and the revised Form 906 are immaterial and have no bearing on Franklin Woods' ability to accept the IRS settlement or its claim under the Policy.  Franklin Woods' deadline for paying its liability resulting under the IRS's settlement offer is September 30, 2025.

Since the issuance of the IRS's offer over a year ago, we have repeatedly requested that the Insurers (i) either consent to Franklin Woods' acceptance of the IRS's offer or waive the consent requirement under the Policy, and (ii) provide their coverage position with respect to the

Sarah Adam
Wilson Elser
August 8, 2025
Page 2

IRS settlement offer. By letter dated March 14, 2025, your firm, on behalf of Volante Global LTD and Fidelis Underwriting Limited not only refused to provide a coverage position with respect to the IRS settlement but further refused to consent or waive the consent requirement under the Policy.

At this time, Franklin Woods has access to sufficient funds to pay the Policy retainer and any liability due under the IRS settlement in excess of the aggregate limit of the Policy. The IRS settlement accordingly represents an in-limits settlement opportunity. Franklin Partners, as the Named Insured under the Policy, demands that the Insurers reconsider their prior position with respect to the IRS settlement and agree to consent to Franklin Woods' acceptance of the same. To the extent that Insurers cannot commit to giving such consent, Franklin Partners demands that Insurers agree not to raise lack of consent or other related policy provisions as an impediment to coverage, as such an agreement does not negatively affect the Insurers' rights. *See, e.g., Homeland Ins. Co. of New York v. Health Care Serv. Corp.*, 2022 WL 2828752, at *4–6 (N.D. Ill. July 19, 2022) (allegations of harm from waiver of consent clause are illusory). Finally, Franklin Partners demands that the Insurers agree to fund amounts due, up to the policy limit, resulting from Franklin Woods' acceptance of the IRS settlement.

An insurer's right to withhold consent to settlement is constrained by its duty to act reasonably and in good faith. Even where a policy includes a consent-to-settle provision, the insurer must exercise that right in a manner consistent with the covenant of good faith and fair dealing implied in every insurance contract. *See, e.g., Piedmont Office Realty Trust, Inc. v. XL Specialty Ins. Co.*, 297 Ga. 38, 43 (2015); *Waters v. American Cas. Co. of Reading, PA*, 261 Ala. 252, 260–61 (1953). Courts evaluate the insurer's decision by asking whether it gave equal consideration to the interests of the insured and acted as a reasonably prudent insurer would under the circumstances. *See Piedmont Office*, 297 Ga. at 43; *see also Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 685 (2003); *First Acceptance Ins. Co. of Ga., Inc. v. Hughes*, 305 Ga. 489, 497 (2019); *State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So.2d 387, 391–92 (Ala. 1989). That reasonableness standard applies regardless of whether the insurer ultimately consents to or denies coverage; it must respond to requests for consent in a timely and informed manner based on the information available at the time. *See Geico Indemn. Co. v. Whiteside*, 311 Ga. 346, 352 (2021) (reasonableness of an insurer is determined based on information available at the time of the decision).

The Insurers position regarding the IRS settlement is blatantly unreasonable, particularly in light of the Tax Court's uniform rejection of taxpayer valuation positions in similar cases over its past 15 opinions. As we have repeatedly explained, even in Tax Court cases where the taxpayer prevailed on alleged technical issues, it nevertheless suffered significant losses of between 86.64% and 99.44% of the claimed deduction, the imposition of the strict liability 40% gross valuation misstatement penalty, and the continued accrual of interest through the litigation process.[1]

---

[1] In cases where the Tax Court disallowed the claimed deduction based on technical issues, including *Oconee Landing*, *Corning Place*, *Green Valley Investors*, and *Rock Cliff*, the taxpayer received no deduction and was liable for a 40%

Sarah Adam
Wilson Elser
August 8, 2025
Page 3

The following table confirms the ultimate result in cases where the taxpayer prevailed on all technical issues at trial:

| Case Name | Original Value | Determined Value | Reduction in Value | Penalty Percentage |
|---|---|---|---|---|
| *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129 | $8,935,000.00 | $900,000.00 | 89.93% | 40% |
| *Carter v. Commissioner*, T.C. Memo. 2023-133 | $14,175,000.00 | $1,000,000.00 | 92.95% | 40% |
| *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35 | $23,000,000.00 | $480,000.00 | 97.91% | 40% |
| *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52 | $47,570,000.00 | $4,595,000.00 | 90.34% | 40% |
| *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60[2] | $16,700,000.00 $14,950,000.00 | $693,000.00 $810,000.00 | 95.85% 94.58% | 40% 40% |
| *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93 | $16,745,000.00 | $93,690.00 | 99.44% | 40% |
| *Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111[3] | $23,142,421.00 $13,830,000.00 | $1,169,797.00 $1,571,226.00 | 94.95% 88.64% | 40% 40% |
| *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6 | $35,850,000.00 | $4,718,000.00 | 86.64% | 40% |
| *Ranch Springs, LLC v. Commissioner*, 164 T.C. No. 6 (2025) | $25,814,000.00 | $335,500.00 | 98.70% | 40% |
| *Beaverdam Creek Holdings, LLC v. Commissioner*, T.C. Memo. 2025-53 | $21,972,000.00 | $193,250.00 | 99.12% | 40% |

penalty. Nevertheless, the Tax Court found in favor of the IRS on the valuation issue in each case, which is what resulted in the assessment of the 40% gross valuation misstatement penalty.

[2] *Excelsior Aggregates* involved five donations: (i) conservation easement over tract 1, (ii) fee simple donation of tract 1, (iii) conservation easement over tract 2, (iv) fee simple donation of tract 2, and (v) fee simple donation of various tracts. The amounts reflected in this chart reflect the combined reported and determined values on tracts 1 and 2.

[3] *Jackson Crossroads* involved two cases: *Jackson Crossroads, LLC* and *Long Branch Investments, LLC*.

Sarah Adam
Wilson Elser
August 8, 2025
Page 4

| *Veribest Vesta, LLC v. Commissioner,* Docket No. 9158-23 (Order July 15, 2025) | $20,310,000.00 | $111,000.00 | 99.45% | 40% |
|---|---|---|---|---|

Across its decisions, the Tax Court has fully refuted the arguments that the Insurers' have raised as grounds for refusing to consent to the acceptance of the IRS settlement. The Insurers have not rebutted this analysis, identified any expert who contradicts this analysis or the assessments of tax counsel in other similarly situated cases, or pointed to any fact or set of facts that would lead a reasonably prudent person to refuse to settle this matter pursuant to the terms of the IRS settlement. *See Cotton States*, 276 G.A. at 685 ("Judged by the standard of the ordinarily prudent insurer, the insurer is negligent in failing to settle if the ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk."); *Waters*, 261 Ala. at 261. Put differently, it appears that in spite of countless tax attorneys directly communicating the reasonableness of the IRS settlement as well as the significant downside risk awaiting the partnership at trial, the Insurers intend to refuse to allow its insureds to protect their interests through accepting the IRS settlement.

To use the Insurers' own example of *Mill Road* as evidence of the reasonableness of the IRS settlement, if Franklin Woods expected the same outcome as the taxpayer in *Mill Road*, the Tax Court would determine that the Franklin Woods easement was worth approximately $4,078,350 (10.07% of the claimed deduction), limit the amount of the deduction to the historic landowners' basis in the property, and assert a 40% penalty on the resulting underpayment. The IRS settlement, by contrast, guarantees Franklin Woods a deduction of $7,904,650, or 19.52% of the claimed contribution, and a reduced penalty rate of 5%. The reduction of the tax rate from a presumed 37% to 21% further allows Franklin Woods to significantly reduce its losses in a manner that is otherwise impossible under the Tax Code if the Insurers refuse to consent to the IRS settlement. Finally, the settlement offer gives Franklin Woods the ability to further limit its losses by stopping the accrual of interest and avoiding legal fees and litigation costs.

In short, the IRS settlement is reasonable based on all available facts and circumstances. Franklin Woods' acceptance of the IRS settlement further significantly reduces the insureds' exposure to losses in this matter. The Insurers accordingly do not have any reasonable basis for (i) continuing to refuse to consent to Franklin Woods' acceptance of the IRS settlement or waive the consent requirement with respect to the same, or (ii) refusing to fund the amounts due as a result of such acceptance. To the extent that the Insurers refuse either demand, Franklin Partners further demands that the Insurers identify all supporting documentation, tax authority, consulting expert, or tax practitioner the Insurers are relying on in support of their unreasonable positions that the IRS settlement offer is not reasonable or is not covered under the Policy.

## II. Insurers' Refusal to Provide a Coverage Position

The Insurers' continued refusal to provide a coverage position concerning the IRS settlement constitutes bad faith. Insurers must act reasonably and in good faith when responding

Sarah Adam
Wilson Elser
August 8, 2025
Page 5

to settlement opportunities. *See S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 268–69 (1992); *Cotton States*, 276 Ga. at 684–85. That duty includes not only evaluating the terms of a proposed settlement, but also clearly and timely communicating the insurer's position to the insured—particularly where the insurer's position will affect the insured's ability to protect itself in the face of a claim. *See Am. Safety Indem. Co. v. Sto Corp.*, 342 Ga. App. 263, 272–73 (2017) (insurer estopped from denying coverage where it failed to timely and clearly reserve rights); *Lee v. Mercury Ins. Co. of Ga.*, 343 Ga. App. 729, 746–48 (2017) (issues of fact precluded summary judgment where insurer's prolonged silence and generic form letters, despite having sufficient information to deny coverage, could support estoppel based on delay and failure to communicate coverage position).

As stated, the IRS's settlement offer has been pending for nearly a year. Franklin Woods has repeatedly requested both a coverage determination and the Insurers' consent (or waiver thereof). The failure to respond meaningfully—by either consenting, denying, or stating any position at all—has placed the partnerships in an impossible situation. This refusal to provide clarity cannot be squared with the insurer's duty to act with the "same faithful consideration" it gives to its own interests. *Great Am. Ins. Co. v. Exum*, 123 Ga. App. 515, 519 (1971); *see also Hollis*, 554 So.2d at 391–92.

Moreover, it appears the Insurers may be withholding a formal coverage denial in order to avoid the legal consequence attached to such a denial. As recognized in *Piedmont Office Realty Trust, Inc. v. XL Specialty Ins. Co.*, "an insurer that denies coverage and refuses to defend an action against its insured . . . waives the provisions of the policy against a settlement by the insured and becomes bound to pay the amount of any settlement (within policy limits) made in good faith." 297 Ga. 38, 43 (2015) (quoting *S. Guar. Ins. Co. v. Dowse*, 278 Ga. 674, 676 (2004)). The *Piedmont* court enforced the consent-to-settle clause only because the insurer had not "wholly abandoned" the insured or denied coverage.

In this case, the Insurers' attempted refusal to take any position—despite full knowledge of the material facts and repeated direct requests—strongly suggests they are attempting to preserve a policy defense they might otherwise forfeit if they acted in good faith. Such gamesmanship is prohibited. The partnerships again demand that the Insurers provide a formal, written coverage position regarding the IRS settlement. Continued refusal will be cited as further evidence of bad faith and unreasonable delay.

## III.    Common Interest Agreement

As we have previously informed you in other matters, Franklin Woods and Franklin Partners are unable to enter into the draft common interest agreement that your firm provided for consideration. This draft agreement confirms the concerns that we have repeatedly raised on this issue. Specifically, the Insurers' express reservation of the right to disclose received information to third parties and to use received information in litigation against the insureds indicates that the parties likely do not have a sufficiently common interest to preserve attorney-client privilege and similar other protections following a voluntary disclosure. *See McKesson Corp. v. Green*, 597

Sarah Adam
Wilson Elser
August 8, 2025
Page 6

S.E.2d 447, 451 (Ga. App. 2004) (voluntary disclosure of work product to third party regulator with potential adversarial relationship constituted waiver).

Notwithstanding this fact, we reiterate that no information has been withheld from the Insurers based on claims of privilege or other protection. Moreover, as evidenced by your discussions with tax counsel in similarly situated cases, the lack of a common interest agreement is not a barrier to the Insurers' actually conducting an appropriate investigation into the reasonableness of an IRS settlement offer and providing their position with respect to the same. We accordingly reiterate our offer to assist in scheduling a time for you to speak with tax counsel in this matter to discuss this case, the current state of the law, and the reasonableness of the IRS settlement. Please provide dates over the next two weeks that would work for this call.

## IV.    Demand Regarding Notices and Policy Documents

We have repeatedly requested for confirmation that Volante Global, LTD, Volante International, LTD and Volante Specialty Risk, LLC (collectively, "Volante") provided notice to all Insurers regarding the start of the IRS proceeding and the issuance of the IRS settlement. We have further requested copies of any underlying policy in this matter that purport to affect the obligations of any Insurer. To date, we have not received a substantive response to these requests. This refusal is unreasonable, particularly considering Volante's representations. We accordingly reiterate the insureds' demands that the Insurers (i) confirm that each Insurer received notice of the IRS proceeding and the IRS settlement as required under the Policy, and (ii) provide copies of each underlying policy in this matter.

As stated above, the insureds demand that that the Insurers provide a written response to this letter or payment pursuant to the terms of the Policy by the close of business on September 8, 2025. Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

CC:    Peter J. Larkin (Peter.Larkin@wilsonelser.com)
       Michael O'Malley (Michael.O'Malley@wilsonelser.com)
       John Nail (jnail@bradley.com)

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

✤ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1704-3**
**Judge Philip C. Smith**
**SEP 22, 2025 01:40 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  <u>25CV-1704-3</u>

Franklin Woods Partners, LLC
Franklin Woods, LLC

_____
**PLAINTIFF**

                                                        **VS.**

Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____
**DEFENDANTS**

### SUMMONS

TO: FIDELIS UNDERWRITING LIMITED

   You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

     **D. Austin Bersinger**
     **Bradley Arant Boult Cummings LLP**
     **Promenade Tower**
     **1230 Peachtree Street NE, Suite 2100**
     **Atlanta, Georgia 30309**
     **abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

   If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 22nd day of September, 2025.**

     Clerk of Superior Court

_____
      Greg G. Allen, Clerk
      Forsyth County, Georgia

# IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

✦ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1704-3**
**Judge Philip C. Smith**
**SEP 22, 2025 01:40 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  25CV-1704-3

Franklin Woods Partners, LLC
Franklin Woods, LLC

_____

**PLAINTIFF**

**VS.**

Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____

**DEFENDANTS**

### SUMMONS

TO: VOLANTE SPECIALTY RISK, LLC

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **D. Austin Bersinger**
> **Bradley Arant Boult Cummings LLP**
> **Promenade Tower**
> **1230 Peachtree Street NE, Suite 2100**
> **Atlanta, Georgia 30309**
> **abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 22nd day of September, 2025.**

Clerk of Superior Court

_____

Greg G. Allen, Clerk
Forsyth County, Georgia

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

📧 EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1704-3**
**Judge Philip C. Smith**
SEP 29, 2025 02:53 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

Franklin Woods Partners, LLC,
Franklin Woods, LLC

        Plaintiff,

                                      CIVIL ACTION
                                      FILE NO.: 25CV-1704-3

v.

Fidelis Underwriting Limited,
Volante Specialty Risk, LLC,

        Defendants.

## AFFIDAVIT JEFF DOLBIER

On Wednesday September 24, 2025 at 12:15 p.m., I served true and correct copies of the SUMMONS and COMPLAINT upon Defendant Volante Specialty Risk, LLC's Registered Agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.  Ms. Alisha Smith, a CSC representative, accepted service.

This __25__ day of September, 2025

                                      Jeff Dolbier
                                      President, Flash Delivery Inc.

Sworn and Subscribed before
me this __25__ day of September, 2025

My Commission Expires: 06/26/2029

REBEKAH ROGERS
NOTARY
EXPIRES
GEORGIA
06-26-2029
PUBLIC
HENRY COUNTY